**GREBEN & ASSOCIATES**
1332 ANACAPA STREET, SUITE 110
SANTA BARBARA, CA 93101
TELEPHONE: (805) 963-9090
FACSIMILE: (805) 963-9098

Jan A. Greben, State Bar No. 103464
Jenna L. Motola, State Bar No. 246738
Attorneys for Plaintiff Wells Fargo Bank, N.A.,
as Trustee of the Clara Poppic Trust

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA-OAKLAND DIVISION

| | |
|---|---|
| WELLS FARGO BANK, N.A., as TRUSTEE for the CLARA POPPIC TRUST,<br><br>Plaintiff,<br><br>vs.<br><br>KENNETH G. RENZ; ESTATE OF JACKSON R. DENNISON; ESTATE OF WILEY UMSTEAD; KAZUKO UMSTEAD; WON JAE YI aka MICHAEL YI; NAN Y. PARK; GUAN HUANG; YING ZHANG and SUI SONG,<br><br>Defendants.<br><br>And Related Counterclaim. | **Case No. CV 08-02561 SBA**<br><br>COMPLAINT FILED:    5/21/08<br>TRIAL DATE:    None Set<br><br>**DECLARATION OF JENNA L. MOTOLA, ESQ. IN SUPPORT OF MOTION FOR LEAVE TO AMEND**<br><br>DATE: TUESDAY, NOVEMBER 4, 2008<br>TIME: 1:00 P.M.<br>COURTROOM: 3 |

I, Jenna L. Motola, declare:

1.    I am an attorney at law, duly licensed to practice before each superior court in the state of California and admitted to practice in the Northern District of California, and am an associate attorney with Greben & Associates, attorneys of record for Plaintiff Wells Fargo Bank, N.A., as Trustee of the Clara Poppic Trust ("Plaintiff"). I make this declaration based upon my own personal knowledge. If called to testify, I could and would competently testify to each

1

1  matter set forth herein.

2      2.    Attached as Exhibit A and incorporated herein by this reference is a copy of

3  Plaintiff's proposed Second Amended Complaint. The changes to the Second Amended

4  Complaint are highlighted in bold.

5      3.    On May 8, 2008, my firm sent Defendants a notice of violation of RCRA pursuant to

6  42 U.S.C. § 6972(b)(2)(A). A copy of this notice is attached hereto as Exhibit B, and

7  incorporated herein by this reference.

8      4.    Defendant Kenneth G. Renz received notice on May 15, 2008. A copy of the

9  Return Receipt is attached hereto as Exhibit C, and incorporated herein by this reference.

10     5.    Defendant Kazuko Umstead received notice on May 12, 2008. A copy of the

11 Return Receipt is attached hereto as Exhibit D, and incorporated herein by this reference.

12     6.    Defendant Won Jae Yi aka Michael Yi received notice on May 10, 2008. A copy

13 of the Return Receipt is attached hereto as Exhibit E, and incorporated herein by this reference.

14     7.    Defendant Sui Song received notice on May 10, 2008. A copy of the Return

15 Receipt is attached hereto as Exhibit F, and incorporated herein by this reference.

16     8.    Defendant Nan Y. Park received notice on May 23, 2008. A copy of the Return

17 Receipt is attached hereto as Exhibit G, and incorporated herein by this reference.

18     9.    Upon learning that the RCRA notice may have been sent to an incorrect address for

19 Guan Huang, on May 21, 2008 my office forwarded a copy of the RCRA notice to Guan Huang

20 to another address. A copy of this notice is attached hereto as Exhibit H, and incorporated herein

21 by this reference.

22     10.   Defendant Guan Huang received notice on May 24, 2008. A copy of the Return

23 Receipt is attached hereto as Exhibit I, and incorporated herein by this reference.

24     11.   Upon learning that the RCRA notice may have been sent to an incorrect address

25 for Ying Zhang, on June 20, 2008 my office forwarded a copy of the RCRA notice to Ying

26 Zhang to another address. A copy of this notice is attached hereto as Exhibit J, and incorporated

27 herein by this reference.

28     12.   The 90 day statutory period for all Defendants, except Ying Zhang, ended on

1  August 22, 2008.  Ying Zhang's 90 day statutory period will expire September 22, 2008 and

2  leave to add the RCRA claim against Ying Zhang is not sought in this motion.

3        13.    Pursuant to Judge Armstrong's Standing Orders, Order No. 5, on August 8, 2008, I

4  sent a letter to the attorneys for all parties who have appeared in this action and to Won Jae Yi,

5  who has appeared *pro se*, regarding my firm's intention to file a motion to amend, and requesting

6  that the Defendants meet and confer.  Attached as Exhibit K. and incorporated herein by this

7  reference, is a copy of this letter.

8        14.    On August 12, 2008, I received a phone call from Karl Morthole, counsel for Guan

9  Huang.  Mr. Morthole indicated that he did not intend to oppose this motion.  No other counsel

10  or *pro se* party have responded to my effort to meet and confer.

11

12        I declare under penalty of perjury under the laws of the United States that the foregoing is

13  true and correct.  Executed on August 26, 2008, in Santa Barbara, California.

14

15                                         JENNA L. MOTOLA

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JENNA L. MOTOLA, ESQ. IN SUPPORT OF MOTION FOR LEAVE TO AMEND
CASE NO. CV 08-02561 SBA

# EXHIBIT A

to Declaration of Jenna Motola, Esq.
In Support of Motion for Leave to Amend

**GREBEN & ASSOCIATES**
1332 ANACAPA STREET, SUITE 110
SANTA BARBARA, CA 93101
TELEPHONE: (805) 963-9090
FACSIMILE: (805) 963-9098

Jan A. Greben, State Bar No. 103464
Jenna L. Motola, State Bar No. 246738
Attorneys for Plaintiff Wells Fargo Bank, N.A.,
as Trustee of the Clara Poppic Trust

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA-OAKLAND DIVISION

| | |
|---|---|
| WELLS FARGO BANK, N.A., as TRUSTEE for the CLARA POPPIC TRUST, <br><br> Plaintiff, <br><br> vs. <br><br> KENNETH G. RENZ; ESTATE OF JACKSON R. DENNISON; ESTATE OF WILEY UMSTEAD; KAZUKO UMSTEAD; WON JAE YI aka MICHAEL YI; NAN Y. PARK; GUAN HUANG; YING ZHANG and SUI SONG, <br><br> Defendants. | **Case No. CV 08-02561 SBA** <br><br> COMPLAINT FILED:    5/21/08 <br> TRIAL DATE:    None Set <br><br> **[PROPOSED] SECOND AMENDED COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

WELLS FARGO BANK, N.A, as TRUSTEE for the CLARA POPPIC TRUST (

"Plaintiff") hereby alleges as follows:

**JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT**

1. Plaintiff's claims against defendants Kenneth G. Renz; Estate of Jackson R.

Dennison; Estate of Wiley Umstead; Kazuko Umstead; Won Jae Yi aka Michael Yi; Nan Y.

Park; Guan Huang; Ying Zhang and Sui Song (hereinafter collectively referred to as

"Defendants") arise out of environmental contamination at and around 2531 Telegraph Avenue,

in Berkeley, California ("the Property").

2. This action primarily arises under the federal Comprehensive Environmental

1

1     Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq **and the**

2     **Federal Resource Conservation and Recovery Act ("RCRA") 42 U.S.C. § 6972(a)(1)(B).**

3     This Court therefore has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

4     §§ 1331, 2202, 42 U.S.C. §§ 9607, 9613, **RCRA § 7002(a) and (b)** and Federal Rules of the

5     Civil Procedure Rule 57. This Court has supplemental jurisdiction of the state claims asserted in

6     this action pursuant to 28 U.S.C. § 1367. The federal and state claims alleged herein are based

7     on the same set of operative facts. Judicial economy, convenience, and fairness to the parties

8     will result if this Court assumes and exercises jurisdiction over the state claims. This Court has

9     jurisdiction over the subject matter of these claims under the provisions of 42 U.S.C. § 9607; 42

10     U.S.C. 6972(a) and 28 U.S.C. § 1367(a).

11         3.    Venue is proper under the provisions of 28 U.S.C. § 1391(b) and 42 U.S.C. §§ 9613,

12     6972(a) because the claims stated herein arose in this district. Intradistrict assignment is proper

13     in this Court under the local rules as the property that is the subject matter of this action and a

14     substantial portion of the events or omissions giving rise to these claims occurred in this judicial

15     district in Alameda County.

16                     **THE PARTIES**

17         4.   Plaintiff WELLS FARGO BANK, N.A, as TRUSTEE for the CLARA POPPIC

18     TRUST is a national association.

19         5.   Defendant Kenneth G. Renz is a natural person residing in the State of California.

20         6.   Defendant Estate of Jackson R. Dennison on information and belief, is an estate

21     existing in the State of California.

22         7.   Defendant Estate of Wiley Umstead, on information and belief, is an estate existing in

23     the State of California.

24         8.   Defendant Kazuko Umstead is a natural person residing in the State of California.

25         9.   Defendant Won Jae Yi, otherwise known as Michael Yi, is a natural person residing

26     in the State of California.

27         10.   Defendant Nan Y. Park is a natural person residing in the State of California.

28         11.   Defendant Guan Huang is a natural person residing in the State of California.

1      12.  Defendant Ying Zhang is a natural person residing in the State of California.

2      13.  Defendant Sui Song is a natural person residing in the State of California.

3                              **GENERAL ALLEGATIONS**

4      14.  Plaintiff is informed and believes, and thereon alleges, that defendants Kenneth G.

5  Renz and non party Jackson R. Dennison operated a dry cleaning business at the Property from

6  on or about **March 1971** until on or about 1983. Mr. Dennison is deceased, and his Estate is

7  named as a Defendant.

8      15.  Plaintiff is informed and believes, and thereon alleges, that non party Wiley Umstead

9  and Defendant Kazuko Umstead (collectively "the Umsteads") operated a dry cleaning business

10  at the Property from on or about 1983 until on or about August 1986. Wiley Umstead is

11  deceased, and his Estate is named as a Defendant.

12      16.  Plaintiff is informed and believes, and thereon alleges, that defendant Won Jae Yi,

13  otherwise known as Michael Yi, operated a dry cleaning business at the Property from on or

14  about August 1986 until on or about November 1999.

15      17.  Plaintiff is informed and believes, and thereon alleges, that defendant Nan Y. Park,

16  operated a dry cleaning business at the Property from on or about November 1999 until on or

17  about April 2004.

18      18.  Plaintiff is informed and believes, and thereon alleges, that defendants Guan Huang,

19  Ying Zhang, Sui Song operated a dry cleaning business at the Property from on or about April

20  2004 until on or about February 2008.

21      19.  Plaintiff is the trustee for the Clara Poppic Trust ("Poppic Trust"). The Poppic Trust

22  has owned the Property at all times relevant to this Complaint.

23      20.  Plaintiff is informed and believes, and thereon alleges, that Defendants, and each of

24  them, during their occupancies of the Property, caused or permitted the release of

25  tetrachlorethylene ("PCE") and other dry-cleaning chemicals into the environment.

26      21.  As a direct and proximate result of Defendants' conduct and failure to act, the

27  condition of the Property was such that it resulted in the release of hazardous substances onto the

28  properties, and surrounding properties, soils, and groundwater. The Plaintiff first discovered

<div align="center">3</div>

1   after September 2006 the existence of contamination in soil and groundwater in and around the

2   Property, of which the claims in this Complaint stem from.  **Plaintiff did not know, nor had**

3   **any reason to know, before September 2006, of the existence of the contamination and**

4   **injury to Plaintiff.**

5                          **FIRST CLAIM FOR RELIEF**

6                      (Cost Recovery Pursuant to CERCLA § 107(a))

7        22.    Plaintiff realleges and incorporates by reference the allegations contained in

8   Paragraphs 1 through 21 as though fully set forth herein.

9        23.    The Property is a "facility" within the meaning of section 101(9) of CERCLA, 42

10  U.S.C. § 9601(9). The contaminants located in the soil and ground water at, on, or under the

11  Property, including but not limited to PCE, are "hazardous substances" within the meaning of 42

12  U.S.C. § 9601(14).

13       24.    Each Defendant is a liable or potentially liable person within the meaning of

14  section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

15       25.    Under Section 107 of CERLCLA, 42 U.S.C. § 9607, Plaintiff seeks recovery of

16  necessary costs of responses and payment from Defendants, and each of them, for Plaintiff's

17  outlays of all past, present, and future necessary response costs incurred in response to the release

18  of hazardous substances at or affecting the Property or surrounding properties.  The release and

19  disposal of the hazardous substances in continuing in nature.

20       26.   Defendants, and each of them, are the past and current operators of the Property.

21  Defendants, and each of them, are the past and current arrangers of the past and continued

22  disposal and release of hazardous substances into the soil, groundwater and environment.

23  Defendants, and each of them, are liable for the contamination pursuant to 42 U.S.C. § 9607(a).

24       27.    Plaintiff has incurred, and will continue to incur, necessary response costs,

25  including costs of investigation, removal and/or remedial actions in the investigation, clean up

26  and abatement of the releases and threatened releases of hazardous substances from Defendants'

27  operations and activities at the Property.   All of the necessary responses costs incurred and to be

28  incurred by Plaintiff are a result of the contamination of the Property and surrounding properties,

1   caused by Defendants.

2        28.  All costs incurred, and to be incurred, by Plaintiff are necessary costs of response

3   consistent with the provisions of CERCLA and the National Contingency Plan.

4        29.  Plaintiff continues to incur response costs and other costs in connection with the

5   investigation and remediation of the Property.  There has been no completion of a removal

6   action.

7        30.  Defendants, and each of them, are jointly and severally liable to Plaintiff pursuant to

8   42 U.S.C. § 9607 for all of the past, present and future necessary costs of response including

9   without limitations, investigation and remediation expenses, attorneys' fees, oversight costs and

10   interest, in an amount to be determined at trial.

11        31.  Pursuant to 42 U.S.C. § 9613(g)(2), Plaintiff is entitled to a declaratory judgment that

12   Defendants, and each of them, are liable in any subsequent action by Plaintiff to recover further

13   responses costs or damages incurred as a result of hazardous substances at and around the

14   Property.

15                             **SECOND CLAIM FOR RELIEF**

16                      (Hazardous Substance Statutory Indemnity)

17        32.    Plaintiff realleges and incorporates by reference the allegations contained in

18   Paragraphs 1 through 31 as though fully set forth herein.

19        33.    The Carpenter-Presley-Tanner Hazardous Substance Account Act, California

20   Health & Safety Code Sections 25300, 25395 (hereinafter the "HSAA") was enacted to

21   encourage expedient clean-up of contaminated properties.  To provide such encouragement, the

22   legislature included the statutory right of indemnification for those parties who incur response

23   costs and those parties who are responsible for the contamination.  The responsible parties are

24   similar to those under CERCLA and include owners and operators of the facilities at the time the

25   alleged hazardous substance is allegedly discharged into the environment for such facility as well

26   as the arrangers of the disposal of hazardous substances.

27        34.    Plaintiff has and will continue to incur costs arising from the hazardous substance

28   contamination of the soil and groundwater in and around the Property.

35.    Defendants, and each of them, are liable persons under the HSAA due to their status as either owners of the property or arrangers of the disposal and discharge of hazardous substances on account of said Defendants' actual and direct control of the method of disposal of PCE on the Property, and such liability has not previously been discharged pursuant to any state apportionment proceeding. Plaintiff is entitled to indemnification and contribution from Defendants, in whole or in part, based upon California Health & Safety Code Section 25363(e).

**THIRD CLAIM FOR RELIEF**

(Equitable Indemnity)

36.    Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 35 as though fully set forth herein.

37.    In the event liability should be established in this action or in any administrative or regulatory action based on the contamination alleged in this action, whose liability is expressly denied, Plaintiff alleges on information and belief that such liability will arise wholly or partly by reason of the conduct of Defendants, and/or that Defendants are jointly liable for said liability. Defendants, and each of them, are therefore, bound and obligated to defend, indemnify and hold harmless Plaintiff from and against any and all claims, losses, damages, attorneys' fees, judgments and settlement expenses incurred, or to be incurred, in this action by Plaintiff.

38.    Plaintiff intends this complaint to be notification to Defendants that Plaintiff hereby tenders to them the obligation to defend Plaintiff.

39.    Plaintiff has necessarily retained legal counsel at Plaintiff's sole cost and expense and to prepare, file and prosecute the claims as set forth herein.  Plaintiff has incurred, and will continue to incur, liability for attorneys' fees and costs and, in the prosecution of these claims, a sum which is presently not ascertained but will be proven at trial.

40.    Plaintiff is entitled to indemnity from Defendants for all such monies expended and to be expended by Plaintiff to remedy the contamination on, underneath and surrounding the Property, and for all other damages incurred by Plaintiff.

**FOURTH CLAIM FOR RELIEF**

(Declaratory Relief)

6

41.    Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 40 as though fully set forth herein.

42.    A determination of the proportionate degree of liability, if any, of Plaintiff, on the one hand, and Defendants, on the other, is necessary to protect the rights of Plaintiff.

43.    An actual controversy has arisen and now exists relating to the legal rights and duties of Plaintiff and Defendants, and each of them, for which Plaintiff desires a declaration of its rights and indemnification, in which Plaintiff contends, and Plaintiff is informed and believes, that Defendants deny, the following:

A.    That as between these parties, the responsibility, if any, for the damages claimed by Plaintiff rests entirely on Defendants;

B.    That as a result, Defendants are obligated to partially indemnify or fully indemnify Plaintiff for sums that Plaintiff may be held to pay as a result of any damages, judgments, settlement or other awards recovered against Plaintiff by the federal or state government or private party as a result of the toxic chemical contamination of the Property, properties near and adjacent properties including, but not limited to, surface and subsurface soil and water; and

C.    Plaintiff is informed and believes that Defendants deny any such liability.

44.    Plaintiff is entitled to, and hereby request, a judicial determination of Plaintiff's rights, indemnification and contribution, any declaration that Defendants and/or others, and not Plaintiff, are liable for all of the costs incurred, and to be incurred to remove, clean-up and remediate the alleged hazardous substance contamination of the soil and groundwater in and around the Property.

## FIFTH CLAIM FOR RELIEF

(Porter-Cologne Statutory Contribution)

45.    Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 44 as though fully set forth herein.

46.    The Porter-Cologne Act provides for statutory contribution to those persons who become liable for the investigation, clean-up and remediation of hazardous substance

7

1  contamination to groundwater. To the extent Plaintiff incurs costs and expenses in response to

2  the alleged hazardous substance contamination of the soil and groundwater in and around the

3  Property, Plaintiff is statutorily entitled to contribution pursuant to Water Code Section 13350(i)

4  and hereby request contribution and indemnification pursuant to that section as against

5  Defendants.

6                          **SIXTH CLAIM FOR RELIEF**

7                          (Continuing Private Nuisance)

8        47.    Plaintiff realleges and incorporates by reference the allegations contained in

9  Paragraphs 1 through 46, as though fully set forth herein.

10       48.    Defendants, and each of them, caused or permitted the contamination alleged in

11  this action by their negligence, intentional or otherwise, actionable acts and/or omissions, as

12  described herein.

13       49.    The contamination constitutes a nuisance within the meaning of Section 3479 of

14  California Civil Code. Defendants, and each of them, have interfered with Plaintiff's right to

15  quiet enjoyment of the Property.

16       50.    Plaintiff is informed and believes, and on that basis alleges, that the contamination

17  is continuing and abatable.

18       51.    As a direct and proximate result of the nuisance, Plaintiff has been and will be

19  damaged by incurring costs to respond to the alleged hazardous substance contamination in and

20  around the Property in an amount to be established at trial. Plaintiff has been and will be

21  damaged by loss of use, constructive eviction of and from the Property, and any loss in value of

22  the Property.

23                        **SEVENTH CLAIM FOR RELIEF**

24                          (Continuing Public Nuisance)

25       52.    Plaintiff realleges and incorporates by reference the allegations contained in

26  Paragraphs 1 through 51 as though fully set forth herein.

27       53.    The contamination on and about the Property constitutes a public nuisance within

28  the meaning of California Water Code Section 13050(m), and California Civil Code Sections

1 | 3479 and 3480.

2 |     54.   Plaintiff is informed and believes, and on that basis alleges, that the contamination

3 | is continuing and abatable.

4 |     55.   As a direct and proximate result of Defendants' actions and activities, Plaintiff has

5 | been, and will be, damaged by incurring costs to respond to the alleged hazardous substance

6 | contamination in and around the Property in an amount to be established at trial.

7 |     56.   Plaintiff has suffered, and will continue to suffer, harm that is different from the

8 | type of harm suffered by the general public as a result of the public nuisance, as alleged herein,

9 | because Plaintiff's property has been damaged, Plaintiff has been required to respond to the

10 | contamination and the contamination has interfered with Plaintiff's right to quiet enjoyment of

11 | the Property.

12 | **EIGHTH CLAIM FOR RELIEF**

13 | (Public Nuisance Per Se)

14 |     57.   Plaintiff realleges and incorporates by reference the allegations contained in

15 | Paragraphs 1 through 56 as though fully set forth herein.

16 |     58.   Plaintiff alleges that the conduct of Defendants, and each of them, which has

17 | resulted in contamination of soil and groundwater on and about the Property, and surrounding

18 | properties, and constitutes a public nuisance, is a violation of California Water Code Sections

19 | 13050(m), 13304, 13350, and 13387, and California Health & Safety Code sections 5411,

20 | 5411.5, and 117555, the purposes of which are to set a standard of care or conduct to protect

21 | Plaintiff, and all persons and property of the general public at large, as well as the environment,

22 | from the type of conduct engaged in by Defendants, and each of them. Therefore, such improper

23 | activities and violations constitute a public nuisance *per se*.

24 |     59.   Defendants, and each of them, have failed to comply with the state law as detailed

25 | above. Plaintiff has sustained special injury as a result of this public nuisance, as the

26 | contamination has interfered with Plaintiff's right to quiet enjoyment of the Property, as

27 | described herein. As a further direct and proximate cause of the public nuisance *per se* created

28 | by Defendants, and each of them, Plaintiff has suffered damages as previously described herein,

9

SECOND AMENDED COMPLAINT
Case No. CV 08-02561 SBA

1    including other consequential, incidental, and general damages to be proven at trial. Plaintiff

2    seeks abatement of the public nuisance, and all other legally available costs and damages.

3                                **NINTH CLAIM FOR RELIEF**

4                                        (Negligence)

5        60.    Plaintiff realleges and incorporates by reference the allegations contained in

6    Paragraphs 1 through 59 as though fully set forth herein.

7        61.    Plaintiff is informed and believes, and thereon alleges, that during Defendants

8    ownership and occupancy, releases of PCE have occurred, resulting in contamination at the

9    Property.  Some of the releases, including sudden and accidental releases, are attributable to

10   Defendants' negligence in failing to properly operate, maintain, repair, and manage dry-cleaning

11   equipment and the failing to property handle and dispose of PCE and other hazardous substances

12   to avoid the release of hazardous substances into the environment.

13       62.    Defendants, and each of them, breached their duty by negligently causing,

14   permitting and/or contributing to contamination at the Property, surrounding properties, soils and

15   groundwater.

16       63.    As a proximate result of Defendants' negligence, Plaintiff has suffered damages

17   including, but not limited to, damage and harm to Plaintiff's property, response costs incurred

18   and to be incurred in the future to properly respond to the alleged hazardous substance

19   contamination in and around the Property, and related properties.  Such costs also include

20   attorneys' fees and consultants' fees incurred as a direct and proximate result of said negligence.

21                                **TENTH CLAIM FOR RELIEF**

22                                      (Negligence Per Se)

23       64.    Plaintiff realleges and incorporates by reference the allegations contained in

24   Paragraphs 1 through 63 as though fully set forth herein.

25       65.    The foregoing acts and/or omissions attributed to Defendants, and each of them,

26   herein violate California Civil Code Sections 3281-3282; California Health & Safety Code

27   Sections 5411, et seq.; California Water Code Sections 13000, et seq.; and Fish & Game Code

28   Sections 5650, et seq.

1    66.    Defendants, and each of them, have failed to comply with the state law as detailed

2    above.  Plaintiff has sustained injury as a result of Defendants' negligent conduct, including

3    investigative costs, attorneys' fees, and other costs, as described herein.  As a further direct and

4    proximate cause of the negligence per se by Defendants, and each of them, Plaintiff has suffered

5    damages as previously described herein, including other consequential, incidental, and general

6    damages to be proven at trial.

7                            **ELEVENTH CLAIM FOR RELIEF**

8                     (Breach of Lease/Contract-Against **All** Defendants)

9    67.    Plaintiff realleges and incorporates by reference the allegations contained in

10   Paragraphs 1 through 66 as though fully set forth herein.

11   68.    Plaintiff is owner of the Property and at all times relevant herein, leased the Property

12   to Defendants **Kenneth G. Renz, Estate of Jackson R. Dennison, Estate of Wiley Umstead,**

13   **Kazuko Umstead,** Won Jae Yi a.k.a. Michael Yi, Nan Y. Park, Guan Huang, Ying Zhang, and

14   Sui Song, under a series of leases, lease amendments and assignments.  Attached hereto to this

15   complaint as Exhibits A through **K**, inclusive, and incorporated by this reference are copies of

16   the relevant leases, amendments and assignments.

17   69. As lessees, Defendants, and each of them, breached said leases by, maintaining the

18   Property, or failing to maintain the Property, including but not limited to the commonly used

19   areas and facilities of the Property over which Plaintiff had no control or duty, in such a manner

20   as to cause hazardous substances to be released from the Property's, and into the soil and

21   groundwater.  Defendants, and each of them, breached said leases by failing to obtain and

22   maintain liability insurance as required by the leases.

23   70.    Said conduct by Defendants, are breaches of the leases, including but not limited to

24   the general covenants of good faith and fair dealing and quiet enjoyment, but also including, but

25   not limited to, lessees' obligations under the leases to operate, maintain, and repair the Property,

26   including commonly used areas, common facilities, utilities, and accommodation areas, as

27   defined in the lease, over which Plaintiff had no control or duty, in such a manner as to not cause

28   hazardous substance contamination.

1     71.   Pursuant to the leases, Plaintiff is entitled to attorneys' fees and costs incurred

2  herein.

3     72.   As a direct and proximate result and cause of Defendants' breaches of the leases,

4  Plaintiff has been injured and damaged, including incurring attorneys fees and costs, in an

5  amount to be proven at trial, but in excess of the jurisdictional limits of this court.

6                  **TWELFTH CLAIM FOR RELIEF**

7             (Express Contractual Indemnity-Against **All** Defendants)

8     73.   Plaintiff realleges and incorporates by reference the allegations contained in

9  Paragraphs 1 through 72 as though fully set forth herein.

10     74.   Pursuant to the leases, attached hereto and incorporated by this reference,

11  Defendants **Kenneth G. Renz, Estate of Jackson R. Dennison, Estate of Wiley Umstead,**

12  **Kazuko Umstead,** Won Jae Yi a.k.a. Michael Yi, Nan Y. Park, Guan Huang, Ying Zhang, and

13  Sui Song agreed to indemnify and hold Plaintiff harmless from any and all claims, damages,

14  injuries and liabilities arising from or connected with the operation of the business by

15  Defendants.

16     75.   By way of this Complaint, Plaintiff hereby notifies Defendants of their obligation to

17  defend and indemnify Plaintiff against any claims in this action, any claims by regulatory

18  agencies and any claims arising in the future regarding the Property.

19     76.   Plaintiff is informed and believes and thereon alleges that any of Plaintiff's damages,

20  or any damages to any other party relating to the Property, if any, were directly and proximately

21  caused and contributed to by the sole fault, and/or negligence, and/or strict liability and/or other

22  actionable conduct of Defendants, and in breaching such terms and warranties in their

23  agreements with Plaintiff.

24     77.   Plaintiff has been compelled to incur attorneys' fees, investigative, court, and other

25  costs to protect itself in said litigation, and have, therefore, been damaged as a result of the

26  breaches of Defendants of their respective duties and obligations under the contracts which

27  oblige Defendants to indemnify Plaintiff for the full amount or some proportionate share, of

28  any damages, which any regulatory agency or any other party may recover against Plaintiff. This

1    amount is not known.

2        78.   These claims arise out of the agreements, attached to this Complaint, between

3    Plaintiff and Defendants.   Pursuant to these agreements, Plaintiff is entitled to attorneys' fees

4    and court costs, in prosecuting this action.

5    <div align="center">**THIRTEENTH CLAIM FOR RELIEF**</div>

6    <div align="center">(Waste)</div>

7        79.   Plaintiff realleges and incorporates by reference the allegations contained in

8    Paragraphs 1 through 78 as though fully set forth herein.

9        80.   Plaintiff has an interest in the Property as owner of the Property.

10        81.   During their occupancy of the Property, Defendants have committed waste upon the

11    Property by contaminating the Property with hazardous substances and failing to remediate the

12    contamination.

13        82.   As a direct and proximate result of said waste, Plaintiff has been damaged in an

14    amount to be proven at trial for the damage to the real property, the loss of use of the Property,

15    and other damages described herein.

16    <div align="center">**FOURTEENTH CLAIM FOR RELIEF**</div>

17    <div align="center">(Continuing Trespass)</div>

18        83.   Plaintiff realleges and incorporates by reference the allegations contained in

19    Paragraphs 1 through 82 as though fully set forth herein.

20        84.   The foregoing acts and omissions of Defendants constitute a continuing trespass on

21    the Property.

22        85.   Defendants, have trespassed and are trespassing on Plaintiff's Property by

23    contaminating the soil and groundwater and/or by contributing to said contamination.

24        86.   Said contamination occurred as a result of the negligent and/or intentional conduct

25    of the Defendants, and each of them, and/or as a result of conduct which constitutes an

26    ultra-hazardous activity.

27        87.   As a direct and proximate result of said trespass, Plaintiff has been damaged in an

28    amount to be proven at trial.

<div align="center">13</div>

<div align="center">SECOND AMENDED COMPLAINT<br>Case No. CV 08-02561 SBA</div>

1

2                          **FIFTEENTH CLAIM FOR RELIEF**

3      (RCRA, 42 U.S.C. § 6972(a)(1)(B)-Against Kenneth G. Renz, Estate of Jackson R.

4      Dennison, Estate of Wiley Umstead, Kazuko Umstead, Won Jae Yi a.k.a. Michael Yi, and

5                                   Guan Huang )

6          88.    Plaintiff realleges and incorporates by reference the allegations contained in

7      Paragraphs 1 through 87 as though fully set forth herein.

8          89.    Pursuant to 42 U.S.C. § 6972(b)(2)(A), on May 8, 2008, Plaintiff duly notified

9      Defendants, the Administrator of the United States Environmental Protection Agency

10     ("USEPA"), the Regional Administrator of the USEPA, the Executive Director of State

11     Water Resources Control Board; the Executive Director of California Integrated Waste

12     Management Board; and the Director of California Department of Toxic Substances

13     Control, of the contamination at the Property and of Plaintiff's intent to bring this suit

14     against Defendants.  A true and correct copy of such notice is attached hereto as Exhibit

15     "H", and incorporated herein by this reference.

16         90.    On May 21, 2008, Plaintiff forwarded the RCRA notice to Defendant Guan

17     Huang. A true and correct copy of such notice is attached hereto as Exhibit "I", and

18     incorporated herein by this reference.

19         91.    Plaintiffs instituted this action more than ninety (90) days after mailing of

20     notice on Defendants and others.

21         92.    Plaintiffs duly served a copy of this Complaint on the United States Attorney

22     General and the Administrator of the USEPA by registered mail.

23         93.    This action against Defendants Kenneth G. Renz, Estate of Jackson R.

24     Dennison, Estate of Wiley Umstead, Kazuko Umstead, Won Jae Yi a.k.a. Michael Yi, and

25     Guan Huang (collectively "RCRA Defendants") is brought pursuant to the Citizen Suit

26     provisions of RCRA, 42 U.S.C. § 6972(a)(1)(B) et seq. and the applicable regulations

27     thereunder, as such parts were in effect at the appropriate times.

28         94.    The PCE used and disposed of by RCRA Defendants at, around and adjacent

                                              14

                                SECOND AMENDED COMPLAINT
                                Case No. CV 08-02561 SBA

1    to the Property is a "hazardous waste" within the meaning of RCRA, 42 U.S.C. § 9603(5).

2        95.   RCRA section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), provides that any

3    person may commence a civil action on its own behalf for appropriate relief against any

4    person who is a "past or present generator, past or present transporter, or past or present

5    owner or operator of a treatment, storage, or disposal facility, who has contributed or who

6    is contributing to the past or present handling, storage, treatment, transportation, or

7    disposal of any solid or hazardous waste which may present an imminent and substantial

8    endangerment to health or the environment."

9        96.   Plaintiff is informed and believes, and on that basis alleges, that the primary

10   cause of the releases of hazardous wastes at the Property was a result of RCRA

11   Defendants' disposal, handling, transportation, release and/or abandonment of hazardous

12   waste.

13       97.   RCRA Defendants discharged and permitted the discharge of PCE to the soil

14   and groundwater by their operation of dry cleaning machinery at the Property, their use

15   and disposal of chlorinated solvents, and their operation and control of the disposal and

16   sewer systems at the Property.

17       98.   As owners and operators of the dry cleaning facility, operators of the Property

18   and the sewer system at the Property, RCRA Defendants are past and present generators,

19   past and present transporters, and past and present operators of a treatment, storage

20   and/or disposal facility.

21       99.   RCRA Defendants have knowingly contributed and are contributing to the past

22   and present handling, storage, treatment transportation and disposal of solid and

23   hazardous waste which presents an imminent and substantial endangerment to human

24   health and the environment.  The endangerment caused by RCRA Defendants has been

25   ongoing since 1971 and is continuing in nature.

26       100.  The discharge and threatened discharge of contaminants has unreasonably

27   affected water quality in that the discharge or threatened discharge is deleterious to the

28   beneficial uses of state waters, and has impaired water quality to a degree which creates a

15

SECOND AMENDED COMPLAINT
Case No. CV 08-02561 SBA

1    threat to public health. The conditions threaten to continue unless the discharge or

2    threatened discharge is permanently cleaned up and abated.

3         101. Plaintiff is informed and believe, and on that basis alleges, that the hazardous

4    waste contamination resulting from RCRA Defendants disposal, handling, transportation,

5    release and/or abandonment of hazardous waste, as detailed above, presents an imminent

6    and substantial endangerment to health and/or the environment as hazardous wastes have

7    infiltrated to the soil and groundwater in and around the Property. The impact of the

8    pollution on the environment has already occurred and is substantial because significant

9    quantities of toxic substances have been released into the soil and groundwater and have

10   impaired the beneficial use of the groundwater beneath the Property.

11        102. Plaintiff seeks injunctive relief under RCRA ordering RCRA Defendants to

12   take such action as may be necessary to address and abate the contamination at the

13   Property, including without limitation: to comply with any and all requirements of cleanup

14   and abatement orders; expend funds to further investigate, test, assess, study, monitor, and

15   remediate the contamination at the Property through the issuance of a "no further action"

16   letter or other similar letter or documents indicating that the Site has been remediated.

17        103. Pursuant to 42 U.S.C. 6972(e), Plaintiff seeks an award of the costs of this

18   litigation, including reasonable attorneys' fees and consultants fees, including such fees to

19   monitor RCRA Defendant's compliance with any orders or judgment issued by this Court.

20                          **SIXTEENTH CLAIM FOR RELIEF**

21   **(Contribution Pursuant to CERCLA § 113(f)- Against Kenneth G. Renz, Estate of Jackson**

22   **R. Dennison, Estate of Wiley Umstead, Kazuko Umstead, Won Jae Yi a.k.a. Michael Yi,**

23                              **and Guan Huang)**

24        104. Plaintiff realleges and incorporates by reference the allegations contained in

25   Paragraphs 1 through 103 as though fully set forth herein.

26        105. Defendant Guan Huang has brought a claim under CERCLA § 107(a) against

27   Plaintiff alleging that Plaintiff is liable for response costs allegedly incurred by Guan

28   Hunag. Plaintiff has denied any and all liability under such claims. However, if Plaintiff is

                                      16
                          ─────────────────────────
                          SECOND AMENDED COMPLAINT
                          Case No. CV 08-02561 SBA

1  found to be liable under CERCLA, Defendants Kenneth G. Renz, Estate of Jackson R.

2  Dennison, Estate of Wiley Umstead, Kazuko Umstead, Won Jae Yi a.k.a. Michael Yi, and

3  Guan Huang (collectively "CERCLA § 113 Defendants"), and each of them, are liable to

4  Plaintiff for their acts or omissions.

5        106.  If the allegations in Guan Huang's counterclaim are true, then CERCLA §

6  113 Defendants, and each of them, are owners, operators, arrangers, and/or transporters as

7  described in CERCLA (42 U.S.C. § 9607(a)).

8        107.  If the allegations in Guan Huang's counterclaim are true, then CERCLA §

9  113 Defendants, and each of them, are liable under CERLCA, and Plaintiff is entitled to

10  contribution from CERCLA § 113 Defendants toward any damages, costs, expenses,

11  judgments, settlement sums, or penalties that Plaintiff may be required to pay.

12

13  <center>**PRAYER FOR RELIEF**</center>

14      **WHEREFORE**, Plaintiff prays to this Court for the following relief:

15      1.    For recovery and contribution from Defendants, and each of them, of all response

16  costs incurred, and to be incurred by Plaintiff, in response to the alleged release of hazardous

17  substances in and around the Property according to proof at trial;

18      2.    For damages against Defendants, jointly and severally, in an amount equal to all

19  response costs and all other costs incurred in investigating, removing, cleaning up and

20  remediating the alleged hazardous substance contamination in an amount according to proof at

21  trial;

22      3.    For compensatory damages according to proof including;

23      4.    For incidental and consequential damages according to proof;

24      5.    For a permanent injunction requiring Defendants to investigate and remediate

25          contamination on and around the Property;

26      6.    For prejudgment interest at the legal rate;

27      7.    For attorneys' fees pursuant to the relevant leases against Defendants;

28      8.    **For injunctive relief pursuant 42 U.S.C. 6972 ordering RCRA Defendants to**

<center>17</center>

1    take such action as may be necessary to address and abate the contamination

2    at the Property;

3    8.    For attorneys' fees and consultants' fees and costs pursuant to 42 U.S.C.

4    6972(e) against the RCRA Defendants;

5    9.    For consultants' fees and costs;

6    10.    For a declaration that Defendants, and each of them, are jointly and severally

7    liable for abating the nuisance on the Property;

8    11.    For recoverable costs; and

9    12.    For such other and further relief as this Court deems just and proper.

10

11    **<u>DEMAND FOR JURY TRIAL</u>**

12    Under Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury

13    on all issues so triable.

14

15    Dated: _____, 2008        GREBEN & ASSOCIATES

16

17    _____

18    JAN A. GREBEN
     JENNA L. MOTOLA
19    Plaintiff Wells Fargo Bank, N.A.,
     as Trustee of the Clara Poppic Trust
20

21

22

23

24

25

26

27

28

18

EXHIBIT "A"

THIS IS MORE THAN A RECEIPT
FOR MONEY OR PRELIMINARY
MEMORANDUM. IT WILL AFFECT
YOUR LEGAL RIGHTS. READ IT
CAREFULLY.

# LEASE — GENERAL FORM

**This Lease,** executed in duplicate at      Oakland     , California, this   19th

**PARTIES**    day of    August     , 19 74 , by and between     HENRY POPPIC, EXECUTOR FOR THE
ESTATE OF CLARA POPPIC

and    KENNETH G. RENZ and JACKSON R. DENNISON

hereinafter called respectively Lessor and Lessee, without regard to number or gender.

**USE**      WITNESSETH: That Lessor hereby leases to Lessee, and Lessee hires from Lessor, for the purpose of conducting therein   a coin-operated launderette and dry cleaning establishment

**PREMISES**    and for no other purpose, those certain premises with the appurtenances, situated in   The City of Berkeley,
County of Alameda      , State of California, and more particularly described as follows, to-wit:

A portion of that certain single-story commercial store building located on the easterly line of Telegraph Avenue, approximately 305 feet southerly from the south line of Dwight Way- and more specifically described as the northern most two stores in said building, being stores #1 and #2, and having frontage on Telegraph Avenue of approximately 47 feet and an approximate depth of 66 feet, and known as <u>2529</u> <u>Telegraph Avenue.</u>

**TERM**      The term shall be for    ten  ·(10)      years, commencing on the   1st    day of
November    , 19 74 and ending on the 31st   day of   October    , 1984 , at the total rent or sum of
ONE HUNDRED THIRTY TWO THOUSAND AND NO/100——————————($ 132,000.00   ) Dollars,
lawful money of the United States of America, which Lessee agrees to pay to Lessor, without deduction or offset,
at such place or places as may be designated from time to time by Lessor, in installments as follows:

**RENTAL**

$1,100.00    on and in consideration of the execution and delivery of this lease,
receipt of which is hereby acknowledged by Lessor, as first month's rent;

$1,200.00    thereof on the first day of December, 1974, and

$1,100.00    thereof on the first day of each and every succeeding calendar month
until the whole of the said sum of $132,000.00 shall have been fully
paid, (each of which payments shall constitute the minimum guaranteed
rental for that month and shall be supplemented by additional percentage
rental as hereinafter set forth).

PLEASE
INITIAL

It is further mutually agreed between the parties as follows:

**POSSESSION**    1. If Lessor, for any reason whatsoever, cannot deliver possession of the said premises to Lessee at the commencement of the said term, as hereinbefore specified, this lease shall not be void or voidable, nor shall Lessor be liable to Lessee for any loss or damage resulting therefrom; but in that event there shall be a proportionate deduction of rent covering the period between the commencement of the said term and the time when Lessor can deliver possession.

**USES PROHIBITED**    2. Lessee shall not use, or permit said premises, or any part thereof, to be used, for any purpose or purposes other than the purpose or purposes for which the said premises are hereby leased; and no use shall be made or permitted to be made of the said premises, nor acts done, which will increase the existing rate of insurance upon the building in which said premises may be located, or cause a cancellation of any insurance policy covering said building, or any part thereof, nor shall Lessee sell, or permit to be kept, used, or sold, in or about said premises, any article which may be prohibited by the standard form of fire insurance policies. Lessee shall, at his sole cost and expense, comply with any and all requirements, pertaining to said premises, of any insurance organization or company, necessary for the maintenance of reasonable fire and public liability insurance, covering said building and appurtenances.

**WASTE; ALTERATIONS**    3. Lessee shall not commit, or suffer to be committed, any waste upon the said premises, or any nuisance, or other act or thing which may disturb the quiet enjoyment of any other tenant in the building in which the demised premises may be located. Lessee shall not make, or suffer to be made, any alterations of the said premises, or any part thereof, without the written consent of Lessor first had and obtained, and any additions to, or alterations of, the said premises, except movable furniture and trade fixtures, shall become at once a part of the realty and belong to Lessor.

**ABANDONMENT**    4. Lessee shall not vacate or abandon the premises at any time during the term; and if Lessee shall abandon, vacate or surrender said premises, or be dispossessed by process of law, or otherwise, any personal property belonging to Lessee and left on the premises shall be deemed to be abandoned, at the option of Lessor, except such property as may be under a security agreement with Lessor.

6-69-1964

REPAIRS

5. Lessee shall at his sole cost, keep and maintain said premises and appurtenances and every part thereof (excepting exterior walls and roofs which Lessor agrees to repair), including windows, doors and skylights, sidewalks adjacent to said premises, any store front and the interior of the premises, in good and sanitary order, condition and repair, hereby waiving all right to make repairs at the expense of Lessor as provided in Section 1942 of the Civil Code of the State of California, and all rights provided for by Section 1941 of said Civil Code. By entry hereunder, Lessee accepts the premises as being in good and sanitary order, condition and repair and agrees on the last day of said term, or sooner termination of this lease, to surrender said Lessor all and singular said premises with said appurtenances in the same condition as when received, reasonable use and wear thereof and damage by fire, act of God or by the elements excepted, and to remove all of Lessee's signs from said premises.

FREE FROM LIENS

6. Lessee shall keep the demised premises and the property in which the demised premises are situated, free from any liens arising out of any work performed, materials furnished, or obligations incurred by Lessee.

COMPLIANCE WITH GOVERNMENTAL REGULATIONS

7. Lessee shall, at his sole cost and expense, comply with all of the requirements of all Municipal, State and Federal authorities now in force, or which may hereafter be in force, pertaining to the said premises, and shall faithfully observe in the use of the premises all Municipal ordinances and State and Federal statutes now in force or which may hereafter be in force. The judgment of any court of competent jurisdiction, or the admission of Lessee in any action or proceeding against Lessee, whether Lessor be a party thereto or not, that Lessee has violated any such ordinance or statute in the use of the premises, shall be conclusive of that fact as between Lessor and Lessee.

INDEMNIFICATION OF LESSOR

8. Lessee, as a material part of the consideration to be rendered to Lessor, hereby waives all claims against Lessor for damages to goods, wares and merchandise, and all other personal property in, upon or about said premises and for injuries to persons in or about said premises, from any cause arising at any time, and Lessee will hold Lessor exempt and harmless from any damage or injury to any person, or to the goods, wares and merchandise and all other personal property of any person, arising from the use of the premises by Lessee, or from the failure of Lessee to keep the premises in good condition and repair, as herein provided.

ADVERTISEMENTS AND SIGNS

9. Lessee shall not conduct or permit to be conducted any sale by auction on said premises. Lessee shall not place or permit to be placed any projecting sign, marquee or awning on the front of the said premises without the written consent of Lessor; Lessee, upon request of Lessor, shall immediately remove any sign or decoration which Lessee has placed or permitted to be placed in, on, or about the front of the premises and which, in the opinion of Lessor, is objectionable or offensive, and if Lessee fails so to do, Lessor may enter upon said premises and remove the same. Lessor has reserved the exclusive right to the two exterior sidewalls, rear wall and roof of said premises, and Lessee shall not place or permit to be placed upon the said sidewalls, rear wall or roof, any sign, advertisement or notice without the written consent of Lessor.

UTILITIES

10. Lessee shall pay for all water, gas, heat, light, power, telephone service and all other service supplied to the said premises.

ENTRY BY LESSOR

11. Lessee shall permit Lessor and his agents to enter into and upon said premises at all reasonable times for the purpose of inspecting the same or for the purpose of maintaining the building in which said premises are situated, or for the purpose of making repairs, alterations or additions to any other portion of said building, including the erection and maintenance of such scaffolding, canopies, fences and props as may be required, or for the purpose of posting notices of non-responsibility for alterations, additions, or repairs, or for the purpose of placing upon the property in which the said premises are located any usual or ordinary "for sale" signs, without any rebate of rent and without any liability to Lessee for any loss of occupation or quiet enjoyment of the premises thereby occasioned; and shall permit Lessor and his agents, at any time within thirty days prior to the expiration of this lease, to place upon said premises any usual or ordinary "to let" or "to lease" signs and exhibit the premises to prospective tenants at reasonable hours.

DESTRUCTION OF PREMISES

12. In the event of a partial destruction of the said premises during the said term, from any cause, Lessor shall forthwith repair the same, provided such repairs can be made within sixty (60) days under the laws and regulations of State, Federal, County or Municipal authorities, but such partial destruction shall in no wise annul or void this lease, except that Lessee shall be entitled to a proportionate deduction of rent while such repairs are being made, such proportionate deduction to be based upon the extent to which the making of such repairs shall interfere with the business carried on by Lessee in the said premises. If such repairs cannot be made in sixty (60) days, Lessor may, at his option, make same within a reasonable time, this lease continuing in full force and effect and the rent to be proportionately rebated as aforesaid in this paragraph provided. In the event that Lessor does not so elect to make such repairs which cannot be made in sixty (60) days, or such repairs cannot be made under destruction which Lessor is obligated to repair or may elect to repair under the terms of this paragraph, the provisions of Section 1932, Subdivision 2, and of Section 1933, Subdivision 4, of the Civil Code of the State of California are waived by Lessee. In the event that the building in which the demised premises are situated be destroyed to the extent of not less than 33 1/3% of the replacement cost thereof, Lessor may elect to terminate this lease, whether the demised premises be injured or not. A total destruction of the building in which the said premises may be situated shall terminate this lease. In the event of any dispute between Lessor and Lessee relative to the provisions of this paragraph, they shall each select an arbitrator, the two arbitrators so selected shall select a third arbitrator and these arbitrators so selected shall hear and determine the controversy and their decision thereon shall be final and binding upon both Lessor and Lessee, who shall bear the cost of such arbitration equally between them.

[handwritten box: PLEASE INITIAL / BRD / signature]

ASSIGNMENT AND SUBLETTING

13. Lessee shall not assign this lease, or any interest therein, and shall not sublet the said premises or any part thereof, or any right or privilege appurtenant thereto, or suffer any other person (the agents and servants of Lessee excepted) to occupy or use the said premises, or any portion thereof, without the written consent of Lessor first had and obtained, and a consent to one assignment, subletting, occupation or use by any other person, shall not be deemed to be a consent to any subsequent assignment, subletting, occupation or use by another person. Any such assignment or subletting without such consent shall be void, and shall, at the option of Lessor, terminate this lease. This lease shall not, nor shall any interest therein, be assignable, as to the interest of Lessee, by operation of law, without the written consent of Lessor.    See revised paragraph attached hereto.

INSOLVENCY OR BANKRUPTCY

14. Either (a) the appointment of a receiver (except a receiver mentioned in paragraph 18 hereof) to take possession of all or substantially all of the assets of Lessee, or (b) a general assignment by Lessee for the benefit of creditors, or (c) any action taken or suffered by Lessee under any insolvency or bankruptcy act shall constitute a breach of this lease by Lessee. Upon the happening of any such event this lease shall terminate ten (10) days after written notice of termination from Lessor to Lessee.

DEFAULT

15. In the event of any breach of this lease by Lessee, then Lessor besides other rights or remedies he may have, shall have the immediate right of re-entry and may remove all persons and property from the premises; such property may be removed and stored in a public warehouse or elsewhere at the cost of, and for the account of Lessee. Should Lessor elect to re-enter, as herein provided, or should he take possession pursuant to legal proceedings or pursuant to any notice provided for by law, he may either terminate this lease or he may from time to time, without terminating this lease, re-let said premises or any part thereof for such term or terms (which may be for a term extending beyond the term of this lease) and at such rental or rentals and upon such other terms and

~~conditions as~~ ~~in his sole discretion may deem advisable with the~~ ~~to make alterations and repairs to~~
said premises; ~~upon~~ each such re-letting (a) Lessee shall be immediately liable to pay to Lessor, in addition to
any indebtedness other than rent due hereunder, the cost and expenses of such re-letting and of such alterations
and repairs, incurred by Lessor, and the amount, if any, by which the rent reserved in this lease for the period of
such re-letting (up to but not beyond the term of this lease) exceeds the amount agreed to be paid as rent for the
demised premises for such period on such re-letting; or (b) at the option of Lessor rents received by such Lessor
from such re-letting shall be applied; first, to the payment of any indebtedness, other than rent due hereunder from
Lessee to Lessor; second, to the payment of any costs and expenses of such re-letting and of such alterations
and repair; third, to the payment of rent due and unpaid hereunder and the residue, if any, shall be held by Lessor
and applied in payment of future rent as the same may become due and payable hereunder. If Lessee has been
credited with any rent to be received by such re-letting under option (a), and such rent shall not be promptly paid
to Lessor by the new tenant, or if such rentals received from such re-letting under option (b) during any month be
less than that to be paid during that month by Lessee hereunder, Lessee shall pay any such deficiency to Lessor.
Such deficiency shall be calculated and paid monthly. No such re-entry or taking possession of said premises by
Lessor shall be construed as an election on his part to terminate this lease unless a written notice of such inten-
tion be given to Lessee or unless the termination thereof be decreed by a court of competent jurisdiction. Not-
withstanding any such re-letting without termination, Lessor may at any time thereafter elect to terminate this
lease for such previous breach. Should Lessor at any time terminate this lease for any breach, in addition to any
other remedy he may have, he may recover from Lessee all damages he may incur by reason of such breach, includ-
ing the cost of recovering the premises, and including the worth at the time of such termination of the excess, if
any, of the amount of rent and charges equivalent to rent reserved in this lease for the remainder of the stated term
over the then reasonable rental value of the premises for the remainder of the stated term, all of which amounts
~~shall be immediately due and payable from Lessee to Lessor.~~ See paragraph attached hereto.

**SURRENDER OF LEASE**  16. The voluntary or other surrender of this lease by Lessee, or a mutual cancellation thereof, shall not work
a merger, and shall, at the option of Lessor, terminate all or any existing subleases or subtenancies, or may, at
the option of Lessor, operate as an assignment to him of any or all such subleases or subtenancies.

**ATTORNEY'S FEE**  17. ~~In case suit shall be brought for or unlawful detainer of the said premises, for the recovery of any rent~~
due under the provisions of this lease, or because of ~~the breach of any other covenant herein contained,~~ on the
part of Lessee to be kept or performed, Lessee shall pay to Lessor a reasonable attorney's fee which shall be
~~fixed by the court.~~ See revised paragraph attached hereto.

**RECEIVERSHIP**  18. If a receiver be appointed at the instance of Lessor in any action against Lessee to take possession of
said premises and/or to collect the rents or profits derived therefrom, if the premises be a rooming house, hotel or
apartment house, the receiver may, if it be necessary or convenient in order to collect such rents and profits,
conduct the business of Lessee then being carried on in said premises and may take possession of any personal
property belonging to Lessee and used in the conduct of such business, and may use the same in conducting such
business on the premises without compensation to Lessee for such use. Neither the application for the appoint-
ment of such receiver, nor the appointment of such a receiver, shall be construed as an election on Lessor's part
to terminate this lease unless a written notice of such intention is given to Lessee.

**NOTICES**  19. All notices to be given to Lessee may be given in writing personally or by depositing the same in the
United States mail, postage prepaid, and addressed to Lessee at the said premises, whether or not Lessee has
departed from, abandoned or vacated the premises.

**TRANSFER OF SECURITY**  20. If any security be given by Lessee to secure the faithful performance of all or any of the covenants of
this lease on the part of Lessee, Lessor may transfer and/or deliver the security, as such, to the purchaser of the
reversion, in the event that the reversion be sold, and thereupon Lessor shall be discharged from any further
liability in reference thereto.

**WAIVER**  21. The waiver by Lessor of any breach of any term, covenant or condition herein contained shall not be
deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term,
covenant or condition therein contained. The subsequent acceptance of rent hereunder by Lessor shall not be
deemed to be a waiver of any preceding breach by Lessee of any term, covenant or condition of this Lease, other
than the failure of Lessee to pay the particular rental so accepted, regardless of Lessor's knowledge of such
preceding breach at the time of acceptance of such rent.

**HOLDING OVER**  22. Any holding over after the expiration of the said term, with the consent of Lessor, shall be construed to
be a tenancy from month to month, at a rental of ONE THOUSAND THREE HUNDRED AND NO/100------------
($  1,300.00 ) Dollars a month, and shall otherwise be on the terms and conditions herein specified, so far as
applicable.

**SUCCESSORS AND ASSIGNS**  23. The covenants and conditions herein contained shall, subject to the provisions as to assignment, apply
to and bind the heirs, successors, executors, administrators and assigns of all of the parties hereto; and all of the
parties hereto shall be jointly and severally liable hereunder.

**TIME**  24. Time is of the essence of this lease.

**MARGINAL CAPTIONS**  25. The captions in the margins of this lease are for convenience only and are not a part of this lease and do
not in any way limit or amplify the terms and provisions of this lease.

Paragraphs 26 through 34 were added hereto and made a part hereof prior to the
execution by the parties hereto.
IN WITNESS WHEREOF, Lessor and Lessee have executed these presents, the day and year first above written.

LESSOR                                                          LESSEE

HENRY POPPIC, EXECUTOR FOR THE
ESTATE OF CLARA POPPIC
_____              _____
                                                               KENNETH G. RENZ

_____              _____
HENRY POPPIC                                                 JACKSON R. DENNISON

CONSULT YOUR ATTORNEY — This document has been prepared for
submission to your attorney for his approval if he finds the same satis-
factory from the standpoint of protection of your legal rights. No repre-
sentation or recommendation is made by broker or its agents or em-
ployees as to the legal sufficiency, legal effect or tax consequences of this
document or the transaction relating thereto. These are questions for
your attorney.

BROKER IS NOT AUTHORIZED TO GIVE
LEGAL OR TAX ADVICE. IF YOU DESIRE
LEGAL OR TAX ADVICE CONSULT YOUR
ATTORNEY BEFORE SIGNING.

26 (a) In addition to the minimum monthly rentals hereinabove agreed to be paid by Lessee, Lessee shall and will pay to Lessor at the times and in the manner hereinafter specified, an additional rental in an amount equal to seven ..........per cent ( 7 %) of the amount of Lessee's gross sales (as gross sales are hereinafter defined) made during each leasehold year of the term hereof, in, upon or from the demised premises, less the aggregate amount of the minimum monthly rental paid by Lessee during said year.

(b) The term gross sales, as used herein, shall (subject to the exception and authorized deductions as hereinafter set forth) mean the gross amount received by Lessee from all sales, both for cash and on credit, and in case of sales on credit whether or not payment be actually made therefor; all charges for services, alterations or repairs to merchandise made in or upon the demised premises; the gross amount received by Lessee for merchandise sold pursuant to orders received in the demised premises, though filled elsewhere; and the gross amount received by Lessee from any and all other sources of income derived from the business conducted upon the demised premises.

(c) There is excepted from Lessee's gross sales (as said term is used herein) the amount of all sales tax receipts which has to be accounted for by Lessee to any government or governmental agency. There shall be deducted from Lessee's gross sales (for the purpose of accounting to Lessor), the amount of any actual refunds or credits made by Lessee for returned merchandise, the amount whereof had theretofore been included by Lessee in Lessee's gross sales.

(d) Lessee shall keep full, complete and proper books, records and accounts of the gross sales (as the term gross sales is used herein), both for cash and on credit of each separate department and concession at any time operated in the demised premises; said books, records and accounts, including any sales tax reports that Lessee may be required to furnish to any government or governmental agency, shall at all reasonable times be open to the inspection of Lessor, Lessor's auditor or other authorized representative or agent.

(e) Within ten (10) days after the end of each calendar month commencing with the 10th day of December 19...74, and ending with the 10th day of the month next succeeding the last month of the lease term, Lessee shall furnish Lessor with a statement to be certified as correct by Lessee or the employee of Lessee authorized so to certify, which shall set forth the gross sales (as herein defined) of each department and concession operating in the demised premises for the month just concluded, and the authorized deductions, if any, therefrom. Within thirty (30) days immediately following the end of each leasehold year, Lessee shall furnish Lessor with a statement of the gross sales during the year so concluded of each of its said departments and concessiions separately, and the amount of any authorized deductions therefrom (including therein the aggregate of the minimum monthly rental paid during said year); said last mentioned statement shall be certified as correct by Lessee or the employee of Lessee authorized so to certify, and with it Lessee shall pay to Lessor the amount of the additional rental which is payable to Lessor as shown thereby. If Lessee shall at any time cause an audit of Lessee's business to be made by a public accountant, Lessee shall furnish Lessor with a copy of said audit without any cost or expense to Lessor. Lessor may, once in any calendar year, cause an audit of the business of Lessee to be made by a public accountant of Lessor's own selection and if the statements of gross sales previously made by Lessee to Lessor shall be found to be less than the amount of Lessee's gross sales shown by such audit, Lessee shall immediately pay the cost of such audit as well as the additional rental therein shown to be payable by Lessee to Lessor; otherwise, the cost of such audit shall be paid by Lessor.

(f) The acceptance by Lessor for any moneys paid to Lessor by Lessee as additional rental for the demised premises as shown by any yearly statement furnished by Lessee shall not be an admission of the accuracy of said yearly statement or of any of the monthly statements furnished by Lessee during the year reported therein, or of the sufficiency of the amount of said additional rental payment, but Lessor shall be entitled at any time within two (2) years after the receipt of any such additional rental payment to question the sufficiency of the amount thereof and/or accuracy of the statement or statements furnished by Lessee to justify the same. Lessee shall, for said period of two (2) years after submission to Lessor of any such statement, keep safe and intact all of Lessee's records, books, accounts and other data which in any wise bear upon or are required to establish in detail Lessee's gross sales and any authorized deductions therefrom as shown by any such statement, and shall upon request make the same available to Lessor, Lessor's auditor, representative or agent for examination at any time during said two (2) year period.

27 (a) Subject to the provisions of Paragraph 12 hereof, Lessee shall continuously during the entire term hereof conduct and carry on Lessee's aforesaid business in the demised premises and shall keep said premises open for business and cause such business to be conducted thereon during each and every business day for such number of hours each day as is customary for businesses of like character in the city in which the demised premises are located to be open for business; provided, however, that this provision shall not apply if the demised premises shall be closed and the business of Lessee therein shall be temporarily shut down on account of strikes, lockouts or causes beyond the control of Lessee, or (for not more than (3) days) out of respect to the memory of any deceased officer or employee of Lessee, or relative of any such officer or employee.

(b) Lessee shall operate Lessee's said business in the demised premises with due diligence and efficiency and in like manner as comparable businesses in the city in which the demised premises are located are operated so as to produce all of the gross sales which may be produced by such manner of operation; and at all times shall carry in said premises a stock of merchandise of such size, character and quality as is reasonably designed to produce the maximum return to Lessee and Lessor and will tend to assure to Lessor a return of the greatest possible amount of additional rental.

28. The provision against subletting elsewhere contained in this lease shall not prohibit Lessee from granting concessions for the operation of one or more departments of the business conducted in or upon the demised premises; provided, however, that: (a) Each such concession which may be granted by Lessee shall be subject to all the terms and provisions of this lease; (b) The gross sale (as herein defined) from the operation of each such concession shall be deemed to be a part of the gross sales of Lessee for the purpose of determining the additional rental payable to Lessor; (c) All of the provisions hereof applying to the business of Lessee shall apply to each such concession; and (d) The majority in number and the major portion in volume of business of the departments in or upon the demised premises, including concessions granted by Lessee, shall at all times belong to and be operated by Lessee.

API-4-61-1M

PLEASE INITIAL

29. Lessee has, contemporaneously with the execution of this lease, deposited with Lessor the sum of ONE THOUSAND ONE HUNDRED AND NO/100 ($1,100.00) DOLLARS receipt of which is hereby acknowledged by Lessor. Said sum shall be held by Lessor as security for the faithful performance by Lessee of all of the terms, covenants, and conditions of said lease by said Lessee to be kept and performed during the term hereof. If at any time during the term of this lease any of the rent herein reserved shall be overdue and unpaid, or any other sums payable by Lessee to Lessor hereunder shall be overdue and unpaid, then Lessor may, at the option of Lessor (but Lessor shall not be required to) appropriate and apply any portion of said $ 1,100.00 to the payment of any such overdue rent or other sum. In the event of the failure of Lessee to keep and perform all of the terms, covenants and conditions of this lease to be kept and performed by Lessee, then at the option of Lessor said Lessor may, after terminating said lease, appropriate and apply said entire $ 1,100.00, or so much thereof as may be necessary, to compensate Lessor for all loss or damage sustained or suffered by Lessor due to such breach on the part of Lessee. Should the entire $ 1,100.00, or any portion thereof, be appropriated and applied by Lessor for the payment of overdue rent or other sums due and payable to Lessor by Lessee hereunder, then Lessee shall, upon the written demand of Lessor, forthwith remit to Lessor a sufficient amount in cash to restore said security to the original sum of $ 1,100.00, and Lessee's failure to do so within five (5) days after receipt of such demand shall constitute a breach of this lease. Should Lessee comply with all of said terms, covenants and conditions and promptly pay all of the rental herein provided for as it falls due, and all other sums payable by Lessee to Lessor hereunder, the said sum of $ 1,100.00 shall be returned in full to Lessee at the end of the term of this lease or upon the earlier termination of this lease under the provisions of Paragraph 12 hereof. Of said sum, $600.00 is carried over from that certain lease dated October 10, 1968 between Henry Poppic, Conservator for the Estate of Clara Poppic, and E. Eugene Leonhart which was assigned to Kenneth G. Renz and Jackson R. Dennison by Assignment of Lease dated March 31, 1971.

30. The parties hereto acknowledge that Lessee accepts the demised premises in an as-is condition, that Lessee contemplates remodeling the premises in order to prepare the same for Lessee's use, and that all remodeling to the interior or exterior of the premises shall require Lessor's prior written consent and shall be at Lessee's sole cost and expense. All work shall be done in a first-class workmanlike manner and comply with any and all laws and regulations of any governmental agency having jurisdiction over such matters. Lessor's written consent shall be obtained by Lessee by delivering to Lessor two (2) copies of complete plans and specifications, together with a complete cost estimate, for the contemplated work, each such copy to be signed and dated by Lessee. Lessor shall indicate its consent and approval by signing, dating and returning to Lessee one (1) copy of said specifications, plans and estimate. Lessor shall be free to disapprove in their entirety or to request reasonable changes in said plans and specifications, and Lessee agrees to abide by Lessor's decision in that regard and to comply with any such request. In the case of Lessee's initial remodeling plans, however, should Lessor fail to approve the plans, specifications and cost estimate submitted by Lessee within ten (10) days after the receipt of same by Lessor, or should Lessee not with to comply with any changes therein requested by Lessor, Lessee shall have the right of terminating this lease by giving written notice to that effect to Lessor.

31. Lessee has executed this lease upon and subject to each and all of the following conditions:

a) Court Acceptance. This lease is subject to confirmation by the Superior Court of Alameda County.

b) Possession. Lessee shall have received possession of the premises demised herewith for the purpose of commencing remodeling on or before the first day of October, 1974. Such possession shall be subject to all the terms and conditions herein contained except payment of rent which shall commence on November 1, 1974.

In the event any of the above conditions are not fulfilled, Lessee shall have the right of terminating this lease by giving written notice to that effect to Lessor.

32. Lessee, at his own cost and expense, shall maintain a plate glass insurance policy and a comprehensive liability insurance policy during the continuance of this lease covering the demised premises and its appurtenances, and the sidewalks fronting thereon, with such insurance company as shall be satisfactory to Lessor, the minimum requirements of which policy shall embrace limits of at least ONE HUNDRED THOUSAND ($100,000) DOLLARS for bodily injury or death of each person, THREE HUNDRED THOUSAND ($300,000) DOLLARS for each occurrence, and property damage of TWENTY FIVE THOUSAND ($25,000) DOLLARS. Lessee shall furnish Lessor insurance certificates issued by each insurance carrier showing that the particular policy will not be modified or cancelled without first giving Lessor ten (10) days written notice thereof. If Lessee does not keep such insurance in full force and effect, Lessor may take out the necessary insurance and pay the premium and the repayment thereof shall be deemed to be part of the rental and payable as such on the next day upon which rent becomes due.



33.  In the event there is any increase during any year of the term of this lease or
any renewal or extension hereof in the municipal, state or county real estate taxes,
including the amount of general or special assessments, levies or charges made by any
municipal or political subdivision for local improvements, over and above the amount
of such taxes assessed for the fiscal year 1974/75, whether because of increased or
added rate or increased assessed valuation, Lessee shall pay to Lessor annually during
the lease term upon demand an amount equal to 66-2/3% of the total increase in taxes,
assessments, levies and charges upon the whole of the land and building upon and within
which the leased premises are situate.  The amount of Lessee's obligation under this
paragraph for the year in which this lease terminates shall be prorated in the proportion
that the period of this lease is in effect during the tax year in which this lease ter-
minates bears to the full tax year.  Any increase in taxes caused by an increase in
assessed valuation due to the work done by Lessee in the demised premises at any time
during said term shall be borne entirely by Lessee.

34.  On October 10, 1968, Henry Poppic, Conservator for the Estate of Clara Poppic,
Lessor, and E. Eugene Leonhart, Lessee, entered into a lease for Store #1, 2529 Telegraph
Avenue.  Said lease was subsequently assigned on March 31, 1971 to Kenneth G. Renz and
Jackson R. Dennison, the Lessees hereunder.  Said lease was for a term commencing April 1,
1970 and ending March 31, 1975.  Said lease is hereby cancelled and shall be of no further
cause or effect as of November 1, 1974.

35.  The provisions of Paragraph 30 hereof not withstanding, the condition of the
demised premises when delivered to Lessee for Lessee's work shall be with smooth
concrete floor, new store front, taped and textured walls, normal electrical outlets,
service to ceiling for tenant fixtures, exits to code for the intended use, existing
plumbing to be in good working condition, 220 volt-3 phase electrical service, separate
electrical meter and panel, and smooth ceiling ready for tenant finish.

36.  This lease shall be subject to the successful application of the Lessee to the
City of Berkeley for necessary governmental permits and approvals.  Should said
approvals not be obtained within a reasonable period of time from the date hereof,
lessee shall be released from all liability hereunder, and this lease shall be
deemed void.



REVISED PARAGRAPHS 13, 15, and 17

13. Lessee may assign this lease or an interest therein and may also sublet said premises, provided the written consent to any such assignment or subletting is first obtained by Lessee. If, during the term of this lease, Lessee requests the written consent of Lessor to any such assignment or subletting, Lessor's consent thereto shall not unreasonably be withheld. A consent to one assignment or subletting with Lessor's consent shall not be deemed to be a consent to any subsequent assignment or subletting, and any such subsequent assignment or subletting without Lessor's consent shall be void and shall, at Lessor's option, terminate this lease. This lease shall not, nor shall any interest therein, be assignable as to the interest of the Lessee by operation of law without the written consent of Lessor, but such consent shall not unreasonably be withheld.

15. (a) In the event of any breach of this lease by Lessee, then Lessor, besides other rights and remedies he may have, shall have the immediate right of re-entry and may remove all persons and property from the premises. If the Lessor's right of re-entry is exercised following abandonment of the premises by Lessee, then Lessor may consider any personal property belonging to Lessee and left on the premises to also have been abandoned, in which case Lessor may dispose of all such personal property in any manner Lessor shall deem proper and is hereby relieved of all liability for doing so.

(b) If Lessee breaches this lease and abandons the property before the end of the term, or if Lessee's right to possession is terminated by Lessor because of a breach of the lease, then in either such case, Lessor may recover from Lessee all damages suffered by Lessor as the result of Lessee's failure to perform his obligations hereunder, including, but not restricted to, the worth at the time of the award (computed in accordance with Paragraph (3) of Subdivision (a) of Section 1951.2 of the California Civil Code) of the amount by which the rent then unpaid hereunder for the balance of the lease term exceeds the amount of such rental loss for the same period which the Lessee proves could be reasonably avoided by Lessor, and in such case, Lessor, prior to the award, may relet the premises for the purpose of mitigating damages suffered by Lessor because of Lessee's failure to perform his obligations hereunder; provided, however, that even though Lessee has abandoned the premises following such breach, this lease shall nevertheless continue in full force and effect for as long as the Lessor does not terminate Lessee's right of possession, and until such termination, Lessor may enforce all his rights and remedies under this lease, including the right to recover the rent from Lessee as it becomes due hereunder.

17. In case suit is brought by either party because of the breach of any term, covenant or condition herein contained, the prevailing party shall be entitled to recover against the other party a reasonable attorney's fee to be fixed by the court.



EXHIBIT "B"

FOR GO    AND VALUABLE CONSIDERATIC  ,   e receipt of which is hereby acknowledged, The undersigned Kenneth C. Renz and Jackson R. Dennison (referred to as "Assignor") does hereby grant, convey and assign to Wiley Umstead and Kazuko Umstead His wife (referred to as "Assignees) all of said assignor's right, title and interest in and to that certain lease dated August 19, 1974 made by Henry Poppic, Executor for the estate of Clara Poppic as LESSOR and the undersigned as LESSEE, for the premises generally known and described as Cal Cleaners & Laundry located at  2529 -2531 Telegraph Ave. Berkeley which said lease is dated the 19th day of  August, 1974      , and is for a term of  ten (10)      years, commencing February 1, 1975 and ending January 31, 1985.

Dated:                                          ASSIGNOR: _____

                                                         KENNETH G. RENZ

                                                         _____
                                                         JACKSON R. DENNISON

## ASSUMPTION OF ASSIGNMENT

The undersigned,  Wiley Umstead and Kazuko, Umstead his wife (hereinafter jointly and severally called "Assignee") do hereby accept assignment of the aforesaid lease dated August 19, 1974 made by Henry Poppic, Executor for the estate of Clara Poppic      as LESSORS and  Kenneth G. Renz and Jackson Dennison                as LESSEE for the premises known as Cal Cleaners and Laundry located at 2529-2531 Telegraph Ave. Berkeley, Calif.

The undersigned does hereby agree to and does substitute himself as LESSEE by assignment and does hereby agree to be bound by all the terms, covenants, conditions and agreements contained in said lease, and agrees to make all rental payments promptly as specified, and to save the Assignor free and harmless from any liability arising under or pur suant to said lease after the date of this assignment.  As used herein, the singular shall include the plural and the plural the singular; and in the   event there be more than one of the undersigned, the liability is joint and several.

Dated:                                          ASSIGNEE: _____
                                                         WILEY UMSTEAD

                                                         _____
                                                         KAZUKO UMSTEAD

## CONSENT TO ASSIGNMENT

                                                                 estate of Clara Poppic
        The undersigned, Henry Poppic, Executor for the/     (hereinafter called the "Lessor") do hereby consent to the above and foregoing assignment, it being understood and agreed that consent to this assignment is subject to all the terms, covenants and conditions in said lease contained, and with the specific understanding that this consent  is not a consent to any future assignment of said lease and on the understanding and condi- tion that the original lessee (to wit, the foregoing Assignor) is not released from any liability under said lease by reason of said assignment.

EXTENSION OF LEASE: Lessor grants Lessee an option to renew this lease for a period of five (5) years upon the same terms and conditions as are set forth herin, except that the Base Rent figure for said option to be left open.

Dated:                                          LESSOR: _____
                                                HENRY POPPIC, EXECUTOR FOR THE
                                                ESTATE OF CLARA POPPIC

                                                _____
                                                HENRY POPPIC

THIS IS MORE THAN A RECEIPT
FOR MONEY OR PRELIMINARY
MEMORANDUM. IT WILL AFFECT
YOUR LEGAL RIGHTS. READ IT
CAREFULLY.

# LEASE — GENERAL FORM

**This Lease,** executed in duplicate at     Oakland     , California, this     19th
day of     August     , 19 74 , by and between     HENRY POPPIC, EXECUTOR FOR THE
ESTATE OF CLARA POPPIC

**PARTIES**

and     KENNETH G. RENZ and JACKSON R. DENNISON

hereinafter called respectively Lessor and Lessee, without regard to number or gender,

**USE**

WITNESSETH: That Lessor hereby leases to Lessee, and Lessee hires from Lessor, for the purpose of
conducting therein  a coin-operated launderette and dry cleaning establishment

**PREMISES**

and for no other purpose, those certain premises with the appurtenances, situated in   The City of Berkeley,
County of Alameda     , State of California, and more particularly described as follows, to-wit:

A portion of that certain single-story commercial store building located on the
easterly line of Telegraph Avenue, approximately 305 feet southerly from the south
line of Dwight Way- and more specifically described as the northern most two stores
in said building, being stores #1 and #2, and having frontage on Telegraph Avenue
of approximately 47 feet and an approximate depth of 66 feet, and known as 2529
Telegraph Avenue.

**TERM**

The term shall be for     ten  (10)     years, commencing on the   1st   day of
November     , 19 74 and ending on the 31st   day of   October     , 1984 , at the total rent or sum of
ONE HUNDRED THIRTY TWO THOUSAND AND NO/100-------------------($ 132,000.00     ) Dollars,
lawful money of the United States of America, which Lessee agrees to pay to Lessor, without deduction or offset,
at such place or places as may be designated from time to time by Lessor, in installments as follows:

**RENTAL**

$1,100.00   on and in consideration of the execution and delivery of this lease,
            receipt of which is hereby acknowledged by Lessor, as first month's rent;
$1,100.00   thereof on the first day of December, 1974, and
$1,100.00   thereof on the first day of each and every succeeding calendar month
            until the whole of the said sum of $132,000.00 shall have been fully
            paid, (each of which payments shall constitute the minimum guaranteed
            rental for that month and shall be supplemented by additional percentage
            rental as hereinafter set forth).



PLEASE
INITIAL

**POSSESSION**

It is further mutually agreed between the parties as follows:

1. If Lessor, for any reason whatsoever, cannot deliver possession of the said premises to Lessee at the
commencement of the said term, as hereinbefore specified, this lease shall not be void or voidable, nor shall
Lessor be liable to Lessee for any loss or damage resulting therefrom; but in that event there shall be a propor-
tionate deduction of rent covering the period between the commencement of the said term and the time when Lessor
can deliver possession.

**USES
PROHIBITED**

2. Lessee shall not use, or permit said premises, or any part thereof, to be used, for any purpose or purposes
other than the purpose or purposes for which the said premises are hereby leased; and no use shall be made or
permitted to be made of the said premises, nor acts done, which will increase the existing rate of insurance upon
the building in which said premises may be located, or cause a cancellation of any insurance policy covering said
building, or any part thereof, nor shall Lessee sell, or permit to be kept, used, or sold, in or about said premises,
any article which may be prohibited by the standard form of fire insurance policies. Lessee shall, at his sole cost
and expense, comply with any and all requirements, pertaining to said premises, of any insurance organization or
company, necessary for the maintenance of reasonable fire and public liability insurance, covering said building
and appurtenances.

**WASTE;
ALTERATIONS**

3. Lessee shall not commit, or suffer to be committed, any waste upon the said premises, or any nuisance, or
other act or thing which may disturb the quiet enjoyment of any other tenant in the building in which the demised
premises may be located. Lessee shall not make, or suffer to be made, any alterations of the said premises, or
any part thereof, without the written consent of Lessor first had and obtained, and any additions to, or alterations
of, the said premises, except movable furniture and trade fixtures, shall become at once a part of the realty and
belong to Lessor.

**ABANDONMENT**

4. Lessee shall not vacate or abandon the premises at any time during the term; and if Lessee shall abandon,
vacate or surrender said premises, or be dispossessed by process of law, or otherwise, any personal property
belonging to Lessee and left on the premises shall be deemed to be abandoned, at the option of Lessor, except
such property as may be under a security agreement with Lessor.

8-66-1BM

**REPAIRS**  5. Lessee sh... his sole cost, keep and maintain said premises and ap... ...nances and every part thereof (excepting exterior ...ls and roofs which Lessor agrees to repair), including windows, doors and skylights, sidewalks adjacent to said premises, any store front and the interior of the premises, in good and sanitary order, condition and repair, hereby waiving all right to make repairs at the expense of Lessor as provided in Section 1942 of the Civil Code of the State of California, and all rights provided for by Section 1941 of said Civil Code. By entry hereunder, Lessee accepts the premises as being in good and sanitary order, condition and repair and agrees on the last day of said term, or sooner termination of this lease, to surrender unto Lessor all and singular said premises with said appurtenances in the same condition as when received, reasonable use and wear thereof and damage by fire, act of God or by the elements excepted, and to remove all of Lessee's signs from said premises.

**FREE FROM LIENS**  6. Lessee shall keep the demised premises and the property in which the demised premises are situated, free from any liens arising out of any work performed, materials furnished, or obligations incurred by Lessee.

**COMPLIANCE WITH GOVERNMENTAL REGULATIONS**  7. Lessee shall, at his sole cost and expense, comply with all of the requirements of all Municipal, State and Federal authorities now in force, or which may hereafter be in force, pertaining to the said premises, and shall faithfully observe in the use of the premises all Municipal ordinances and State and Federal statutes now in force or which may hereafter be in force. The judgment of any court of competent jurisdiction, or the admission of Lessee in any action or proceeding against Lessee, whether Lessor be a party thereto or not, that Lessee has violated any such ordinance or statute in the use of the premises, shall be conclusive of that fact as between Lessor and Lessee.

**INDEMNIFI- CATION OF LESSOR**  8. Lessee, as a material part of the consideration to be rendered to Lessor, hereby waives all claims against Lessor for damages to goods, wares and merchandise, and all other personal property in, upon or about said premises and for injuries to persons in or about said premises, from any cause arising at any time, and Lessee will hold Lessor exempt and harmless from any damage or injury to any person, or to the goods, wares and merchandise and all other personal property of any person, arising from the use of the premises by Lessee, or from the failure of Lessee to keep the premises in good condition and repair, as herein provided.

**ADVERTISE- MENTS AND SIGNS**  9. Lessee shall not conduct or permit to be conducted any sale by auction on said premises. Lessee shall not place or permit to be placed any projecting sign, marquee or awning on the front of the said premises without the written consent of Lessor; Lessee, upon request of Lessor, shall immediately remove any sign or decoration which Lessee has placed or permitted to be placed in, on, or about the front of the premises and which, in the opinion of Lessor, is objectionable or offensive, and if Lessee fails so to do, Lessor may enter upon said premises and remove the same. Lessor has reserved the exclusive right to the two exterior sidewalls, rear wall and roof of said premises, and Lessee shall not place or permit to be placed upon the said sidewalls, rear wall or roof, any sign, advertisement or notice without the written consent of Lessor.

**UTILITIES**  10. Lessee shall pay for all water, gas, heat, light, power, telephone service and all other service supplied to the said premises.

**ENTRY BY LESSOR**  11. Lessee shall permit Lessor and his agents to enter into and upon said premises at all reasonable times for the purpose of inspecting the same or for the purpose of maintaining the building in which said premises are situated, or for the purpose of making repairs, alterations or additions to any other portion of said building, including the erection and maintenance of such scaffolding, canopies, fences and props as may be required, or for the purpose of posting notices of non-responsibility for alterations, additions, or repairs, or for the purpose of placing upon the property in which the said premises are located any usual or ordinary "for sale" signs, without any rebate of rent and without any liability to Lessee for any loss of occupation or quiet enjoyment of the premises thereby occasioned; and shall permit Lessor and his agents, at any time within thirty days prior to the expiration of this lease, to place upon said premises any usual or ordinary "to let" or "to lease" signs and exhibit the premises to prospective tenants at reasonable hours.

**DESTRUCTION OF PREMISES**  12. In the event of a partial destruction of the said premises during the said term, from any cause, Lessor shall forthwith repair the same, provided such repairs can be made within sixty (60) days under the laws and regulations of State, Federal, County or Municipal authorities, but such partial destruction shall in no wise annul or void this lease, except that Lessee shall be entitled to a proportionate deduction of rent while such repairs are being made, such proportionate deduction to be based upon the extent to which the making of such repairs shall interfere with the business carried on by Lessee in the said premises. If such repairs cannot be made in sixty (60) days, Lessor may, at his option, make same within a reasonable time, this lease continuing in full force and effect and the rent to be proportionately rebated as aforesaid in this paragraph provided. In the event that Lessor does not so elect to make such repairs which cannot be made in sixty (60) days, or such repairs cannot be made under such laws and regulations, this lease may be terminated at the option of either party. In respect to any partial destruction which Lessor is obligated to repair or may elect to repair under the terms of this paragraph, the provisions of Section 1932, Subdivision 2, and of Section 1933, Subdivision 4, of the Civil Code of the State of California are waived by Lessee. In the event that the building in which the demised premises may be situated be destroyed to the extent of not less than 33 1/3% of the replacement cost thereof, Lessor may elect to terminate this lease, whether the demised premises be injured or not. A total destruction of the building in which the said premises may be situated shall terminate this lease. In the event of any dispute between Lessor and Lessee relative to the provisions of this paragraph, they shall each select an arbitrator, the two arbitrators so selected shall select a third arbitrator and the three arbitrators so selected shall hear and determine the controversy and their decision thereon shall be final and binding upon both Lessor and Lessee, who shall bear the cost of such arbitration equally between them.

**ASSIGNMENT AND SUBLETTING**  13. ~~Lessee shall not assign this lease, or any interest therein, and shall not sublet the said premises or any part thereof, or any right or privilege appurtenant thereto, or suffer any other person (the agents and servants of Lessee excepted) to occupy or use the said premises, or any portion thereof, without the written consent of Lessor first had and obtained, and a consent to one assignment, subletting, occupation or use by any other person, shall not be deemed to be a consent to any subsequent assignment, subletting, occupation or use by another person. Any such assignment or subletting without such consent shall be void, and shall, at the option of Lessor, terminate this lease. This lease shall not, nor shall any interest therein, be assignable, as to the interest of Lessee, by operation of law without the written consent of Lessor.~~     See revised paragraph attached hereto.

**INSOLVENCY OR BANKRUPTCY**  14. Either (a) the appointment of a receiver (except as mentioned in paragraph 1B hereof) to take possession of all or substantially all of the assets of Lessee, or (b) a general assignment by Lessee for the benefit of creditors, or (c) any action taken or suffered by Lessee under any insolvency or bankruptcy act shall constitute a breach of this lease by Lessee. Upon the happening of any such event this lease shall terminate ten (10) days after written notice of termination from Lessor to Lessee.

**DEFAULT**  15. In the event of any breach of this lease by Lessee, then Lessor besides other rights or remedies he may have, shall have the immediate right of re-entry and may remove all persons and property from the premises; such property may be removed and stored in a public warehouse or elsewhere at the cost of, and for the account of Lessee. Should Lessor elect to re-enter, as herein provided, or should he take possession pursuant to legal proceedings or pursuant to any notice provided for by law, he may either terminate this lease or he may from time to time, without terminating this lease, re-let said premises or any part thereof for such term or terms (which may be for a term extending beyond the term of this lease) and at such rental or rentals and upon such other terms and

conditions as ... in his sole discretion may deem advisable with the ... to make alterations and repairs in each such re-letting (a) Lessee shall be immediately liable to pay to Lessor any indebtedness other than rent due hereunder, the cost and expenses of such re-letting and of such alterations and repairs, incurred by Lessor, and the amount, if any, by which the rent reserved in this lease for the period of such re-letting (up to but not beyond the term of this lease) exceeds the amount agreed to be paid as rent for the demised premises for such period on such re-letting; or (b) at the option of Lessor rent received by such Lessor from such re-letting shall be applied; first, to the payment of any indebtedness, other than rent due hereunder from Lessee to Lessor; second, to the payment of any costs and expenses of such re-letting and of such alterations and repair; third, to the payment of rent due and unpaid hereunder and the residue, if any, shall be held by Lessor credited with any rent to be received by such re-letting under option (a), and such rent shall not be promptly paid to Lessor by the new tenant, or if such rentals received from such re-letting under option (b) during any month be less than that to be paid during that month by Lessee hereunder, Lessee shall pay any such deficiency to Lessor. Such deficiency shall be calculated and paid monthly. No such re-entry or taking possession of said premises by Lessor shall be construed as an election on his part to terminate this lease unless a written notice of such intention be given to Lessee or unless the termination thereof be decreed by a court of competent jurisdiction. Notwithstanding any such re-letting without termination, Lessor may at any time thereafter elect to terminate this lease for such previous breach. Should Lessor at any time terminate this lease for any breach, in addition to any other remedy he may have, he may recover from Lessee all damages he may incur by reason of such breach, including the cost of recovering the premises, and including the worth at the time of such termination of the excess, if any, of the amount of rent and charges equivalent to rent reserved in this lease for the remainder of the stated term over and then reasonable rental value of the premises for the remainder of the stated term, all of which amounts shall be immediately due and payable from Lessee to Lessor. **See revised paragraph attached hereto.**

**SURRENDER OF LEASE** 16. The voluntary or other surrender of this lease by Lessee, or a mutual cancellation thereof, shall not work a merger, and shall, at the option of Lessor, terminate all or any existing subleases or subtenancies, or may, at the option of Lessor, operate as an assignment to him of any or all such subleases or subtenancies.

**ATTORNEY'S FEE** 17. In case suit shall be brought for an unlawful detainer of the said premises, for the recovery of any rent due under the provisions of this lease, or because of the breach of any other covenant herein contained, on the part of Lessee to be kept or performed, Lessee shall pay to Lessor a reasonable attorney's fee which shall be fixed by the court. **See revised paragraph attached hereto.**

**RECEIVERSHIP** 18. If a receiver be appointed at the instance of Lessor in any action against Lessee to take possession of said premises and/or to collect the rents or profits derived therefrom, if the premises be a rooming house, hotel or apartment house, the receiver may, if it be necessary or convenient in order to collect such rents and profits, conduct the business of Lessee then being carried on in said premises and may take possession of any personal property belonging to Lessee and used in the conduct of such business, and may use the same in conducting such business on the premises without compensation to Lessee for such use. Neither the application for the appointment of such receiver, nor the appointment of such a receiver, shall be construed as an election on Lessor's part to terminate this lease unless a written notice of such intention is given to Lessee.

**NOTICES** 19. All notices to be given to Lessee may be given in writing personally or by depositing the same in the United States mail, postage prepaid, and addressed to Lessee at the said premises, whether or not Lessee has departed from, abandoned or vacated the premises.

**TRANSFER OF SECURITY** 20. If any security be given by Lessee to secure the faithful performance of all or any of the covenants of this lease on the part of Lessee, Lessor may transfer and/or deliver the security, as such, to the purchaser of the reversion, in the event that the reversion be sold, and thereupon Lessor shall be discharged from any further liability in reference thereto.

**WAIVER** 21. The waiver by Lessor of any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition therein contained. The subsequent acceptance of rent hereunder by Lessor shall not be deemed to be a waiver of any preceding breach by Lessee of any term, covenant or condition of this Lease, other than the failure of Lessee to pay the particular rental so accepted, regardless of Lessor's knowledge of such preceding breach at the time of acceptance of such rent.

**HOLDING OVER** 22. Any holding over after the expiration of the said term, with the consent of Lessor, shall be construed to be a tenancy from month to month, at a rental of ONE THOUSAND THREE HUNDRED AND NO/100———————— ($ 1,300.00 ) Dollars a month, and shall otherwise be on the terms and conditions herein specified, so far as applicable.

**SUCCESSORS AND ASSIGNS** 23. The covenants and conditions herein contained shall, subject to the provisions as to assignment, apply to and bind the heirs, successors, executors, administrators and assigns of all of the parties hereto; and all of the parties hereto shall be jointly and severally liable hereunder.

**TIME** 24. Time is of the essence of this lease.

**MARGINAL CAPTIONS** 25. The captions in the margins of this lease are for convenience only and are not a part of this lease and do not in any way limit or amplify the terms and conditions of this lease.

Paragraphs 26 through 34 were added hereto and made a part hereof prior to the execution by the parties hereto.

IN WITNESS WHEREOF, Lessor and Lessee have executed these presents, the day and year first above written.

LESSOR

HENRY POPPIC, EXECUTOR FOR THE
ESTATE OF CLARA POPPIC


HENRY POPPIC

LESSEE

KENNETH G. RENZ

JACKSON R. DENNISON

CONSULT YOUR ATTORNEY — This document has been prepared for submission to your attorney for his approval if he finds the same satisfactory from the standpoint of protection of your legal rights. No representation or recommendation is made by broker or its agents or employees as to the legal sufficiency, legal effect or tax consequence of this document or the transaction relating thereto. These are questions for your attorney.

BROKER IS NOT AUTHORIZED TO GIVE LEGAL OR TAX ADVICE. IF YOU DESIRE LEGAL OR TAX ADVICE CONSULT YOUR ATTORNEY BEFORE SIGNING.

26 (a)  In addition to the minimum monthly rentals hereinabove agreed to be paid by Lessee, Lessee shall and will pay to Lessor at the times and in the manner hereinafter specified, an additional rental in an amount equal to _seven_____ per cent (  7  %) of the amount of Lessee's gross sales (as gross sales are hereinafter defined) made during each leasehold year of the term hereof, in, upon or from the demised premises, less the aggregate amount of the minimum monthly rental paid by Lessee during said year.

(b)  The term gross sales, as used herein, shall (subject to the exception and authorized deductions as hereinafter set forth) mean the gross amount received by Lessee from all sales, both for cash and on credit, and in case of sales on credit whether or not payment be actually made therefor; all charges for services, alterations or repairs to merchandise made in or upon the demised premises; the gross amount received by Lessee for merchandise sold pursuant to orders received in the demised premises, though filled elsewhere; and the gross amount received by Lessee from any and all other sources of income derived from the business conducted upon the demised premises.

(c)  There is excepted from Lessee's gross sales (as said term is used herein) the amount of all sales tax receipts which has to be accounted for by Lessee to any government or governmental agency. There shall be deducted from Lessee's gross sales (for the purpose of accounting to Lessor), the amount of any actual refunds or credits made by Lessee for returned merchandise, the amount whereof had theretofore been included in Lessee in Lessee's gross sales.

(d)  Lessee shall keep full, complete and proper books, records and accounts of the gross sales (as the term gross sales is used herein), both for cash and on credit of each separate department and concession at any time operated in the demised premises; said books, records and accounts, including any sales tax reports that Lessee may be required to furnish to any government or governmental agency, shall at all reasonable times be open to the inspection of Lessor, Lessor's auditor or other authorized representative or agent.

(e)  Within ten (10) days after the end of each calendar month commencing with the 10th day of _December_ 19___74, and ending with the 10th day of the month next succeeding the last month of the lease term, Lessee shall furnish Lessor with a statement to be certified as correct by Lessee or the employee of Lessee authorized so to certify, which shall set forth the gross sales (as herein defined) of each department and concession operating in the demised premises for the month just concluded, and the authorized deductions, if any, therefrom. Within thirty (30) days immediately following the end of each leasehold year, Lessee shall furnish Lessor with a statement of the gross sales during the year so concluded of each of its said departments and concessions separately, and the amount of any authorized deductions therefrom (including therein the aggregate of the minimum monthly rental paid during said year); said last mentioned statement shall be certified as correct by Lessee or the employee of Lessee authorized so to certify, and with it Lessee shall pay to Lessor the amount of the additional rental which is payable to Lessor as shown thereby. If Lessee shall at any time cause an audit of Lessee's business to be made by a public accountant, Lessee shall furnish Lessor with a copy of said audit without any cost or expense to Lessor. Lessor may, once in any calendar year, cause an audit of the business of Lessee to be made by a public accountant of Lessor's own selection and if the statements of gross sales previously made by Lessee to Lessor shall be found to be less than the amount of Lessee's gross sales shown by such audit, Lessee shall immediately pay the cost of such audit as well as the additional rental therein shown to be payable by Lessee to Lessor; otherwise, the cost of such audit shall be paid by Lessor.

(f)  The acceptance by Lessor for any moneys paid to Lessor by Lessee as additional rental for the demised premises as shown by any yearly statement furnished by Lessee shall not be an admission of the accuracy of said yearly statement or of any of the monthly statements furnished by Lessee during the year reported therein, or of the sufficiency of the amount of said additional rental payment, but Lessor shall be entitled at any time within two (2) years after the receipt of any such additional rental payment to question the sufficiency of the statement thereof and/or accuracy of the statement or statements furnished by Lessee to justify the same. Lessee shall, for said period of two (2) years after submission to Lessor of any such statement, keep safe and intact all of Lessee's records, books, accounts and other data which in any wise bear upon or are required to establish in detail Lessee's gross sales and any authorized deductions therefrom as shown by any such statement, and shall upon request make the same available to Lessor, Lessor's auditor, representative or agent for examination at any time during said two (2) year period.

27 (a)  Subject to the provisions of Paragraph 12 hereof, Lessee shall continuously during the entire term hereof conduct and carry on Lessee's aforesaid business in the demised premises and shall keep said premises open for business and cause such business to be conducted thereon during each and every business day for such number of hours each day as is customary for businesses of like character in the city in which the demised premises are located to be open for business; provided, however, that this provision shall not apply if the demised premises shall be closed and the business of Lessee therein shall be temporarily shut down on account of strikes, lockouts or causes beyond the control of Lessee, or (for not more than (5) days) out of respect to the memory of any deceased officer or employee of Lessee, or relative of any such officer or employee.

(b)  Lessee shall operate Lessee's said business in the demised premises with due diligence and efficiency and in like manner as comparable businesses in the city in which the demised premises are located are operated so as to produce all of the gross sales which may be produced by such manner of operation; and as at all times shall carry in said premises a stock of merchandise of such size, character and quality as is reasonably designed to produce the maximum return to Lessee and Lessor and will tend to assure to Lessor a return of the greatest possible amount of additional rental.

28.  The provision against subletting elsewhere contained in this lease shall not prohibit Lessee from granting concessions for the operation of one or more departments of the business conducted in or upon the demised premises; provided, however, that: (a) Each such concession which may be granted by Lessee shall be subject to all the terms and provisions of this lease; (b) The gross sale (as herein defined) from the operation of each such concession shall be deemed to be a part of the gross sales of Lessee for the purpose of determining the additional rental payable to Lessor; (c) All of the provisions hereof applying to the business of Lessee shall apply to each such concession; and (d) The majority in number and the major portion in volume of business of the departments in or upon the demised premises, including concessions granted by Lessee, shall at all times belong to and be operated by Lessee.

AP-6-61-1M



29. Lessee has, contempo... ously with the execution of this lease, deposited with Lessor the sum of ONE THOUSAND ONE HUNDRED AND NO/100—————————————($1,100.00)———————————————————DOLLARS receipt of which is hereby acknowledged by Lessor. Said sum shall be held by Lessor as security for the faithful performance by Lessee of all of the terms, covenants, and conditions of said lease by said Lessee to be kept and performed during the term hereof. If at any time during the term of this lease any of the rent herein reserved shall be overdue and unpaid, or any other sum payable by Lessee to Lessor hereunder shall be overdue and unpaid, then Lessor may, at the option of Lessor (but Lessor shall not be required to) appropriate and apply any portion of said $_____1,100.00 to the payment of any such overdue rent or other sum. In the event of the failure of Lessee to keep and perform all of the terms, covenants and conditions of this lease to be kept and performed by Lessee, then at the option of Lessor said Lessor may, after terminating said lease, appropriate and apply said entire $_____1,100.00_____, or so much thereof as may be necessary, to compensate Lessor for all loss or damage sustained or suffered by Lessor due to such breach on the part of Lessee. Should the entire $_____1,100.00_____, or any portion thereof, be appropriated and applied by Lessor for the payment of overdue rent or other sums due and payable to Lessor by Lessee hereunder, then Lessee shall, upon the written demand of Lessor, forthwith remit to Lessor a sufficient amount in cash to restore said security to the original sum of $_____1,100.00_____, and Lessee's failure to do so within five (5) days after receipt of such demand shall constitute a breach of this lease. Should Lessee comply with all of said terms, covenants and conditions and promptly pay all of the rental herein provided for as it falls due, and all other sums payable by Lessee to Lessor hereunder, the said sum of $_____1,100.00_____ shall be returned in full to Lessee at the end of the term of this lease or upon the earlier termination of this lease under the provisions of Paragraph __12__ hereof. Of said sum, $600.00 is carried over from that certain lease dated October 10, 1968 between Henry Poppic, Conservator for the Estate of Clara Poppic, and E. Eugene Leonhart which was assigned to Kenneth G. Renz and Jackson R. Dennison by Assignment of Lease dated March 31, 1971.

30.  The parties hereto acknowledge that Lessee accepts the demised premises in an as-is condition, that Lessee contemplates remodeling the premises in order to prepare the same for Lessee's use, and that all remodeling to the interior or exterior of the premises shall require Lessor's prior written consent and shall be at Lessee's sole cost and expense.  All work shall be done in a first-class workmanlike manner and comply with any and all laws and regulations of any governmental agency having jurisdiction over such matters.  Lessor's written consent shall be obtained by Lessee by delivering to Lessor two (2) copies of complete plans and specifications, together with a complete cost estimate, for the contemplated work, each such copy to be signed and dated by Lessee.  Lessor shall indicate its consent and approval by signing, dating and returning to Lessee one (1) copy of said specifications, plans and estimate.  Lessor shall be free to disapprove in their entirety or to request reasonable changes in said plans and specifications, and Lessee agrees to abide by Lessor's decision in that regard and to comply with any such request.  In the case of Lessee's initial remodeling plans, however, should Lessor fail to approve the plans, specifications and cost estimate submitted by Lessee within ten (10) days after the receipt of same by Lessor, or should Lessee not wish to comply with any changes therein requested by Lessor, Lessee shall have the right of terminating this lease by giving written notice to that effect to Lessor.

31.  Lessee has executed this lease upon and subject to each and all of the following conditions:

a) Court Acceptance.  This lease is subject to confirmation by the Superior Court of Alameda County .

b) Possession.  Lessee shall have received possession of the premises demised herewith for the purpose of commencing remodeling on or before the first day of October, 1974.  Such possession shall be subject to all the terms and conditions herein contained except payment of rent which shall commence on November 1, 1974.

In the event any of the above conditions are not fulfilled, Lessee shall have the right of terminating this lease by giving written notice to that effect to Lessor.

32.  Lessee, at his own cost and expense, shall maintain a plate glass insurance policy and a comprehensive liability insurance policy during the continuance of this lease covering the demised premises and its appurtenances, and the sidewalks fronting thereon, with such insurance company as shall be satisfactory to Lessor, the minimum requirements of which policy shall embrace limits of at least ONE HUNDRED THOUSAND ($100,000) DOLLARS for bodily injury or death of each person, THREE HUNDRED THOUSAND ($300,000) DOLLARS for each occurrence, and property damage of TWENTY FIVE THOUSAND ($25,000) DOLLARS. Lessee shall furnish Lessor insurance certificates issued by each insurance carrier showing that the particular policy will not be modified or cancelled without first giving Lessor ten (10) days written notice thereof.  If Lessee does not keep such insurance in full force and effect, Lessor may take out the necessary insurance and pay the premium and the re-payment thereof shall be deemed to be part of the rental and payable as such on the next day upon which rent becomes due.



33.  In the event there is any increase during any year of the term of this lease or any renewal or extension hereof in the municipal, state or county real estate taxes, including the amount of general or special assessments, levies or charges made by any municipal or political subdivision for local improvements, over and above the amount of such taxes assessed for the fiscal year 1974/75, whether because of increased or added rate or increased assessed valuation, Lessee shall pay to Lessor annually during the lease term upon demand an amount equal to 66-2/3% of the total increase in taxes, assessments, levies and charges upon the whole of the land and building upon and within which the leased premises are situate.  The amount of Lessee's obligation under this paragraph for the year in which this lease terminates shall be prorated in the proportion that the period of this lease is in effect during the tax year in which this lease terminates bears to the full tax year.  Any increase in taxes caused by an increase in assessed valuation due to the work done by Lessee in the demised premises at any time during said term shall be borne entirely by Lessee.

34.  On October 10, 1968, Henry Poppic, Conservator for the Estate of Clara Poppic, Lessor, and E. Eugene Leonhart, Lessee, entered into a lease for Store #1, 2529 Telegraph Avenue.  Said lease was subsequently assigned on March 31, 1971 to Kenneth G. Renz and Jackson R. Dennison, the Lessees hereunder.  Said lease was for a term commencing April 1, 1970 and ending March 31, 1975.  Said lease is hereby cancelled and shall be of no further cause or effect as of November 1, 1974.

35.  The provisions of Paragraph 30 hereof not withstanding, the condition of the demised premises when delivered to Lessee for Lessee's work shall be with smooth concrete floor, new store front, taped and textured walls, normal electrical outlets, service to ceiling for tenant fixtures, exits to code for the intended use, existing plumbing to be in good working condition, 220 volt-3 phase electrical service, separate electrical meter and panel, and smooth ceiling ready for tenant finish.

36.  This lease shall be subject to the successful application of the Lessee to the City of Berkeley for necessary governmental permits and approvals.  Should said approvals not be obtained within a reasonable period of time from the date hereof, lessee shall be released from all liability hereunder, and this lease shall be deemed void.



REVISED PARAGRAPHS 13, 15, and 17

13.  Lessee may assign this lease or an interest therein and may also sublet said premises, provided the written consent to any such assignment or subletting is first obtained by Lessee.  If, during the term of this lease, Lessee requests the written consent of Lessor to any such assignment or subletting, Lessor's consent thereto shall not unreasonably be withheld.  A consent to one assignment or subletting with Lessor's consent shall not be deemed to be a consent to any subsequent assignment or subletting, and any such subsequent assignment or subletting without Lessor's consent shall be void and shall, at Lessor's option, terminate this lease.  This lease shall not, nor shall any interest therein, be assignable as to the interest of the Lessee by operation of law without the written consent of Lessor, but such consent shall not unreasonably be withheld.

15.  (a)  In the event of any breach of this lease by Lessee, then Lessor, besides other rights and remedies he may have, shall have the immediate right of re-entry and may remove all persons and property from the premises.  If the Lessor's right of re-entry is exercised following abandonment of the premises by Lessee, then Lessor may consider any personal property belonging to Lessee and left on the premises to also have been abandoned, in which case Lessor may dispose of all such personal property in any manner Lessor shall deem proper and is hereby relieved of all liability for doing so.

(b)  If Lessee breaches this lease and abandons the property before the end of the term, or if Lessee's right to possession is terminated by Lessor because of a breach of the lease, then in either such case, Lessor may recover from Lessee all damages suffered by Lessor as the result of Lessee's failure to perform his obligations hereunder, including, but not restricted to, the worth at the time of the award (computed in accordance with Paragraph (3) of Subdivision (a) of Section 1951.2 of the California Civil Code) of the amount by which the rent then unpaid hereunder for the balance of the lease term exceeds the amount of such rental loss for the same period which the Lessee proves could be reasonably avoided by Lessor, and in such case, Lessor, prior to the award, may relet the premises for the purpose of mitigating damages suffered by Lessor because of Lessee's failure to perform his obligations hereunder; provided, however, that even though Lessee has abandoned the premises following such breach, this lease shall nevertheless continue in full force and effect for as long as the Lessor does not terminate Lessee's right of possession, and until such termination, Lessor may enforce all his rights and remedies under this lease, including the right to recover the rent from Lessee as it becomes due hereunder.

17.  In case suit is brought by either party because of the breach of any term, covenant or condition herein contained, the prevailing party shall be entitled to recover against the other party a reasonable attorney's fee to be fixed by the court.



EXHIBIT "C"

COMMERCIAL REAL PROPERTY LEASE

(MODIFIED GROSS)

Between

CROCKER NATIONAL BANK, Landlord

and

Wiley Umstead

Cal Cleaners/Laundry , Tenant

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| 1. | Premises | 1 |
| 2. | Term; Rent | 1 |
| 3. | Security Deposit | 1 |
| 4. | Leasing Fee | 1 |
| 5. | Utilities | 2 |
| 6. | Use of Premises | 2 |
| 7. | Delivery of Possession | 2 |
| 8. | Governmental Requirements | 2 |
| 9. | Signs | 2 |
| 10. | Acceptance of the Premises | 2 |
| 11. | Maintenance and Repair | 3 |
| 12. | Alterations | 3 |
| 13. | Liens | 3 |
| 14. | Assignment and Subletting | 3 |
| 15. | Taxes | 3 |
| 16. | Insurance | 4 |
| 17. | Waiver of Subrogation | 4 |
| 18. | Hold Harmless | 4 |
| 19. | Entry by Landlord | 4 |
| 20. | Reconstruction | 5 |
| 21. | Condemnation | 5 |
| 22. | Default | 6 |
| 23. | Remedies | 6 |
| 24. | No Waiver | 7 |
| 25. | Subordination | 7 |
| 26. | Surrender of Premises | 7 |
| 27. | Quitclaim Deed | 7 |
| 28. | No Merger | 7 |
| 29. | Holding Over | 7 |
| 30. | Rules and Regulations | 7 |
| 31. | Estoppel Certificates | 7 |
| 32. | Landlord's Right to Perform Tenant's Covenants | 8 |
| 33. | Corporate Authority | 8 |
| 34. | Notices | 8 |
| 35. | General Provisions | 8 |
|  | (a) Joint Obligation | 8 |
|  | (b) Captions | 8 |
|  | (c) Time | 8 |
|  | (d) Successors and Assigns | 8 |
|  | (e) Recordation | 8 |
|  | (f) Non-Disturbance | 8 |
|  | (g) Prior Agreements | 8 |
|  | (h) Inability to Perform | 8 |
|  | (i) Attorneys' Fees | 8 |
|  | (j) Sale of Premises by Landlord | 8 |
|  | (k) Name | 9 |
|  | (l) Severability | 9 |
|  | (m) Choice of Law | 9 |
|  | (n) Counterparts | 9 |
|  | (o) Consent | 9 |
| 36. | Capacity of Crocker National Bank | 9 |
| 37. | Limitation of Landlord's Liability | 9 |
| 38. | Brokers | 9 |

## COMMERCIAL REAL PROPERTY LEASE
### (MODIFIED GROSS)

THIS LEASE is executed at _____Berkeley_____, California, this _____13_____ day of
_____JULY_____, 19 83, between CROCKER NATIONAL BANK, a National Banking Association,
and Henry Poppic, Co-Trustee U/W of Clara Poppic _____

("Landlord"), and _____Wiley Umstead, Cal Cleaners/Laundry_____
("Tenant").

In consideration of the payment of the rents and the performance of the covenants and conditions contained herein on the part
of Tenant and in the manner specified below, Landlord and Tenant agree as follows:

1. Premises.

   (a) Landlord leases to Tenant and Tenant hires from Landlord those certain premises ("Premises") described as follows:
   A portion of that certain single-story commercial store building located on the
   easterly line of Telegraph Avenue, approximately 305 feet southerly from the
   south line of Dwight Way and more specifically described as the northern most
   two stores in said building, being stores #1 and #2, and having frontage on
   Telegraph Avenue approximately 47 feet and an approximate depth of 66 feet, and
   known as 2529 Telegraph Avenue.

said Premises being all of (or a portion of, as the case may be) a building located on certain land situated in the City of_____
_____Berkeley_____, County of_____Alameda_____, State of California (the land and building collectively
referred to as "Building"). The Building is commonly known or referred to as _____
and is more particularly described in Exhibit A attached hereto.

   (b) Landlord leases to Tenant and Tenant hires from Landlord (check one):
   ☐ No personal property.
   ☐ The personal property described on Exhibit _____ attached hereto.

2. Term; Rent. The term and rent under this Lease shall be:
   ☐ a month-to-month term, commencing on the _____ day of _____, 19____
   and ending when terminated in the manner provided by law ("Lease Term"), at a monthly rent of _____
   _____ Dollars ($_____) commencing on such date and continuing
   on the_____ day of each month thereafter during the Lease Term.
   ☒ a term of _____10 years_____ months commencing on the _____First_____ day of _____AUGUST_____, 1983,
   and ending on the _____31st_____ day of _____JULY_____, 19____ ("Lease Term"),
   at a total rent of _____*_____ Dollars ($_____), payable in
   installments of _____*_____ Dollars ($_____) per month, com-
   mencing on the first day of the term and continuing on the _____First_____ day of each month
   thereafter during the Lease Term.

Tenant agrees to pay to Landlord the foregoing rent, monthly in advance, without deduction, offset, prior notice or demand, in the
lawful money of the United States, at such place as may be designated from time to time by Landlord. Monthly rent for any partial
month at the beginning or end of the Lease Term shall be prorated at the rate of 1/30th of the monthly rent per day.

3. Security Deposit. Tenant has deposited with Landlord Two Thousand One Hundred Fifty Dollars ($ 2,150.00)
as a security deposit for the performance by Tenant of its obligations under this Lease. In addition to its other remedies, Landlord
may use the security deposit, or any portion thereof, to remedy any breach of this Lease by Tenant, including without limitation the
failure of Tenant to pay rent, to repair damages to the Premises or the Building caused by Tenant, or to clean the Premises upon ter-
mination of this Lease. TENANT HEREBY WAIVES THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1950.7. If any
portion of the security deposit is used by Landlord as provided in this paragraph, upon demand by Landlord, Tenant shall immediately
deposit cash with Landlord in an amount sufficient to restore the security deposit to its original amount. In the event Tenant is not in
default at the expiration of the Lease Term or the earlier termination of this Lease, Landlord shall return to Tenant within two weeks

*Rent is to begin at $2,150.00 per month. There will be a CPI increases every
two (2) years throughout the duration of the lease. At the beginning of the
sixth (6) year there will be a Market Rental Survey. In no event will the rent
be lower than the years preceeding the CPI increases.

- 1 -

any unused portion of the security deposit. Tenant agrees that Landlord is not required to keep the security deposit separate from its general funds and that Tenant is not entitled to interest on such deposit.

4.    Leasing Fee. As additional consideration for execution of this Lease, Tenant shall pay to Landlord within five (5) days of the date hereof a non-refundable leasing fee in the sum of_____N/A_____ Dollars ($____N/A____).

5.    Utilities. Tenant shall pay for all utilities and services supplied to the Premises, including without limitation water, heat, refuse, air conditioning, janitorial service, electricity, telephone and gas. If Landlord so elects, Tenant shall also pay the cost of installing separate utility meters for the Premises. If any utility service is not separately metered to the Premises, Tenant shall reimburse Landlord, as Additional Rent, for Tenant's reasonable share of such utility service within ten (10) days of Landlord's presenting a bill therefor. In the event Tenant fails to pay for any utility service, as required by this paragraph, Landlord may discontinue that utility service without notice to Tenant. Such discontinuance shall not be deemed an actual or constructive eviction and shall not entitle Tenant to any reduction in rent. Additionally, there shall be no reduction of rent for, and Landlord shall not be liable for, any failure to furnish utilities or services to the Premises when the failure results from emergencies, necessary repairs, improvements or causes beyond Landlord's reasonable control.

6.    Use of Premises.

(a)    The Premises shall be used and occupied only for____Coin-operated Laundrette and dry cleaning establishment

and for no other business or purpose without Landlord's prior written consent. Tenant shall conduct its business at the Premises under the trade name of____Cal Cleaners/Laundry____and under no other name without Landlord's prior written consent.

(b)    Tenant shall at its own cost comply with all requirements of any insurance company issuing a policy pertaining to the Building.

(c)    Tenant shall not do or permit anything to be done in or near the Premises or Building or bring or keep anything therein, which will increase the existing rate of insurance for, or otherwise effect or cause cancellation of, any other insurance covering the Building or any portion thereof, or any of the contents thereof. Any increases in premiums for Landlord's insurance of the Building or its contents caused by Tenant or Tenant's use of the Premises, including the use contemplated by this Lease, shall be paid by Tenant within ten (10) days after demand therefor by Landlord. Tenant shall not do or permit anything to be done in or near the Premises which will in any way obstruct or interfere with the rights of other tenants or occupants of the Building, injure or annoy them, or disturb their quiet enjoyment. Tenant shall not cause, maintain or permit any nuisance or commit or permit any waste or damage in or near the Premises or the Building. Tenant shall not place any loads upon the floor, walls or ceilings of the Building which endanger the structure, and shall not obstruct the sidewalk or passageways or stairways in front of, within or adjacent to the Building.

(d)    Tenant shall store all its trash and garbage in the Premises at its own expense and shall regularly remove same from the Premises in accordance with such rules and regulations as may be adopted from time to time by Landlord.

7.    Delivery of Possession. If for any reason Landlord is unable to deliver possession of the Premises on the commencement date of the Lease Term, this Lease shall not be void or voidable, Landlord shall not be liable for any damage arising out of its failure to deliver possession, the expiration date of the Lease Term shall not be extended, and Tenant's obligations hereunder shall not commence until Landlord delivers possession of the Premises to Tenant. If Landlord is unable to deliver the Premises to Tenant within one (1) year after the commencement date, this Lease shall terminate and all sums of money paid by Tenant to Landlord shall be refunded.

8.    Governmental Requirements. Tenant shall not use or allow any person to use the Premises or any part thereof for any use or purpose in violation of the laws, statutes, ordinances, rules, regulations or requirements of any governmental agency or Board of Fire Underwriters (or any other board or organization exercising a similar function) having jurisdiction over the use of the Premises or the Building, and Tenant shall at its own expense (including without limitation the cost to alter or restore the Premises) abide by and comply with all such laws, statutes, ordinances, rules, regulations and requirements concerning Tenant's use or occupancy of the Premises. The commencement or pendency in any court or agency of any abatement proceedings affecting the use of the Premises shall, at the option of Landlord, be deemed to be a breach of this Lease.

9.    Signs. Landlord reserves the exclusive right to use the roof and all exterior walls of the Premises and Building for signs. Consequently, without the prior written consent of Landlord, Tenant shall not place, inscribe, paint, affix or display any sign, advertisement or notice (collectively "signs") whatsoever on or to any part of the exterior walls or roof of the Building or to the interior of the Premises if visible from outside the Building. Any signs placed by Tenant shall be placed and maintained in first-class condition at Tenant's expense and shall comply with all applicable laws. At the expiration or termination of this Lease, Tenant agrees to remove any signs placed by it and repair all damage to the Premises or Building caused by the installation and removal of Tenant's signs. If Tenant fails to remove its signs, Landlord may remove such signs at Tenant's expense and charge such expense to Tenant as Additional Rent, which shall be paid by Tenant within ten (10) days of Landlord's presenting a bill therefor.

10.    Acceptance of the Premises. By entering and taking possession of the Premises, Tenant acknowledges that it has examined the Premises and accepts them as is, subject to all matters of record and all applicable laws. Tenant further acknowledges that neither

Landlord nor any agent of Landlord has made any representation or warranty concerning the Premises or the Building or the suitability of the Premises or the Building for the conduct of Tenant's business.

11. **Maintenance and Repair.**

(a) At its sole expense Tenant shall repair and maintain in good order the Premises and every part thereof, including without limitation, partitions, electrical equipment and fixtures, carpentry, storefronts, plate glass, heating, ventilating, air conditioning and mechanical equipment, show windows, and plumbing, and Tenant's improvements, signs, equipment and personal property, excluding only the structural components, foundation, exterior walls and roof of the Building. Tenant shall also repair any damage to the Premises or Building resulting directly or indirectly from acts or omissions of Tenant or permitted by Tenant.

(b) Tenant hereby waives the provisions of California Civil Code Sections 1941 and 1942 and any similar provision of law imposing on Landlord obligations concerning the tenantability of the Premises or Building or giving to Tenant the right to make repairs and deduct the expenses of such repairs from rent.

12. **Alterations.**

(a) Tenant shall make no alterations of or additions or improvements to the Premises (collectively "alterations") without the prior written consent of Landlord.

(b) Any alterations by Tenant shall be made at Tenant's sole expense; Tenant's contractor and the plans and specifications for the alterations shall be approved in writing by Landlord before work on such alterations is begun. Landlord's approval shall be obtained at least ten (10) days before Tenant (or its contractor) begins work on such alterations so that Landlord may post and record an appropriate notice of nonresponsibility.

(c) At Landlord's option and after notice to Tenant, upon the expiration of the Lease Term or the sooner termination of this Lease any or all alterations (excepting only Tenant's movable equipment and trade fixtures) shall either: (i) become a part of the realty and therefore the property of Landlord and be surrendered with the Premises; or (ii) be removed by Tenant, in which case Tenant shall repair any damages to the Premises or Building caused by such removal.

13. **Liens.** Tenant shall keep the Premises and Building free from any liens arising out of any work performed for, materials furnished to, or obligations incurred by Tenant, and Tenant agrees to indemnify and hold Landlord harmless from all claims, demands, damages and liability, including attorneys' fees, costs and expenses, with respect to such liens. Tenant shall discharge any such lien asserted against Tenant with respect to the Premises or the Building or filed against the Building or the Premises within five (5) days after written demand by Landlord. However, Tenant shall have the right to contest the correctness or the validity of any such lien if, within five (5) days after written demand by Landlord, Tenant procures and records a lien release bond issued by a corporation authorized to issue surety bonds in California in an amount equal to one and one-half times the amount of the claim of lien. The bond shall meet the requirements of California Civil Code Section 3143 and shall provide for the payment of any sum that the claimant may recover on the claim (together with costs of suit, if it recovers in the action).

14. **Assignment and Subletting.**

(a) Tenant shall neither voluntarily nor by operation of law assign, transfer, hypothecate or encumber this Lease or any interest therein, shall not sublet the Premises, any part thereof, or any right or privilege appurtenant thereto, and shall not permit any other person to occupy or use the Premises or any portion thereof (all of the foregoing being collectively referred to as a "transfer") without the prior written consent of Landlord. Landlord agrees with regard only to a voluntary subletting or assignment of the entire Premises not to unreasonably withhold its consent on the conditions (i) that Tenant notifies Landlord in writing no fewer than sixty (60) days prior to any such assignment or subletting, (ii) that Tenant remains liable for the performance by its assignee or subtenant of all of the obligations of Tenant or subtenant under this Lease, (iii) that the notice to Landlord contains the following information with respect to the proposed assignee or subtenant: (a) its name and address; (b) the names and addresses of its officers, directors, and principals; (c) the nature of its business; and (d) appropriate credit references and financial data; and (iv) that such information discloses that the proposed assignee's or subtenant's business and financial condition are at least as creditworthy as Tenant's and that the proposed assignee or subtenant is otherwise acceptable to Landlord, in Landlord's judgment reasonably exercised.

(b) Any transfer by Tenant without Landlord's prior written consent shall be void and shall constitute a material default under this Lease.

(c) Tenant hereby irrevocably assigns to Landlord, as security for Tenant's obligations under this Lease, all rent from any subletting of all or a part of the Premises. Tenant hereby irrevocably appoints Landlord assignee and attorney-in-fact for Tenant, with power to apply for the appointment of a receiver on Tenant's behalf, to collect such rent and to apply it towards the obligations of Tenant under this Lease; provided, that Tenant shall have the right to collect such rent until the occurrence of a default by Tenant (or its assignee or subtenant) under this Lease.

(d) Any consent by Landlord to any transfer hereof shall not be a consent to any other transfer.

- 3 -

15. **Taxes.**

(a)   Tenant shall pay before delinquency all taxes, assessments, license fees and other charges (collectively "taxes") which are levied or assessed against Tenant, Tenant's estate hereunder, or the personal property, fixtures, furniture, or appliances of Tenant installed or located in or near the Premises (collectively "Tenant's personal property"). Satisfactory evidence of such payments by Tenant shall be furnished to Landlord upon demand. In the event any taxes on Tenant's personal property are levied directly against Landlord or Landlord's property, or in the event the taxes assessed against the Premises or Building are increased by the inclusion of a value placed on Tenant's personal property, then Tenant shall immediately reimburse Landlord, as Additional Rent, for the amount of any taxes paid on such personal property or the amount of the increased taxes attributable to such personal property. Landlord is entitled to pay any such taxes regardless of the validity of the levy.

(b)   Tenant shall also pay as Additional Rent the amount of all taxes levied upon or measured by the rent, Landlord's receipt of the rent, ~~the rental or other charges~~ the occupancy of Tenant, or the act of entering into this Lease. This obligation shall exist whether the tax is levied as a so-called sales tax, transaction privilege tax, excise tax, gross receipts tax, or otherwise, and whether or not such tax is now customary or within the contemplation of the parties. Tenant shall further pay as Additional Rent the cost to Landlord of contesting the amount, validity, or applicability of any taxes mentioned in this paragraph. Such taxes and costs shall be due and payable at the same time as and in addition to each payment of rent.

16. **Insurance.**

(a)   At its own expense Tenant shall maintain in full force and effect a policy or policies of comprehensive general liability insurance insuring Tenant and Landlord (and such other persons, firms or corporations as are designated by Landlord) against any liability for death, personal injury or property damage to any person or persons occurring in or near the Premises or the Building. Such insurance shall name Landlord as an additional insured and shall have an initial combined single event coverage of not less than One Million Dollars ($1,000,000.00). In the event such coverage amount is at any time inadequate in the considered opinion of Landlord's insurance advisor or legal counsel, Tenant shall increase such coverage to a reasonable amount determined by such insurance advisor or legal counsel.

(b)   Tenant shall at its own expense maintain in full force and effect a policy or policies of fire and extended coverage casualty insurance insuring Tenant for full replacement value on all of Tenant's merchandise, inventory, fixtures, equipment, plate glass, alterations and leasehold improvements in the Premises. Such insurance shall have a vandalism and malicious mischief endorsement together with a sprinkler leakage endorsement (if the Building contains sprinklers) and any proceeds from such insurance shall be used for the repair or replacement of insured items. Tenant agrees that Landlord has no obligation to insure any alterations installed by Tenant.

(c)   All insurance required of Tenant under this Lease shall be with insurance companies and in a form satisfactory to Landlord and shall not be subject to cancellation or change except after twenty (20) days prior written notice to Landlord. All required insurance policies, or properly executed certificates evidencing the same, together with satisfactory evidence of premium payments, shall be deposited with Landlord prior to Tenant's entering into possession of the Premises and, for renewals, at least thirty (30) days prior to the expiration of such coverage.

17. **Waiver of Subrogation.** As long as their respective insurers so permit, each party to this Lease shall cause each insurance policy obtained by it to provide that the issuing insurance company waives all right of recovery by way of subrogation against either party to this Lease in connection with any damage covered by such policy.

18. **Hold Harmless.** Except in the event of the gross negligence or willful misconduct of Landlord and/or Landlord's agents or employees, Landlord shall not be liable to any person for damage from any cause whatsoever to any real or personal property or effects, irrespective of their ownership, located in or about the Premises or the Building, or for any personal injury or damage suffered by any person whomsoever in or about the Premises or the Building. Tenant agrees to exercise all reasonable care and diligence in the occupation, use, repair and maintenance of the Premises and the Building, and the roads and sidewalks appurtenant or adjacent thereto, so as to avoid the causing of any injury to any person or property. Tenant agrees to protect and indemnify Landlord and to hold Landlord harmless from all claims, demands, damages and liability (including without limitation attorneys' fees and expenses) to any and all persons arising from damage to property or personal injury occasioned to or sustained during the Lease Term in or about the Premises or the Building unless solely caused by other tenants of the Building (if a portion of the Building is leased to other tenants) or by the gross negligence or willful misconduct of Landlord and/or Landlord's agents.

19. **Entry by Landlord.** In addition to entry at any time for emergencies, Landlord and its authorized representatives have the right to enter the Premises at all reasonable times for reasonable purposes, including without limitation the following: to inspect the Premises; to make repairs, alterations, or additions; to perform maintenance on the Premises or Building; to reconstruct the Premises or Building; to erect scaffolding and protective barriers around the Premises or Building; to post notices of nonresponsibility; to post "for sale" signs; to post "for rent" or "for lease" signs during the last ninety (90) days of the term; and to show the Premises to prospective buyers, tenants or their agents. Landlord shall retain keys for all of the doors in and to the Premises and Building, and Tenant shall immediately furnish Landlord with keys for any lock installed by Tenant on doors to and within the Premises. In no event shall there be an abatement of rent nor shall Landlord incur any liability to any person arising out of Landlord's entry into the Premises as provided in this paragraph.

-4-

20. **Reconstruction.**

(a) **Insured Loss.** If the Premises or Building are totally or partially destroyed from a risk covered by Landlord's casualty insurance (other than damage Tenant is obligated to repair as specified in paragraph 11 hereof), Landlord shall restore the same (except as provided below) to substantially the same condition as they were in immediately before destruction. Notwithstanding the above, Landlord may elect to terminate this Lease by giving written notice to Tenant within thirty (30) days after determining that the restoration cost will exceed the insurance proceeds. Nothing in this paragraph shall obligate Landlord to insure the Premises or Building for any risk or in any amount. Any restoration required hereunder shall not commence until insurance sums sufficient to recover the cost of restoration are received by Landlord.

(b) **Uninsured Loss.** If the Premises or Building are totally or partially destroyed from a risk not covered by Landlord's casualty insurance, Landlord shall restore the same (except as provided below) to substantially the same condition as they were in immediately before destruction. Notwithstanding the above, Landlord may elect to terminate this Lease by giving written notice to Tenant within thirty (30) days of determining that the cost of restoration exceeds ten percent (10%) of the then replacement value of the Building.

(c) **Restoration Not Permitted.** In the event then existing laws do not permit restoration of the Premises or Building, Landlord may terminate this Lease immediately by giving written notice to Tenant. If such notice is not given within thirty (30) days after the appropriate governmental agency determines that restoration is not permitted, the provisions of subparagraphs 20(a) and 20(b) shall control.

(d) **Rent.** Except for termination as provided for in this paragraph, destruction in whole or in part of the Premises or Building shall not terminate this Lease. In case of a destruction which renders the Premises totally or partially inaccessible or unusable, there shall be an abatement of Rent, between the date of destruction and the date of completion of restoration, to the extent which the destruction and restoration interfere with the business carried on by Tenant at the Premises. No such reduction of Rent shall be made if the destruction of the Premises or Building arises out of the fault or neglect of Tenant.

(e) **End of Term.** Notwithstanding anything herein to the contrary, if any destruction of the Premises or Building occurs during the last twelve (12) months of the term, Landlord may terminate this Lease by giving notice to Tenant not more than thirty (30) days after the destruction.

(f) **Tenant's Improvements.** In no event shall Landlord be required to restore or reconstruct Tenant's alterations, trade fixtures, or personal property. Tenant hereby covenants to restore such items if they are totally or partially destroyed and this Lease is not terminated pursuant to this paragraph 20.

(g) **Waiver.** Tenant hereby waives the benefit of the provisions of Sections 1932(2) and 1933(4) of the California Civil Code.

21. **Condemnation.**

(a) **Definitions.** For the purposes of this Lease:

(i) "Condemnation" means (a) the exercise of any governmental power by a condemnor to acquire the Building or any portion thereof, whether by legal proceedings or otherwise, and (b) a voluntary sale or transfer by Landlord to any condemnor, either under threat of condemnation or while legal proceedings for condemnation are pending.

(ii) "Date of taking" means the date the condemnor has the right to possession of the property being condemned.

(iii) "Award" means all compensation, sums, or anything of value awarded, paid, or received on a total or partial condemnation.

(iv) "Condemnor" means any public or quasi-public authority, or private corporation or individual, having the power of condemnation.

(b) **Total Taking.** If the Premises are totally taken by condemnation, this Lease shall terminate on the date of taking.

(c) **Partial Taking.** If any portion of the Premises is taken by condemnation this Lease shall remain in effect, except that either party may elect to terminate this Lease from the date of taking upon thirty (30) days prior written notice to the other party if fifty percent (50%) or more of the total number of square feet in the Premises is taken.

(d) **Taking of Building.** A partial taking of the Building shall not affect this Lease, except that if fifty percent (50%) or more of the total number of square feet in the improvements which form the Building, or if fifty percent (50%) or more of the land on which such improvements are located is taken by condemnation, Landlord may elect to terminate this Lease from the date of taking upon thirty (30) days prior written notice to Tenant. Such notice shall be delivered within thirty (30) days after the date of taking.

(e) **Rent Abatement.** If any portion of the Premises is taken by condemnation and this Lease remains in full force and effect, on the date of taking the monthly rent shall be reduced by an amount that is in the same ratio to monthly rent as the total number of square feet in the Premises taken bears to the total number of square feet in the Premises immediately before the date of taking. No other charge or obligation of this Lease shall be affected.

(f) **Waiver.** Each party waives the provisions of California Code of Civil Procedure Section 1265.130 allowing either party to petition the Superior Court to terminate this Lease in the event of a partial taking of the Premises.

(g)  Award. The award, if any, shall belong to and be paid to Landlord, except that Tenant shall receive from the award a sum attributable to Tenant's improvements or alterations which Tenant has the right to remove from the Premises pursuant to the provisions of this Lease but elects not to remove; or, if Tenant elects to remove any such improvements or alterations, a sum for reasonable removal and relocation costs not to exceed the market value of such improvements or alterations.

(h)  Temporary Taking. The taking of the Premises or Building or any part thereof shall constitute a taking by condemnation only when the use and occupancy by the taking authority is for a period longer than 180 consecutive days. During the 180-day period all the provisions of this Lease shall remain in full force and effect except that Rent shall be abated or reduced during such period of taking only in proportion to the portion of the Premises temporarily taken. Landlord shall be entitled to whatever award may be paid for the use and occupation of the Premises for the period involved.

22.  Default. A default by Tenant under this Lease shall exist upon the occurrence of any of the following:

(a)  Tenant shall fail to pay when due Rent, Additional Rent, or any other payment of money imposed by this Lease;

(b)  Tenant shall breach the transfer restrictions of paragraph 14 of this Lease;

(c)  Tenant shall fail to perform any term, covenant or condition of this Lease, other than those restricting transfer of this Lease or requiring the payment of money, and shall fail to cure such breach within thirty (30) days after written notice thereof from Landlord; provided, that where such breach cannot reasonably be cured within a thirty (30) day period, Tenant shall not be in default unless it fails to begin curing such default within thirty (30) days after such notice or fails to continue diligently to cure such breach until cured;

(d)  Tenant shall abandon or vacate the Premises;

(e)  Tenant shall be unable to pay its debts as they become due;

(f)  Tenant, under the law of any state or the United States, shall assign its assets for the benefit of its creditors, or shall voluntarily institute any bankruptcy, reorganization, insolvency, or wage-earner proceedings;

(g)  Any assets of Tenant shall be sequestered or attached and Tenant shall fail to obtain the release of such assets within thirty (30) days;

(h)  Any application or petition shall be filed against Tenant seeking a determination that Tenant is insolvent or bankrupt, or seeking a reorganization or arrangement of Tenant under any bankruptcy or debtor's relief law or statute, or seeking the appointment of a receiver for Tenant, and the same shall not be removed or dismissed within thirty (30) days after the date of filing; or

(i)  If Tenant is a corporation, Tenant shall cease to be in good standing under the laws of the State of California.

23.  Remedies.

(a)  Upon the occurrence of any default by Tenant, Landlord may, at any time thereafter, with or without notice or demand and without limiting Landlord in the exercise of any other right or remedy, do one or more of the following (unless otherwise provided by law):

(i)  Collect by suit or otherwise each installment of Rent, Additional Rent, or other sum as it becomes due under this Lease or enforce any other term or provision required to be kept or performed by Tenant.

(ii)  Cure any default of Tenant at Tenant's cost. If Landlord at any time pays any sum or does any act that requires the payment of any sum, the sum paid by Landlord shall be due immediately from Tenant to Landlord and shall accrue interest at the rate of ten percent (10%) per annum from the date of Landlord's payment until the date of Tenant's reimbursement to Landlord.

(iii)  Re-let the Premises or any part thereof to third parties for the account of Tenant, upon such terms and conditions as Landlord may deem advisable, without in any way affecting any rights or remedies of Landlord or any duties or obligations of Tenant under this Lease. In the event of such re-letting any rents received shall be applied first to the expenses of re-letting, including without limitation renovation and alteration of the Premises, collection costs, reasonable attorneys' fees, and real estate commissions actually paid. The remainder of any rents received shall be applied toward payment of all sums due or to become due to Landlord pursuant to this Lease. In the event the amount of rents realized is not sufficient to pay amounts due Landlord under the Lease, Tenant shall pay monthly to Landlord any deficiency, and Landlord may sue therefor as each monthly deficiency arises. No re-letting of the Premises by Landlord shall constitute a termination of Tenant's right to possession or be construed as an election by Landlord to terminate this Lease unless a written notice of such intention of Landlord is given to Tenant. Notwithstanding anything herein to the contrary, Landlord may elect to terminate this Lease at any time after default by Tenant.

(iv)  Terminate this Lease by giving Tenant such written notice of termination as may be required by law. In such event Tenant shall immediately surrender possession of the Premises and Landlord shall be entitled to recover from Tenant the following amounts pursuant to California Civil Code Section 1951.2:

(A)  the worth at the time of award of the unpaid Rent and items of Additional Rent which had been earned at the time of termination;

(B)  the worth at the time of award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided;

(C)  the worth at the time of award of the amount by which the unpaid Rent for the balance of the term after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided; and

(D)  any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course would be likely to result therefrom.

The "worth at the time of award" of the amounts referred to in subsections (A) and (B) of subsection (iv) above is computed by allowing interest at a rate of ten percent (10%) per annum. The "worth at the time of award" of the amount specified in subsection (C) of subsection (iv) above is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).

(b)  The foregoing remedies of Landlord shall not be exclusive, but shall be cumulative, and shall be in addition to all remedies now or hereafter existing at law or in equity.

24.  **No Waiver.** The waiver by Landlord of any breach of any term, covenant or condition of this Lease shall not be deemed to be a waiver of such term, covenant or condition or of any subsequent breach of the same or any other term, covenant or condition of this Lease. The subsequent acceptance of Rent or other sums hereunder by Landlord during the pendency of an unlawful detainer action or otherwise shall not be deemed to be a waiver of any preceding breach by Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay the particular rental so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such rent.

25.  **Subordination.** At Landlord's sole option, this Lease shall be either subordinate to or prior to any ground lease, mortgage, deed of trust, or hypothecation for security (collectively "Encumbrance") now or hereafter placed upon the Building. Such subordination or priority shall apply also to any and all advances made on the security of any Encumbrance, as well as to all renewals, modifications, consolidations, replacements and extensions of the same. Tenant agrees to execute any documents required with respect to subordination or priority required by this paragraph 25. In connection therewith, Tenant hereby irrevocably appoints Landlord as Tenant's attorney-in-fact to execute such documents in Tenant's name in the event Tenant fails to so execute within ten (10) days after written demand from Landlord.

26.  **Surrender of Premises.**

(a)  Tenant shall, at least ninety (90) days before the last day of the term hereof, give to Landlord a written notice of intention to surrender the Premises on that date, but nothing contained herein shall be construed as an extension of the term hereof or as consent of Landlord to any holding over by Tenant.

(b)  At the end of the Lease Term or upon the earlier termination of this Lease, Tenant shall deliver to Landlord possession of the Premises, together with all improvements or additions to the Premises, in the same condition as received or first installed, ordinary wear and tear excepted (subject to the provisions of paragraph 12 of this Lease). If Tenant is not in default under this Lease at the end of the Lease Term or upon the earlier termination of this Lease, Tenant may at its sole expense remove Tenant's personal property, movable equipment and trade fixtures, repairing any damage to the Premises or Building caused by such removal. At the election of Landlord, any personal property, movable equipment or trade fixtures not removed shall be deemed abandoned by Tenant and title to such shall pass to Landlord. Tenant shall indemnify and hold Landlord harmless from all claims, demands, damages or liability (including attorneys' fees, costs and expenses) resulting from any delay by Tenant in complying with this paragraph, including without limitation any claims by any succeeding tenant and any losses to Landlord due to lost opportunities to lease to succeeding tenants.

27.  **Quitclaim Deed.** On Landlord's request, Tenant shall execute and deliver to Landlord a recordable quitclaim deed to the Premises designating Landlord as transferee, effective as of the expiration or sooner termination of this Lease.

28.  **No Merger.** The voluntary or involuntary surrender of this Lease by Tenant, or mutual cancellation hereof, shall not work a merger, and at the option of Landlord shall terminate any or all existing subleases or subtenancies, or shall operate as an assignment to Landlord of any or all such subleases or subtenancies.

29.  **Holding Over.** Any holding over with the prior written consent of Landlord after the expiration of the Lease Term or the sooner termination thereof shall be construed to be a tenancy from month to month at the rental specified above as rent, and shall otherwise be on the terms and conditions herein specified, so far as applicable. Any holding over without Landlord's prior written consent shall be a tenancy at sufferance and may be terminated at any time by written notice from Landlord to Tenant.

30.  **Rules and Regulations.** Tenant shall abide by such reasonable rules and regulations as Landlord may promulgate from time to time for the safety, care, cleanliness, and orderly management of the Premises and Building, which shall be binding upon Tenant and Tenant's employees upon delivery to Tenant of a copy thereof.

31.  **Estoppel Certificates.** Upon request by Landlord, Tenant shall execute and deliver to Landlord any document, including an estoppel certificate, which: (a) certifies that this Lease is unmodified and in full force and effect, or, if modified, states the nature of such modification and certifies that this Lease as modified is in full force and effect; and (b) certifies the date to which the rent and

-7-

other charges are paid; and (e) acknowledges that there are no uncured defaults on the part of Landlord hereunder; and (d) otherwise evidences the status of this Lease as may be requested by Landlord. Failure by Tenant to deliver such document within ten (10) days from Landlord's request shall be conclusive against Tenant that this Lease is in full force and effect without modification except as may be represented by Landlord, that no uncured defaults in Landlord's performance exist, and that no rent or other charge due or to become due under this Lease has been prepaid.

32.  **Landlord's Right to Perform Tenant's Covenants.** If Tenant fails at any time to make any payment or perform any act on its part required by this Lease, Landlord may, without waiving or releasing Tenant from any obligation (including penalties and interest, if any), make such payment or perform such act to the extent Landlord deems desirable. In connection with such performance, Landlord may pay expenses and employ counsel. Any amounts so expended by Landlord shall be immediately due and payable from Tenant to Landlord, together with interest at the rate of ten percent (10%) per annum from such date to the date of reimbursement by Tenant to Landlord. The rights and remedies of Landlord for the non-payment by Tenant of such amounts shall be the same as for any other breach or default under this Lease.

33.  **Corporate Authority.** If Tenant is a corporation, each individual executing this Lease on behalf of said corporation represents and warrants that he is duly authorized to execute and deliver this Lease on behalf of said corporation in accordance with a duly adopted resolution of the Board of Directors of said corporation or in accordance with the Bylaws of said corporation, that this Lease is binding upon said corporation in accordance with its terms, and that said corporation is duly qualified to do business in the State of California.

34.  **Notices.** Any notice, demand, request, consent, approval or communication that either party desires or is required to give to the other party shall be in writing and either served personally or sent by prepaid first class mail to the following address:

    Landlord's Address:    Crocker National Bank
                           Trust and Investment Division
                           Attention: Larrisa Potson-Lowery
                           P.O. Box 417
                           Oakland, CA 94604

    Tenant's Address:      Wiley L. Umstead
                           2529-31 Telegraph Avenue
                           Berkeley, CA 94704

Either party may change its address by notifying the other party in writing.

35.  **General Provisions.**

    (a)  **Joint Obligation.** If there is more than one Tenant hereunder the obligations imposed upon Tenants shall be joint and several.

    (b)  **Captions.** The captions in this Lease are not a part of this Lease and shall have no effect upon construction or interpretation.

    (c)  **Time.** Time is of the essence of this Lease.

    (d)  **Successors and Assigns.** The covenants and conditions herein contained, subject to the provisions as to assignment, apply to and bind the heirs, successors, executors, administrators and assigns of all the parties hereto.

    (e)  **Recordation.** Neither Landlord nor Tenant shall record this Lease or any short form memorandum thereof without the prior written consent of the other party.

    (f)  **Non-Disturbance.** Landlord covenants that it has full right to make this Lease and that so long as Tenant is not in default hereunder Tenant shall have possession of the Premises without disturbance by Landlord, its successors and assigns. No other covenant of quiet enjoyment is given.

    (g)  **Prior Agreements.** This Lease contains the entire understanding of Landlord and Tenant and supersedes all prior written or oral agreements. This Lease cannot be amended except by an agreement in writing signed by both parties.

    (h)  **Inability to Perform.** This Lease and the obligations of Tenant hereunder shall not be affected or impaired because Landlord is unable to fulfill any of its obligations hereunder or is delayed in doing so if such inability or delay is caused by reason of strike, labor troubles, acts of God, or other cause beyond the control of Landlord.

    (i)  **Attorneys' Fees.** Tenant agrees to reimburse Landlord for any attorneys' fees, costs of collection and/or other expenses incurred in connection with any breach by Tenant and enforcement by Landlord, of the terms, covenants, and conditions of this Lease. Landlord agrees to pay the reasonable attorneys' fees of Tenant to the extent required by California Civil Code Section 1717.

    (j)  **Sale of Premises by Landlord.** In the event of any sale or transfer of the Building or the Premises, Landlord shall be and is hereby entirely freed and relieved of all liability under any and all of its covenants and obligations contained in or derived from this Lease which arise out of any act, occurrence, or omission after the consummation of such sale or transfer. The transferee at such sale or transfer shall be deemed, without any further agreement between the parties to this Lease or their successors in interest or between the parties to this Lease and any such transferee, to have assumed and agreed to carry out any and all of the covenants and

- 8 -

obligations of Landlord under this Lease, and Tenant hereby agrees to attorn in writing to such transferee. In such event, Landlord shall transfer any unused security deposit or prepaid rent to Landlord's successor and upon such transfer Landlord shall be discharged from any further liability in reference to the security deposit or prepaid rent.

(k)   Name. Tenant shall not use the name of the Building (or of the development in which the Building may be situated) for any purpose other than as an address of the business to be conducted by Tenant at the Premises.

(l)   Severability. In case any one or more of the provisions contained herein, except for the payment of rent, shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Lease, but this Lease shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein.

(m)   Choice of Law. The interpretation and performance of this Lease shall be governed by the laws of the State of California.

(n)   Counterparts. The parties may execute this Lease in two or more counterparts, which shall, in the aggregate, be signed by all the parties; each counterpart shall be deemed an original instrument as against any party who has signed it.

(o)   Consent. Landlord's consent to or approval of any act by Tenant requiring Landlord's consent or approval shall not be deemed to waive or render unnecessary Landlord's consent or approval of any subsequent act by Tenant.

36.   Capacity of Crocker National Bank. Tenant and Landlord agree that Crocker National Bank is executing this Lease in its fiduciary capacity and not in its corporate capacity, and that Crocker National Bank in its corporate capacity does not and shall not incur, directly or indirectly, any liabilities hereunder. The rights and claims of a party hereto other than Crocker National Bank shall be limited to such claims as said party may have against the trust, probate, guardianship, conservatorship or other estate (as the case may be) represented herein by Crocker National Bank, subject to the provisions of paragraph 37 of this Lease.

37.   Limitation of Landlord's Liability. If Landlord is in default under this Lease, and as a consequence Tenant recovers a money judgment against Landlord, such judgment shall be satisfied only out of the proceeds of sale received on execution of the judgment and levy against the right, title, and interest of Landlord in the Building, or out of rent or other income from such real property receivable by Landlord or out of the consideration received by Landlord from the sale or other disposition of all or any part of Landlord's right, title and interest in the Building.

38.   Brokers. Tenant warrants that it has had no dealings with any real estate broker or agents in connection with the negotiation of this Lease excepting only __None_____

_____

_____

and Tenant knows of no other real estate broker or agent who is entitled to a commission in connection with this Lease.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease the day and year first above written.

LANDLORD:                                              TENANT:

CROCKER NATIONAL BANK,
a National Banking Association

By _____                    By _____

Title: _____                 Title: _____

By _____                    By _____

Title: _____                 Title: _____

98-6177 (4-80)

-9-

EXHIBIT "D"

Poppie, 500-6139208

## ASSIGNMENT OF LEASE

This Agreement is made this _____ day of August, 1986, by and between Wiley Umstead, an individual doing business as Cal Cleaners and Laundry, hereinafter called "Assignor," and Won Jae Yi, an individual, hereinafter called "Assignee."

### Recitals

A.     Crocker National Bank, a national banking association, and Henry Poppic, Co-Trustees U/W of Clara Poppic, jointly, as Landlord, and Assignor as Tenant, executed a lease to be effective as of the first day of August, 1983. By the terms of said lease, a copy of which is attached hereto, Landlord leased to Assignor as Tenant for a term of 10 years, commencing on August 1, 1983, and ending on July 31, 1993, subject to earlier termination as therein provided, the following described property:

> A portion of that certain single-story commercial store building located on the easterly line of Telegraph Avenue, approximately 305 feet southerly from the south line of Dwight Way and more specifically described as the northern most two stores in said building, being stores #1 and #2, and having frontage on Telegraph Avenue approximately 47 feet and an approximate depth of 68 feet, and known as 2529 Telegraph Avenue; and

B.     Assignor now desires to assign the lease to Assignee, and Assignee desires to accept the assignment thereof.

THEREFORE, Assignor and Assignee agree as follows:

### Assignment

For and in consideration of the sum of $10.00, receipt of which is hereby acknowledged, and the agreement of Assignee, hereinafter set forth, Assignor hereby assigns and transfers to Assignee all of his right, title, and interest in and to the lease hereinbefore described, and Assignee hereby agrees to and does accept the assignment, and Assignee expressly assumes and agrees to keep, perform, and fulfill all the terms, covenants, conditions, and obligations, required to be kept, performed, and fulfilled by Assignor as Tenant thereunder, including the making of all payments due to or payable on behalf of Tenant under said lease when due and payable.

Assignor and Assignee acknowledge that the approval by Landlord of this assignment does not affect or impair Landlord's rights under the lease as to Assignor/Tenant and Assignee.

Executed at Berkeley, California, on the day and year first above written.

ASSIGNOR:                                                    ASSIGNEE:

_____                      _____
Wiley Umstead                                                Won Jae Yi

### Consent of Landlord

The undersigned, jointly, Landlord in the lease described in the foregoing assignment hereby consents to the assignment of said lease to Won Jae Yi, waiving none of Landlord's rights thereunder as to the Tenant or the Assignee which rights have been acknowledged hereinabove by said Tenant and Assignee.

LANDLORD:

WELLS FARGO BANK N.A., Successor to
CROCKER NATIONAL BANK,
a National Banking Association, Co-Trustee

By _____
Dirk Peterson,
Real Property Officer

By: _____                 X _____
THOMAS CHARLES SAGER                                Henry Poppic,
REAL PROPERTY OFFICER                               Co-Trustee

EXHIBIT "E"

PM&S 7-5-90

COMMERCIAL LEASE - NET
(Multi-Tenant Building)

Telegraph Avenue
Berkeley, California

Basic Lease Information

Date:          February 1, 1994

Landlord:      Wells Fargo Bank, N. A., as Trustee for the
               Clara Poppic Trust

Tenant:        Michael Yi

Premises (section 1.1): 2531 Telegraph Avenue, Berkeley, California
                        Consisting of approximately 1825 square
                        feet

Building (section 1.1): 2529-2533 Telegraph Avenue

Term (section 2.1):     Five (5) years

Commencement Date (section 2.1): February 1, 1994

Expiration Date (section 2.1):   January 31, 1999

Base Rent (section 3.1(a)):      Two Thousand, Three Hundred Dollars
                                 and No/100s - ($2,300.00)

CPI Adjustment Date(s) (section 3.2(a)):    November

Market Adjustment Date(s) (section 3.2(b)): January 1999

Tenant's Percentage Share (section 4.1): Thirty-Three Percent (33%)

Use (section 6.1): Dry Cleaner

Liability Insurance (section 10.2): 1,000,000 Commercial-General
                                    Liability

Deposit (section 21.1): Two Thousand, Three Hundred Dollars and
                        no/100s ($2,300.00)

Landlord's Address (section 24.1): Wells Fargo Bank, N. A.,
                                   TREO
                                   P. O. Box 63700
                                   San Francisco, CA  94163

Tenant's Address (section 24.1):   Michael Yi
                                   Cal Cleaners
                                   2531 Telegraph Avenue
                                   Berkeley, CA  94704

10093664

i

Guarantor(s) Address (section 24.1):    N/A

Guarantor(s) (section 25.3):    N/A

Real Estate Broker(s) (section 25.4):    N/A

Continuing Lease Guaranty

Exhibit A - Plan(s) Outlining the Premises

Exhibit B - Rules and Regulations
Exhibit C - Additional Terms and Conditions

The foregoing Basic Lease Information is incorporated in and made a part of the Lease to which it is attached. If there is any conflict between the Basic Lease Information and the Lease, the Lease shall control.

Wells Fargo Bank, N.A. As Trustee
For the Clara Poppic Trust

By _____        By _____
Michael Yi                        Steven S. Schulman
                                  Its:Assistant Vice President

                                  By _____
                                  James B. Boydstone
                                  Its: Vice President

                                  BY _____
                                  Henry Poppic Co-Trustee

10999864

ii

## TABLE OF CONTENTS

**Article**                                                                 **Page**

1.   Premises . . . . . . . . . . . . . . . . . . . . . . . . .   1
2.   Term . . . . . . . . . . . . . . . . . . . . . . . . . . .   1
3.   Rent . . . . . . . . . . . . . . . . . . . . . . . . . . .   1
4.   Property Taxes . . . . . . . . . . . . . . . . . . . . . .   2
5.   Other Taxes Payable by Tenant . . . . . . . . . . . . . . .  7
6.   Use . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8
7.   Services . . . . . . . . . . . . . . . . . . . . . . . . .   9
8.   Maintenance and Repairs . . . . . . . . . . . . . . . . . .  9
9.   Alterations . . . . . . . . . . . . . . . . . . . . . . . . 10
10.  Insurance . . . . . . . . . . . . . . . . . . . . . . . . . 11
11.  Compliance With Legal Requirements . . . . . . . . . . . .  13
12.  Assignment or Sublease . . . . . . . . . . . . . . . . . .  14
13.  Rules and Regulations . . . . . . . . . . . . . . . . . . . 15
14.  Entry by Landlord . . . . . . . . . . . . . . . . . . . . . 17
15.  Events of Default and Remedies . . . . . . . . . . . . . .  17
16.  Damage or Destruction . . . . . . . . . . . . . . . . . . . 18
17.  Eminent Domain . . . . . . . . . . . . . . . . . . . . . .  20
18.  Subordination, Merger and Sale . . . . . . . . . . . . . .  21
19.  Estoppel Certificate . . . . . . . . . . . . . . . . . . .  22
20.  Holding Over . . . . . . . . . . . . . . . . . . . . . . .  23
21.  Security Deposit . . . . . . . . . . . . . . . . . . . . .  23
22.  Hazardous Materials . . . . . . . . . . . . . . . . . . . . 23
23.  Waiver . . . . . . . . . . . . . . . . . . . . . . . . . .  24
24.  Notices . . . . . . . . . . . . . . . . . . . . . . . . . . 25
25.  Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . 26
                                                                 26

Continuing Lease Guaranty . . . . . . . . . . . . . . . . . . . .29

Exhibit A - Plan(s) Outlining the Premises
Exhibit B - Rules and Regulations
Exhibit C - Additional Terms and Conditions

KONUM

COMMERCIAL LEASE - NET
(Multi-Tenant Building)


THIS LEASE, made as of the date specified in the Basic Lease Information, by and between the landlord specified in the Basic Lease Information ("Landlord") and the tenant specified in the Basic Lease Information ("Tenant"),

W I T N E S S E T H:

## ARTICLE 1

### Premises

1.1 Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, for the term and subject to the covenants hereinafter set forth, to all of which Landlord and Tenant hereby agree, the space on the floor(s) specified in the Basic Lease Information (the "Premises"), as outlined on the floor plan(s) attached hereto as Exhibit A, in the building specified in the Basic Lease Information (the "Building"), which includes the land on which the Building is located. Tenant shall have the right to use, in common with others, the entrances, lobbies, stairs and elevators of the Building for access to the Premises. All of the windows and outside decks, balconies and walls of the Building and any space in the Premises used for shafts, stacks, pipes, conduits, ducts, electric or other utilities, sinks or other Building facilities, and the use thereof and access thereto through the Premises for the purposes of operation, maintenance and repairs, are reserved to Landlord.

1.2 No easement for light, air or view is included with or appurtenant to the Premises. Any diminution or shutting off of light, air or view by any structure which may hereafter be erected (whether or not constructed by Landlord) shall in no way affect this Lease or impose any liability on Landlord.


## ARTICLE 2

### TERM

2.1 The term of this Lease shall be the term specified in the Basic Lease Information, which shall commence on the commencement date specified in the Basic Lease Information (the "Commencement Date") and, unless sooner terminated as hereinafter provided, shall end on the expiration date specified in the Basic Lease Information (the "Expiration Date"). Notwithstanding the foregoing, the term of this Lease shall not commence until Landlord has delivered possession of the Premises to Tenant. If Landlord, for any reason whatsoever, does not deliver possession of the Premises to Tenant on the Commencement Date, this Lease shall not be void or voidable and Landlord shall not be liable to Tenant for any loss or damage resulting therefrom, but, in such event, the Commencement Date shall be postponed until the date on which Landlord delivers possession of the Premises to Tenant and the Expiration Date shall be extended for an equal period (subject to adjustment in accordance with section 2.2 hereof).

10393864

1

2.2 If the Commencement Date as determined in accordance with section 2.1 hereof would not be the first day of the month and the Expiration Date would not be the last day of the month, then the Commencement Date shall be the first day of the next calendar month following the date so determined pursuant to section 2.1 hereof and the Expiration Date shall be the last day of the appropriate calendar month so the term of this Lease shall be the full term specified in the Basic Lease Information. The period of the fractional month between the date so determined pursuant to section 2.1 hereof and the Commencement Date shall be on and subject to all of the covenants in this Lease, all of which shall be binding on and apply to Tenant during such period, except the term of this Lease shall not commence until the Commencement Date and Tenant shall pay to Landlord, as additional rent, the Base Rent payable under section 3.1 hereof, calculated on a per diem basis, for such period. Tenant shall pay the Base Rent in respect of such period to Landlord on the Commencement Date. Landlord and Tenant each shall, promptly after the Commencement Date and the Expiration Date have been determined, execute and deliver to the other an amendment to this Lease which sets forth the Commencement Date and the Expiration Date for this Lease, but the term of this Lease shall commence on the Commencement Date and end on the Expiration Date whether or not such amendment is executed.

2.3 Tenant shall accept the Premises "as is" on the Commencement Date. Landlord shall have no obligation to construct or install any improvements in the Premises. Tenant's taking possession of the Premises shall constitute Tenant's acknowledgment that the Premises are in all respects in the condition in which Landlord is required to deliver the Premises to Tenant under this Lease and that Tenant has examined the Premises and is fully informed to Tenant's satisfaction of the physical and environmental condition of the Building and the Premises. Tenant acknowledges that Landlord, its agents and employees and other persons acting on behalf of Landlord have made no representation or warranty of any kind in connection with any matter relating to the physical or environmental condition, value, fitness, use or zoning of the Building or the Premises upon which Tenant has relied directly or indirectly for any purpose.

## ARTICLE 3

### Rent

3.1 Tenant shall pay to Landlord the following amounts as rent for the Premises:

(a) During the term of this Lease, Tenant shall pay to Landlord, as base monthly rent, the amount of monthly rent specified in the Basic Lease Information (the "Base Rent"), subject to increase as provided in sections 3.2(a) and 3.2(b) hereof.

(b) During the term of this Lease, Tenant shall pay to Landlord, as additional monthly rent, Tenant's Percentage Share (as hereinafter defined) of all Operating Expenses (as hereinafter defined) paid or incurred by Landlord during the term of this Lease and ~~Tenant's Percentage Share of all Property Taxes (as hereinafter defined) paid or incurred by Landlord during the term of this lease.~~

(c) Throughout the term of this Lease, Tenant shall pay, as additional rent, all other amounts of money and charges required to be paid by Tenant under this Lease, whether or not such amounts of money or charges are designated "additional rent." As used in this

10993864

2



Lease, "rent" shall mean and include all Interim Rent, Base Rent, additional monthly rent and additional rent payable by Tenant in accordance with this Lease.

3.2 The Base Rent payable pursuant to section 3.1(a) hereof shall be subject to increase as follows:

(a) Effective as of the Consumer Price Index (as hereinafter defined) rent adjustment date(s) specified in the Basic Lease Information (a "CPI Adjustment Date"), the Base Rent shall be the product obtained by multiplying the Base Rent payable under section 3.1(a) hereof by a fraction, the numerator of which (the comparison index) is the Consumer Price Index published three months prior to the CPI Adjustment date and the denominator of which (the base index) is the Consumer Price Index published three months prior to the Commencement Date. Notwithstanding the foregoing, in no event shall the Base Rent after any CPI Adjustment Date be less than the Base Rent for the month immediately preceding such CPI Adjustment Date. An example of a rent adjustment pursuant to this section 3.2(a) is as follows: Assume that the Commencement Date is April 1, 1991, the Base Rent is $10,000, each April 1 is a CPI Adjustment Date (i.e., an annual adjustment is made on April 1 of every year), and the Consumer Price Index last published prior to the Commencement Date and the CPI Adjustment Date is March. To calculate the new Base Rent as of April 1, 1994, divide the comparison index for March, 1994 by the base index for March, 1991, and then multiply by the Base Rent of $10,000. If the base index were 120 and the comparison index were 150, the calculation would be:

$$\frac{150 \text{ [comparison index]}}{120 \text{ [base index]}} \times \$10,000 \text{ [Base Rent]} = \$12,500.$$

(b) Effective as of the market rent adjustment date(s) specified in the Basic Lease Information (a "Market Adjustment Date"), the Base Rent shall be the prevailing fair market rental value of the Premises on the Market Adjustment Date in question, on and subject to the covenants (except the amount of Base Rent) in this Lease, based on then current rent being offered and accepted for comparable space in comparable buildings (including, without limitation, other space in the Building) in the area in which the Building is located, leased on terms comparable to this Lease as of the Market Adjustment Date. Such fair market rental value shall be determined by written agreement between Landlord and Tenant. If Landlord and Tenant do not agree in writing on such fair market rental value by the date three (3) months prior to the Market Adjustment Date in question, such fair market rental value shall be determined by appraisal in accordance with section 3.2(d) hereof. Notwithstanding the foregoing, in no event shall the Base Rent after any Market Adjustment Date be less than the Base Rent for the month immediately preceding such Market Adjustment Date.

(c) As used in this Lease, "Consumer Price Index" shall mean the Consumer Price Index for All Urban Consumers for the metropolitan area in or nearest which the Building is located, All Items, 1982-1984 equals 100, published by the United States Department of Labor, Bureau of Labor Statistics. If the comparison Consumer Price Index required for the calculation specified in section 3.2(a) hereof is not available on the CPI Adjustment Date in question, Tenant shall continue to pay the same amount of Base Rent payable during the period immediately preceding the CPI Adjustment Date in question until the Consumer Price Index is available and the necessary calculation is made. As soon as such calculation is made, Tenant shall immediately pay to Landlord the

amount of any underpayment of Base Rent for the month or months that may have elapsed pending the calculation of the Base Rent for the CPI Adjustment Date in question. If the federal government revises or ceases to publish the Consumer Price Index, Landlord and Tenant shall convert to the revised index or adopt the successor index in accordance with the guidelines therefor issued by the federal government.

(d)  For the purpose of section 3.2(b) hereof, if Landlord and Tenant do not agree on the fair market rental value of the Premises by the date three (3) months prior to the Market Adjustment Date in question, such fair market rental value shall be determined as follows:  Landlord and Tenant each shall appoint one (1) appraiser within fifteen (15) days after written request for appointment of appraisers has been given by either Landlord or Tenant to the other. If either Landlord or Tenant fails to appoint its appraiser within such period of fifteen (15) days, such appraiser shall be appointed by the Superior Court of the State of California in and for the county in which the Building is located upon application of the other. Each such appraiser shall appraise the Premises and submit his written report setting forth the appraised fair market rental value to Landlord and Tenant within thirty (30) days after the appointment of both such appraisers (or as soon thereafter as practicable). If the higher appraised value in such two (2) appraisals is not more than one hundred ten percent (110%) of the lower appraised value, such fair market rental value of the Premises shall be the average of the two (2) appraised values. If the higher appraised value is more than one hundred ten percent (110%) of the lower appraised value, Landlord and Tenant shall agree upon and appoint a neutral third appraiser within fifteen (15) days after both of the first two (2) appraisals have been submitted to Landlord and Tenant. If Landlord and Tenant do not agree and fail to appoint such neutral third appraiser within such period of fifteen (15) days, such neutral third appraiser shall be appointed by the Superior Court of the State of California in and for the county in which the Building is located upon application of either Landlord or Tenant. The neutral third appraiser shall appraise the Premises and submit his written report setting forth the appraised fair market rental value to Landlord and Tenant within thirty (30) days after his appointment (or as soon thereafter as practicable). Such fair market rental value of the Premises shall be the average of the two (2) appraised values in such three (3) appraisals that are closest to each other (unless the differences are equal, in which case the three (3) appraised values shall be averaged). The fair market rental value of the Premises, determined in accordance with this section 3.2(d), shall be conclusive and binding upon Landlord and Tenant. Any proceedings in connection with the determination of the fair market rental value of the Premises shall be conducted in the county in which the Building is located in accordance with California Code of Civil Procedure sections 1280 to 1294.2 (including section 1283.05) or successor California laws then in effect relating to arbitration. All appraisers appointed by Landlord or Tenant, or both of them, shall be members of the American Institute of Real Estate Appraisers of the National Association of Realtors (or its successor), or real estate professionals qualified by appropriate training or experience, and have at least ten (10) years of experience dealing with commercial real estate. The appraisers shall have no power or authority to amend or modify this Lease in any respect and their jurisdiction is limited accordingly. Landlord and Tenant each shall pay the fee and expenses charged by its appraiser plus one-half of the fee and expenses charged by the neutral third appraiser. If the fair market rental value of the Premises has not been determined in accordance with this section

10093664

4

3.2(d) by the Market Adjustment Date in question, Tenant shall continue to pay the Base Rent in effect immediately preceding such Market Adjustment Date until the fair market rental value of the Premises has been determined. Within ten (10) days after such determination, Tenant shall pay to Landlord any deficiency in the amount of Base Rent which arose between the Market Adjustment Date in question and such determination, together with interest on such deficiency at the annual rate determined pursuant to section 3.6 hereof as such deficiency accrued until the payment date. Landlord and Tenant each shall, promptly after any determination of the Base Rent pursuant to section 3.2(b) hereof or this section 3.2(d), execute and deliver to the other a written amendment to this Lease which sets forth the Base Rent, but such Base Rent shall become effective whether or not such amendment is executed.

3.3 The additional monthly rent payable by Tenant pursuant to section 3.1(b) hereof shall be calculated and paid in accordance with the following procedures:

(a) On or before the Commencement Date, or as soon thereafter as practicable, and on or before the first day of each subsequent calendar year during the term of this Lease, or as soon thereafter as practicable, Landlord shall give Tenant written notice of Landlord's estimate of the amount payable under section 3.1(b) hereof for the balance of the first calendar year after the Commencement Date or for the ensuing calendar year, as the case may be. Tenant shall pay such estimated amount to Landlord in equal monthly installments, in advance, on or before the Commencement Date and on or before the first day of each month during such balance of the first calendar year after the Commencement Date or during such ensuing calendar year, as the case may be. If such notice is not given for any calendar year, Tenant shall continue to pay on the basis of the prior year's estimate until the month after such notice is given, and subsequent payments by Tenant shall be based on Landlord's current estimate. If at any time it appears to Landlord that the amount payable under section 3.1(b) hereof for the current calendar year will vary from Landlord's estimate, Landlord may, by giving written notice to Tenant, revise Landlord's estimate for such year, and subsequent payments by Tenant for such year shall be based on such revised estimate.

(b) Within a reasonable time after the end of each calendar year, Landlord shall give Tenant a written statement of the amount payable by Tenant under section 3.1(b) hereof for such calendar year certified by Landlord. If such statement shows an amount owing by Tenant that is less than the estimated payments for such calendar year previously made by Tenant, Landlord shall credit the excess to the next succeeding monthly installments of the amount payable by Tenant under section 3.1(b) hereof. If such statement shows an amount owing by Tenant that is more than the estimated payments for such calendar year previously made by Tenant, Tenant shall pay the deficiency to Landlord within ten (10) days after delivery of such statement. Tenant or Tenant's authorized agent or representative shall have the right to inspect the books of Landlord relating to Operating Expenses and Property Taxes, after giving reasonable prior written notice to Landlord and during the business hours of Landlord at Landlord's office in the Building or at such other location as Landlord may designate, for the purpose of verifying the information in such statement. Failure by Landlord to give any notice or statement to Tenant under this section 3.3 shall not waive Landlord's right to receive, or Tenant's obligation to pay, the amount payable by Tenant under section 3.1(b) hereof.

(c) If the term of this Lease ends on a day other than the last day of a calendar year, the amount payable by Tenant under section 3.1(b) hereof applicable to the calendar year in which such term ends shall be prorated according to the ratio which the number of days in such calendar year to and including the end of the term bears to three hundred sixty-five (365). Termination of this Lease shall not affect the obligations of Landlord and Tenant pursuant to section 3.3(b) hereof to be performed after such termination.

3.4 It is the intention of Landlord and Tenant that the Base Rent payable by Tenant to Landlord during the entire term of this Lease shall be absolutely net of Tenant's Percentage Share of all Operating Expenses and all Property Taxes, and the provisions of sections 3.1 and 3.3 hereof are intended to so provide. The provisions of this Lease for payment by Tenant of Tenant's Percentage Share of all Operating Expenses and all Property Taxes are intended to pass on to Tenant and to reimburse Landlord for all Operating Expenses and all Property Taxes in connection with the Building. Landlord and Tenant agree that statements in this Lease to the effect that Landlord is to perform certain of its obligations hereunder at its own or sole cost or expense shall not be interpreted as excluding any cost or expense from Operating Expenses or Property Taxes if such cost or expense is an Operating Expense or a Property Tax pursuant to this Lease.

3.5    Tenant shall pay all Base Rent and additional monthly rent under section 3.1 hereof to Landlord, in advance, on or before the first day of each and every calendar month during the term of this Lease. Tenant shall pay all rent to Landlord without notice, demand, deduction or offset, in lawful money of the United States of America, at the address of Landlord specified in the Basic Lease Information, or to such other person or at such other place as Landlord may from time to time designate in writing.

3.6 Tenant acknowledges that the late payment by Tenant of any Base Rent or additional rent (including the additional monthly rent described in sections 3.1(b) and 3.1(c) hereof) will cause Landlord to incur costs and expenses, the exact amount of which is extremely difficult and impractical to fix. Such costs and expenses will include administration and collection costs and processing and accounting expenses. Therefore, if any Base Rent or additional rent is not received by Landlord within ten (10) days after it is due, Tenant shall immediately pay to Landlord a late charge equal to ten percent (10%) of such delinquent amount. Landlord and Tenant agree that such late charge represents a reasonable estimate of such costs and expenses and is fair compensation to Landlord for the loss suffered by Tenant's failure to make timely payment. In no event shall such late charge be deemed to grant to Tenant a grace period or extension of time within which to pay any rent or prevent Landlord from exercising any right or enforcing any remedy available to Landlord upon Tenant's failure to pay all rent due under this Lease in a timely fashion, including the right to terminate this Lease. All amounts of money payable by Tenant to Landlord hereunder, if not paid when due, shall bear interest from the due date until paid at the maximum annual interest rate allowed by law for business loans (not primarily for personal, family or household purposes) not exempt from the usury law at such due date or, if there is no such maximum annual interest rate, at the rate of eighteen percent (18%) per annum.

10963644

6

## ARTICLE 4

### Property Taxes

4.1 As used in this Lease, "Tenant's Percentage Share" shall mean the percentage specified in the Basic Lease Information.

4.2 As used in this Lease, "Operating Expenses" shall mean all costs and expenses paid or incurred by Landlord in connection with the ownership, management, operation, maintenance or repair of the Building or providing services in accordance with this Lease, including the following: salaries, wages, other compensation, taxes and benefits (including payroll, social security, workers' compensation, unemployment, disability and similar taxes and payments) for all personnel engaged in the management, operation, maintenance or repair of the Building; uniforms provided to such personnel; premiums and other charges for all property, earthquake, rental value, liability and other insurance carried by Landlord; water and sewer charges or fees; license, permit and inspection fees; electricity, chilled water, air conditioning, gas, fuel, steam, heat, light, power and other utilities; sales, use and excise taxes on goods and services purchased by Landlord; telephone, delivery, postage, stationery supplies and other expenses; management fees and expenses; equipment lease payments; repairs to and maintenance of the Building, including Building systems and accessories thereto and repair and replacement of worn-out or broken equipment, facilities, parts and installations, but excluding the replacement of major Building systems; janitorial, window cleaning, security, guard, extermination, water treatment, garbage and waste disposal, rubbish removal, plumbing and other services; inspection or service contracts for elevator, electrical, mechanical and other Building equipment and systems; supplies, tools, materials and equipment; accounting, legal and other professional fees and expenses (excluding legal fees incurred by Landlord relating to disputes with specific tenants or the negotiation, interpretation or enforcement of specific leases); painting the exterior or the public or common areas of the Building and the cost of maintaining the sidewalks, landscaping and other common areas of the Building; the cost, reasonably amortized as determined by Landlord, with interest at the rate of ten percent (10%) per annum, or such higher rate as Landlord may actually have to pay, on the unamortized balance, of all furniture, fixtures, draperies, carpeting and personal property (excluding paintings, sculptures or other works of fine art) furnished by Landlord in common areas or public corridors of the Building or in the Building office; all costs and expenses resulting from compliance with any laws, ordinances, rules, regulations or orders applicable to the Building; Building office rent or rental value for office space reasonably necessary for the proper management and operation of the Building; all costs and expenses of contesting by appropriate legal proceedings any matter concerning managing, operating, maintaining or repairing the Building or the validity or applicability of any law, ordinance, rule, regulation or order relating to the Building, or the amount or validity of any Property Taxes; reasonable depreciation as determined by Landlord on all machinery, fixtures and equipment (including window washing machinery) used in the management, operation, maintenance or repair of the Building and on window coverings provided by Landlord; and the cost, reasonably amortized as determined by Landlord, with interest at the rate of ten percent (10%) per annum or such higher annual rate as Landlord may actually have to pay, on the unamortized balance, of all capital improvements made to the Building or capital assets acquired by Landlord that are designed or intended to be a

10995864





labor-saving or energy-saving device, or to improve economy or efficiency in the management, operation, maintenance or repair of the Building, or to reduce any item of Operating Expenses, or that are reasonably necessary to comply with any conservation program or required by any law, ordinance, rule, regulation or order. Operating Expenses shall not include Property Taxes, depreciation on the Building (except as described above), costs of tenants' improvement, real estate brokers' commissions, interest (except as described above) or capital items (except as described above). Actual Operating Expenses for the first calendar year and each subsequent calendar year shall be adjusted, if necessary, to equal Landlord's reasonable estimate of Operating Expenses for a full calendar year with the total area of the Building occupied during such full calendar year. The determination of Operating Expenses shall be in accordance with generally accepted accounting principles applied on a consistent basis.

4.3 As used in this Lease, "Property Taxes" shall mean all taxes, assessments, excises, levies, fees and charges (and any tax, assessment, excise, levy, fee or charge levied wholly or partly in lieu thereof or as a substitute therefor or as an addition thereto) of every kind and description, general or special, ordinary or extraordinary, foreseen or unforeseen, secured or unsecured, whether or not now customary or within the contemplation of Landlord and Tenant, that are levied, assessed, charged, confirmed or imposed by any public or government authority on or against, or otherwise with respect to, the Building or any part thereof or any personal property used in connection with the Building. If the Building is not assessed on a fully completed basis for all or any part of any calendar year, until it is so assessed, Property Taxes for such calendar year shall be established by multiplying Landlord's reasonable estimate of such assessed valuation by the applicable tax rates for such calendar year. Property Taxes shall not include net income (measured by the income of Landlord from all sources or from sources other than solely rent), franchise, documentary transfer, inheritance or capital stock taxes of Landlord, unless levied or assessed against Landlord in whole or in part in lieu of, as a substitute for, or as an addition to any Property Taxes. Property Taxes shall not include any tax, assessment, excise, levy, fee or charge paid by Tenant pursuant to section 5.1 hereof.

## ARTICLE 5

### Other Taxes Payable by Tenant

5.1 In addition to all monthly rent and other charges to be paid by Tenant under this Lease, Tenant shall reimburse Landlord upon demand for all taxes, assessments, excises, levies, fees and charges, including all payments related to the cost of providing facilities or services, whether or not now customary or within the contemplation of Landlord and Tenant, that are payable by Landlord and levied, assessed, charged, confirmed or imposed by any public or government authority upon, or measured by, or reasonably attributable to (a) the Premises, (b) the cost or value of Tenant's equipment, furniture, fixtures and other personal property located in the Premises or the cost or value of any leasehold improvements made in or to the Premises by or for Tenant, regardless of whether title to such improvements is vested in Tenant or Landlord, (c) any rent payable under this Lease, including any gross income tax or excise tax levied by any public or government authority with

10093844

8

respect to the receipt of any such rent, (d) the possession, leasing, operation, management, maintenance, alteration, repair, use or occupancy by Tenant of the Premises, or (e) this transaction or any document to which Tenant is a party creating or transferring an interest or an estate in the Premises. Such taxes, assessments, excises, levies, fees and charges shall not include net income (measured by the income of Landlord from all sources or from sources other than solely rent), franchise, documentary transfer, inheritance or capital stock taxes of Landlord, unless levied or assessed against Landlord in whole or in part in lieu of, as a substitute for, or as an addition to any such taxes, assessments, excises, levies, fees and charges. All taxes, assessments, excises, levies, fees and charges payable by Tenant under this section 5.1 shall be deemed to be, and shall be paid as, additional rent.

### ARTICLE 6

#### Use

6.1 The Premises shall be used only for the purpose specified in the Basic Lease Information and no other purpose. Tenant shall not do or permit to be done in, on or about the Premises, nor bring or keep or permit to be done in, on or about the Premises, nor bring or keep or permit to be brought or kept therein, anything which is prohibited by or will in any way conflict with any law, ordinance, rule, regulation or order now in force or which may hereafter be enacted, or which is prohibited by any insurance policy carried by Landlord for the Building, or will in any way increase the existing rate of, or cause a cancellation of, or affect any insurance for the Building. Tenant shall not do or permit anything to be done in or about the Premises which will in any way obstruct or interfere with the rights of Landlord or other tenants of the Building, or injure or annoy them. Tenant shall not use or allow the Premises to be used for any improper, immoral, unlawful or objectionable activity, nor shall Tenant cause, maintain or permit any nuisance in, on or about the Premises or commit or suffer to be committed any waste in, on or about the Premises. Tenant shall not bring or keep in the Premises any furniture, equipment, materials or other objects which overload the Premises or any portion thereof in excess of fifty (50) pounds per square foot live or dead load, which is the normal load-bearing capacity of the floors of the Building. Tenant shall not place any sign on or in the Premises that is visible from outside the Premises without Landlord's prior written consent.

### ARTICLE 7

#### Services

7.1 Landlord shall supply the Premises during reasonable and usual business hours, as determined by Landlord and subject to the Rules and Regulations (as herein after defined) established by Landlord, with normal electricity for lighting and the operation of desk top office machines, normal heating, ventilating and air conditioning reasonably required for the use and occupancy of the Premises, and normal water for lavatory and drinking purposes. Landlord shall also furnish normal elevator service to the Premises at all times, and lighting replacement for Building standard lights, restroom supplies and window washing when needed, as determined by Landlord and subject to the Rules and Regulations. Landlord shall also furnish normal security service for the Building (not Tenant or the Premises) and normal janitor service to

160993464

9

the Premises during the times and in the manner that such services are customarily furnished in comparable office buildings in the area. Landlord shall not be liable for any criminal acts of others or for any direct, consequential or other loss or damage related to any malfunction, circumvention or other failure of such security service. Landlord shall not be in default under this Lease or be liable for any damage or loss directly or indirectly resulting from, nor shall the rent be abated or a constructive or other eviction be deemed to have occurred by reason of, any installation, use or interruption of use of any equipment in connection with the furnishing of any of the foregoing services, any failure to furnish or delay in furnishing any such services when such failure or delay is caused by accident or breakdown or any condition beyond the reasonable control of Landlord or by the making of repairs or improvements to the Premises or to the Building, or any limitation, curtailment, rationing or restriction on use of water, electricity, gas or any resource or form of energy serving the Premises or the Building, whether such results from mandatory restrictions or voluntary compliance with guidelines. Landlord shall use reasonable efforts to correct any interruption in the furnishing of such services.

7.2 If Tenant uses heat generating machines, equipment or computers or lighting other than Building standard lights in the Premises which affect the temperature otherwise maintained by the air conditioning system, Landlord shall have the right to install supplementary air conditioning units in the Premises and Tenant shall pay to Landlord the cost thereof, including the costs of installation, operation, maintenance and repair thereof, as reasonably determined by Landlord, upon billing by Landlord. If Tenant installs lighting requiring power in excess of that required for normal office use in the Building or equipment or computers requiring power in excess of that required for normal desk top office equipment, Tenant shall pay to Landlord, upon billing by Landlord, the cost of such excess, as reasonably determined by Landlord. Tenant shall pay to Landlord, upon billing by Landlord, the cost of all additional services, electricity, power and energy consumed by Tenant, in excess of the amount that would reasonably be incurred for a normal business office operating during reasonable and usual business hours, as a result of the operation of Tenant's computers or equipment, the number of hours Tenant operates, or any other feature of the conduct of Tenant's business in the Premises, all as reasonably determined by Landlord based on the actual additional cost incurred by Landlord. All costs payable by Tenant under this section 7.2 shall be deemed to be, and shall be paid as, additional rent.

### ARTICLE 8

### Maintenance and Repairs

8.1 Landlord shall maintain and repair the public and common areas of the Building, such as plazas, lobbies, stairs, corridors and restrooms, the roof and exterior elements of the Building, and the elevator, mechanical (heating, ventilating and air conditioning) and electrical systems of the Building and keep such areas, elements and systems in reasonably good order and condition. Any damage in or to any such areas, elements or systems caused by Tenant or any agent, officer, employee, contractor, licensee or invitee of Tenant shall be repaired by Landlord at Tenant's expense and Tenant shall pay to Landlord, upon billing by Landlord, as additional rent, the cost of such repairs incurred by Landlord.

10293664

10

8.2 Tenant shall, at all times during the term of this Lease and at Tenant's sole cost and expense, maintain and repair the Premises and every part thereof and all equipment, fixtures and improvements therein and keep all of the foregoing clean and in good order and operating condition, ordinary wear and tear and damage thereto by fire or other casualty excepted. Tenant hereby waives all rights under California Civil Code section 1941 and all rights to make repairs at the expense of Landlord or in lieu thereof to vacate the Premises as provided by California Civil Code section 1942 or any other law, statute or ordinance now or hereafter in effect. Subject to section 9.2 hereof, Tenant shall, at the end of the term of this Lease, surrender to Landlord the Premises and all alterations, additions, fixtures and improvements therein or thereto in the same condition as when received, ordinary wear and tear and damage thereto by fire or other casualty excepted.

<center>**ARTICLE 9**</center>

<center>**Alterations**</center>

9.1 Tenant shall not make any alterations, additions or improvements in or to the Premises or any part thereof, or attach any fixtures or equipment thereto, without Landlord's prior written consent. Notwithstanding the preceding sentence, Tenant may make such alterations, additions or improvements without Landlord's consent only if the total cost of such alterations, additions or improvements is five thousand dollars ($5,000) or less and such alterations, additions or improvements will not affect in any way the structural, exterior or roof elements of the Building or the elevator, mechanical, electrical, plumbing, utility or life safety systems of the Building, but Tenant shall give prior written notice of any such alterations, additions or improvements to Landlord. All alterations, additions and improvements (except the initial improvements to be constructed or installed in the Premises in accordance with Exhibit B) in or to the Premises to which Landlord consents shall be made by Tenant at Tenant's sole cost and expense as follows:

(a) Tenant shall submit to Landlord, for Landlord's written approval, complete plans and specifications for all work to be done by Tenant. Such plans and specifications shall be prepared by responsible licensed architect(s) and engineer(s) approved in writing by Landlord, shall comply with all applicable codes, laws, ordinances, rules and regulations, shall not adversely affect the Building shell or core or any systems, components or elements of the Building, shall be in a form sufficient to secure the approval of all government authorities with jurisdiction over the Building, and shall be otherwise satisfactory to Landlord in Landlord's reasonable discretion. Tenant shall notify Landlord in writing of the licensed architect(s) and engineer(s) whom Tenant proposes to engage to prepare such plans and specifications. Landlord shall notify Tenant promptly in writing whether Landlord approves or disapproves such architect(s) and engineer(s).

(b) Landlord shall notify Tenant promptly in writing whether Landlord approves or disapproves such plans and specifications and, if Landlord disapproves such plans and specifications, Landlord shall describe the reasons for disapproval. Tenant may submit to Landlord revised plans and specifications for Landlord's prior written approval. Tenant shall pay all costs, including the fees and expenses of the licensed architect(s) and engineer(s), in preparing such plans and specifications.

11

(c) All changes in the plans and specifications approved by Landlord shall be subject to Landlord's prior written approval. If Tenant wishes to make any such change in such approved plans and specifications, Tenant shall have Tenant's architect(s) and engineer(s) prepare plans and specifications for such change and submit them to Landlord for Landlord's written approval. Landlord shall notify Tenant in writing promptly whether Landlord approves or disapproves such change and, if Landlord disapproves such change, Landlord shall describe the reasons for disapproval. Tenant may submit to Landlord revised plans and specifications for such change for Landlord's written approval. After Landlord's written approval of such change, such change shall become part of the plans and specifications approved by Landlord.

(d) Tenant shall, through Tenant's licensed contractor, perform the work substantially in accordance with the plans and specifications approved in writing by Landlord. Tenant shall pay, as additional rent, the entire cost of all work (including the cost of all utilities, permits, fees, taxes, and property and liability insurance premiums in connection therewith) required to make the alterations, additions and improvements. Tenant shall engage responsible licensed contractor(s) approved in writing by Landlord to perform all work. Tenant shall notify Landlord in writing of the licensed contractor(s) whom Tenant proposes to engage for the work. Landlord shall notify Tenant promptly in writing whether Landlord approves or disapproves such contractor(s). All contractors and other persons shall at all times be subject to Landlord's control while in the Building. Tenant shall pay to Landlord any additional direct costs (beyond the normal services provided to tenants in the Building) and shall reimburse Landlord for all expenses incurred by Landlord in connection with the review, approval and supervision of any alterations, additions or improvements made by Tenant. Under no circumstances shall Landlord be liable to Tenant for any damage, loss, cost or expense incurred by Tenant on account of Tenant's plans and specifications, Tenant's contractors or subcontractors, design of any work, construction of any work, or delay in completion of any work.

(e) Tenant shall give written notice to Landlord of the date on which construction of any work will be commenced at least ten (10) days prior to such date. Tenant shall cause all work to be performed by the licensed contractor(s) approved in writing by Landlord in accordance with the plans and specifications approved in writing by Landlord and in full compliance with all applicable codes, laws, ordinances, rules and regulations. Tenant shall keep the Premises and the Building free from mechanics', materialmen's and all other liens arising out of any work performed, labor supplied, materials furnished or other obligations incurred by Tenant. Tenant shall promptly and fully pay and discharge all claims on which any such lien could be based. Landlord shall have the right to post and keep posted on the Premises any notices that may be provided by law or which Landlord may deem to be proper for the protection of Landlord, the Premises and the Building from such liens, and to take any other action Landlord deems necessary to remove or discharge liens or encumbrances at the expense of Tenant.

9.2 All alteration, additions, fixture and improvements, whether temporary or permanent in character, made in or to the Premises by Landlord or Tenant, shall become part of the Building and Landlord's property. Upon termination of this Lease, Landlord shall have the right, at Landlord's option, by giving written notice to Tenant at any time before or within ten (10) days after such termination, to retain all such alterations, additions, fixtures and improvements in the Premises, without compensation to

Tenant, or to remove all such alterations, additions, fixtures and improvements from the Premises, repair all damage caused by any such removal, and restore the Premises (including restoration of all openings or holes, stairs and vertical penetrations in the Premises) to the condition in which the Premises existed before such alterations, additions, fixtures and improvements were made, and in the latter case Tenant shall pay to Landlord, upon billing by Landlord, the cost of such removal, repair and restoration (including a reasonable charge for Landlord's overhead and profit). All movable furniture, equipment, trade fixtures, computers, office machines and other personal property shall remain the property of Tenant. Upon termination of this Lease, Tenant shall, at Tenant's expense, remove all such movable furniture, equipment, trade fixtures, computers, office machines and other personal property from the Building and repair all damage caused by any such removal. Termination of this Lease shall not affect the obligations of Tenant pursuant to this section 9.2 to be performed after such termination.

## ARTICLE 10

### Insurance

10.1 Landlord shall not be liable to Tenant and Tenant hereby waives all claims against Landlord, for any damage to or loss or theft of any property or for any bodily or personal injury, illness or death of any person in, on or about the Premises or the building arising at any time and from any cause whatsoever, except to the extent caused by the negligence or willful misconduct of Landlord. Tenant shall indemnify and defend Landlord against and hold Landlord harmless from all claims, demands, liabilities, damages, losses, costs and expenses, including reasonable attorneys' fees and disbursements, arising from or related to any use or occupancy of the Premises, or any condition of the Premises, or any default in the performance of Tenant's obligations, or any damage to any property (including property of employees and invitees of Tenant) or any bodily or personal injury, illness or death of any person (including employees and invitees of Tenant) occurring in, on or about the Premises or any part thereof arising at any time and from any cause whatsoever (except to the extent caused by the negligence or willful misconduct of Landlord) or occurring in, on or about any part of the Building other than the Premises when such damage, bodily or personal injury, illness or death is caused by any act or omission of Tenant or its agents, officers, employees, contractors, invitees or licensees. This section 10.1 shall survive the termination of this Lease with respect to any damage, bodily or personal injury, illness or death occurring prior to such termination.

10.2 Tenant shall, at all times during the term of this Lease and at Tenant's sole cost and expense, obtain and keep in force comprehensive general liability insurance, including contractual liability (specifically covering this Lease), fire legal liability and premises operations, with a minimum combined single limit in the amount specified in the Basic Lease Information per occurrence for bodily or personal injury to, illness of, or death of persons and damage to property occurring in, on or about the Premises or the Building. Tenant shall, at Tenant's sole cost and expense, be responsible for insuring Tenant's furniture, equipment, fixtures, computers, office machines and personal property.

10.3 All insurance required to be maintained by Tenant under this Article 10 and all renewals thereof shall be issued by good and responsible companies qualified to do and doing business in the

16993664

State of California. All deductible amounts under each such insurance policy shall be subject to Landlord's prior written approval. Each policy to be maintained by Tenant shall expressly provide that the policy shall not be cancelled or altered without thirty (30) days' prior written notice to Landlord and shall remain in effect notwithstanding any such cancellation or alteration until such notice shall have been given to Landlord and such period of thirty (30) days shall have expired. All liability insurance to be maintained by Tenant under this Article 10 shall name Landlord and any other parties designated by Landlord as an additional insured, shall be primary and noncontributing with any insurance which may be carried by Landlord, shall afford coverage for all claims based on any act, omission, event or condition that occurred or arose (or the onset of which occurred or arose) during the policy period, and shall expressly provide that Landlord, although named as an insured, shall nevertheless be entitled to recover under the policy for any loss, injury or damage to Landlord. Upon the issuance of each such policy to be maintained by Tenant, Tenant shall deliver each such policy or a certified copy and a certificate thereof to Landlord for retention by Landlord. If Tenant fails to insure or fails to furnish to Landlord upon notice to do so any policy to be maintained by Tenant or a certified copy and a certificate thereof as required, Landlord shall have the right from time to time to effect such insurance for the benefit of Tenant or Landlord or both of them and all premiums paid by Landlord shall be payable by Tenant as additional rent on demand.

10.4 Tenant waives on behalf of all insurers under all policies of property, liability and other insurance (excluding workers' compensation) now or hereafter carried by Tenant insuring or covering the Premises, or any portion or any contents thereof, or any operations therein, all rights of subrogation which any insurer might otherwise, if at all, have to any claims of Tenant against Landlord. Landlord waives on behalf of all insurers under all policies of property, liability and other insurance (excluding workers' compensation) now or hereafter carried by Landlord insuring or covering the Building or any portion or any contents thereof, or any operations therein, all rights of subrogation which any insurer might otherwise, if at all, have to any claims of Landlord against Tenant. Tenant shall, prior to or immediately after the date of this Lease, procure from each of the insurers under all policies of property, liability and other insurance (excluding workers' compensation) now or hereafter carried by Tenant insuring or covering the Premises, or any portion or any contents thereof, or any operations therein, a waiver of all rights of subrogation which the insurer might otherwise, if at all, have to any claims of Tenant against Landlord as required by this section 10.4.

## ARTICLE 11

### Compliance With Legal Requirements

11.1 Tenant shall, at Tenant's sole cost and expense, promptly comply with all laws, ordinances, rules, regulations, orders and other requirements of any government or public authority now in force or which may hereafter be in force, with all requirements of any board of fire underwriters or other similar body now or hereafter constituted, and with all directions and certificates of occupancy issued pursuant to any law by any governmental agency or officer, insofar as any thereof relate to or are required by the condition, use or occupancy of the Premises or the operation, use or maintenance of any personal property,

102993464

14

fixtures, machinery, equipment or improvements in the Premises, but Tenant shall not be required to make structural changes unless structural changes are related to or required by Tenant's acts or use of the Premises or by improvements made by or for Tenant.

## ARTICLE 12

### Assignment or Sublease

12.1 Tenant shall not, directly or indirectly, without the prior written consent of Landlord (which consent shall not be unreasonably withheld), assign this Lease or any interest herein or sublease the Premises or any part thereof, or permit the use or occupancy of the Premises by any person or entity other than Tenant. Tenant shall not, directly or indirectly, without the prior written consent of Landlord, pledge, mortgage or hypothecate this Lease or any interest herein. This Lease shall not, nor shall any interest herein, be assignable as to the interest of Tenant involuntarily or by operation of law without the prior written consent of Landlord. Any of the foregoing acts without such prior written consent of Landlord shall be void and shall, at the option of Landlord, constitute a default that entitles Landlord to terminate this Lease. Without limiting or excluding other reasons for withholding Landlord's consent, Landlord shall have the right to withhold consent if the proposed assignee or subtenant or the use of the Premises to be made by the proposed assignee or subtenant is not consistent with the character and nature of other tenants and uses in the Building or is prohibited by this Lease or if it is not demonstrated to the satisfaction of Landlord that the proposed assignee or subtenant is financially able to perform all of the obligations of Tenant under this Lease (as evidenced by financial statements and business and credit references acceptable to Landlord). Tenant agrees that the instrument by which any assignment or sublease to which Landlord consents is accomplished shall expressly provide that the assignee or subtenant will perform all of the covenants to be performed by Tenant under this Lease (in the case of a sublease, only insofar as such covenants relate to the portion of the Premises subject to such sublease) as and when performance is due after the effective date of the assignment or sublease and that Landlord will have the right to enforce such covenants directly against such assignee or subtenant. Any purported assignment or sublease without an instrument containing the foregoing provisions shall be void. Tenant shall in all cases remain liable for the performance by any assignee or subtenant of all such covenants.

12.2 If Tenant wishes to assign this Lease or sublease all or any part of the Premises, Tenant shall give written notice to Landlord identifying the intended assignee or subtenant by name and address and specifying all of the terms of the intended assignment or sublease. Tenant shall give Landlord such additional information concerning the intended assignee or subtenant (including complete financial statements and a business history) or the intended assignment or sublease (including true copies thereof) as Landlord requests. For a period of thirty (30) days after such written notice is given by Tenant, Landlord shall have the right, by giving written notice to Tenant, (a) to consent in writing to the intended assignment or sublease, unless Landlord determines not to consent, or (b) to enter into an assignment of this Lease or a sublease of the Premises, as the case may be, with Tenant upon the terms set forth in such written notice, or (c) in the case of an assignment of this Lease or a sublease of substantially the entire Premises for substantially the balance of the term of this Lease,

10993464

15

to terminate this Lease, which termination shall be effective as of the date on which the intended assignment or sublease would have been effective if Landlord had not exercised such termination right. If Landlord elects to enter into an assignment of this Lease or a sublease of the Premises or to terminate this Lease, Landlord may enter into a new lease or agreement covering the Premises or any portion thereof with the intended assignee or subtenant on such terms as Landlord and such assignee or subtenant may agree, or enter into a new lease or agreement covering the Premises or any portion thereof with any other person or entity. In such event, Tenant shall not be entitled to any portion of the profit, if any, which Landlord may realize on account of such new lease or agreement. If Landlord elects to terminate this Lease, then from and after the date of such termination, Landlord and Tenant each shall have no further obligation to the other under this Lease with respect to the Premises except for matters occurring or obligations arising hereunder prior to the date of such termination.

12.3 If Landlord consents in writing, Tenant may complete the intended assignment or sublease subject to the following covenants: (a) the assignment or sublease shall be on the same terms as set forth in the written notice given by Tenant to Landlord, (b) no assignment or sublease shall be valid and no assignee or subtenant shall take possession of the Premises or any part thereof until an executed duplicate original of such assignment or sublease, in compliance with section 12.1 hereof, has been delivered to Landlord, (c) no assignee or subtenant shall have a right further to assign or sublease, and (d) all "excess rent" (as hereinafter defined) derived from such assignment or sublease shall be paid to Landlord. Such excess rent shall be deemed to be, and shall be paid by Tenant to Landlord as, additional rent. Tenant shall pay such excess rent to Landlord immediately as and when such excess rent becomes due and payable to Tenant. As used in this section 12.3, "excess rent" shall mean the amount by which the total money and other economic consideration to be paid by the assignee or subtenant as a result of an assignment or sublease, whether denominated rent or otherwise, exceeds, in the aggregate, the total amount of rent which Tenant is obligated to pay to Landlord under this Lease (prorated to reflect the rent allocable to the portion of the Premises subject to such assignment or sublease), less only the reasonable costs paid by Tenant for additional improvements installed in the portion of the Premises subject to such assignment or sublease by Tenant at Tenant's sole cost and expense for the specific assignee or subtenant in question and reasonable leasing commissions paid by Tenant in connection with such assignment or sublease, without deduction for carrying costs due to vacancy or otherwise. Such costs of additional improvements and leasing commissions shall be amortized without interest over the term of such assignment or sublease unless, with respect to such additional improvements, such additional improvements have a useful life greater than the term of such assignment or sublease, in which case such additional improvements shall be amortized without interest over their useful life.

12.4 No assignment or sublease whatsoever shall release Tenant from Tenant's obligations and liabilities under this Lease or alter the primary liability of Tenant to pay all rent and to perform all obligations to be paid and performed by Tenant. The acceptance of rent by Landlord from any other person or entity shall not be deemed to be a waiver by Landlord of any provision of this lease. Consent to one assignment or sublease shall not be deemed consent to any subsequent assignment or sublease. If any

10093844

16

assignee, subtenant or successor of Tenant defaults in the performance of any obligation to be performed by Tenant under this Lease, Landlord may proceed directly against Tenant without the necessity of exhausting remedies against such assignee, subtenant or successor. Landlord may consent to subsequent assignments or subleases or amendments or modifications to this Lease with assignees, subtenants or successors of Tenant, without notifying Tenant or any successor of Tenant and without obtaining any consent thereto from Tenant or any successor of Tenant, and such action shall not release Tenant from liability under this Lease.

12.5 If Tenant assigns this Lease or sublets the Premises or requests the consent of Landlord to any assignment, subletting, hypothecation or other action requiring the consent of Landlord under Article 12 hereof, then Tenant shall pay to Landlord promptly upon demand, as additional rent due hereunder, Landlord's standard processing fee then in effect and Landlord's reasonable attorneys' fees incurred in connection therewith.

## ARTICLE 13

### Rules and Regulations

13.1 Tenant shall faithfully observe and comply with the rules and regulations (the "Rules and Regulations") set forth in Exhibit B attached hereto and, after notice thereof, all modifications thereof and additions thereto from time to time made in writing by Landlord. If there is any conflict, this Lease shall prevail over the Rules and Regulations and any modifications thereof or additions thereto. Landlord shall not be liable to Tenant or responsible for the noncompliance by any other tenant or occupant of the Building with any Rules and Regulations.

## ARTICLE 14

### Entry by Landlord

14.1 Landlord shall have the right to enter the Premises at any time to (a) inspect the Premises, (b) exhibit the Premises to prospective purchasers, lenders or tenants, (c) determine whether Tenant is performing all of Tenant's obligations, (d) supply any service to be provided by Landlord, (e) post notices of non-responsibility, and (f) investigate and perform tests to determine Tenant's compliance with Article 22 hereof and (g) make any repairs to the Premises, or make any repairs to any adjoining space or utility services, or make any repairs, alterations or improvements to any other portion of the Building, provided all such work shall be done as promptly as reasonably practicable and so as to cause as little interference to Tenant as reasonably practicable. Tenant waives all claims for damages for any injury or inconvenience to or interference with Tenant's business, any loss of occupancy or quiet enjoyment of the Premises or any other loss occasioned by such entry. All locks for all doors in, on or about the Premises (excluding Tenant's vaults, safes and similar special security areas designated in writing by Tenant) shall be keyed to the master system for the Building. Landlord shall at all times have a key to unlock all such doors and Landlord shall have the right to use any and all means which Landlord may deem proper to open such doors in an emergency to obtain entry to the Premises. Any entry to the Premises obtained by Landlord by any of such means shall not under any circumstances be construed or deemed to be a forcible or unlawful entry into or a detainer of the Premises or an eviction, actual or constructive, of Tenant from the Premises or any portion thereof.

10593844

## ARTICLE 15

### Events of Default and Remedies

15.1 The occurrence of any one or more of the following events ("Event of Default") shall constitute a breach of this Lease by Tenant:

(a)  Tenant fails to pay any Interim Rent or any Base Rent or additional monthly rent under section 3.1 hereof as and when such rent becomes due and payable and such failure continues for more than three (3) days after Landlord gives written notice thereof to Tenant; provided, however, that after the second such failure in a calendar year, only the passage of time, but no further notice, shall be required to establish an Event of Default in the same calendar year; or

(b)  Tenant fails to pay any additional rent or other amount of money or charge payable by Tenant hereunder as and when such additional rent or amount or charge becomes due and payable and such failure continues for more than ten (10) days after Landlord gives written notice thereof to Tenant; provided, however, that after the second such failure in a calendar year, only the passage of time, but no further notice, shall be required to establish an Event of Default in the same calendar year; or

(c)  Tenant fails to perform or breaches any other agreement or covenant of this Lease to be performed or observed by Tenant as and when performance or observance is due and such failure or breach continues for more than ten (10) days after Landlord gives written notice thereof to Tenant; provided, however, that if, by the nature of such agreement or covenant, such failure or breach cannot reasonably be cured within such period of ten (10) days, an Event of Default shall not exist as long as Tenant commences with due diligence and dispatch the curing of such failure or breach within such period of ten (10) days and, having so commenced, thereafter prosecutes with diligence and dispatch and completes the curing of such failure or breach; or

(d)  Tenant (i) is generally not paying its debts as they become due, (ii) files, or consents by answer or otherwise to the filing against it of, a petition for relief or reorganization or arrangement or any other petition in bankruptcy or for liquidation or to take advantage of any bankruptcy, insolvency or other debtors' relief law of any jurisdiction, (iii) makes an assignment for the benefit of its creditors, (iv) consents to the appointment of a custodian, receiver, trustee or other officer with similar powers of Tenant or of any substantial part of Tenant's property, or (v) takes action for the purpose of any of the foregoing; or

(e)  Without consent by Tenant, a court or government authority enters an order, and such order is not vacated within thirty (30) days, (i) appointing a custodian, receiver, trustee or other officer with similar powers with respect to Tenant or with respect to any substantial part of Tenant's property, or (ii) constituting an order for relief or approving a petition for relief or reorganization or arrangement or any other petition in bankruptcy or for liquidation or to take advantage of any bankruptcy, insolvency or other debtors' relief law of any jurisdiction, or (iii) ordering the dissolution, winding-up or liquidation of Tenant; or

(f)  This Lease or any estate of Tenant hereunder is levied upon under any attachment or execution and such attachment or execution is not vacated within thirty (30) days; or

102993864

18

(g)  Tenant abandons the Premises.

15.2  If an Event of Default occurs, Landlord shall have the right at any time to give a written termination notice to Tenant and, on the date specified in such notice, Tenant's right to possession shall terminate and this Lease shall terminate.  Upon such termination, Landlord shall have the right to recover from Tenant:

(a)  The worth at the time of award of all unpaid rent which had been earned at the time of termination;

(b)  The worth at the time of award of the amount by which all unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided;

(c)  The worth at the time of award of the amount by which all unpaid rent for the balance of the term of this Lease after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided; and

(d)  All other amounts necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform all of tenants's obligations under this Lease or which in the ordinary course of things would be likely to result therefrom. The "worth at the time of award" of the amounts referred to in clauses (a) and (b) above shall be computed by allowing interest at the maximum annual interest rate allowed by law for business loans (not primarily for personal, family or household purposes) not exempt from the usury law at the time of termination or, if there is no such maximum annual interest rate, at the rate of eighteen percent (18%) per annum.  The "worth at the time of award" of the amount referred to in clause (c) above shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).  For the purpose of determining unpaid rent under clauses (a), (b) and (c) above, the rent reserved in this Lease shall be deemed to be the total rent payable by Tenant under Articles 3 and 5 hereof.

15.3  Even though Tenant has breached this Lease, this Lease shall continue in effect for so long as Landlord does not terminate Tenant's right to possession, and Landlord shall have the right to enforce all its rights and remedies under this Lease, including the right to recover all rent as it becomes due under this Lease.  Acts of maintenance or preservation or efforts to relet the Premises or the appointment of a receiver upon initiative of Landlord to protect Landlord's interest under this Lease shall not constitute a termination of Tenant's right to possession unless written notice of termination is given by Landlord to Tenant.

15.4  The remedies provided for in this Lease are in addition to all other remedies available to Landlord at law or in equity by statute or otherwise.

15.5  All agreements and covenants to be performed or observed by Tenant under this Lease shall be at Tenant's sole cost and expense and without any abatement of rent.  If Tenant fails to pay any sum of money to be paid by Tenant or to perform any other act to be performed by Tenant under this Lease, Landlord shall have the right, but shall not be obligated, and without waiving or releasing Tenant from any obligations of Tenant, to make any such payment or to perform any such other act on behalf of Tenant in accordance

10893044

19

with this Lease. All sums so paid by Landlord and all necessary
incidental costs shall be deemed additional rent hereunder and
shall be payable by Tenant to Landlord on demand, together with
interest on all such sums from the date of expenditure by Landlord
to the date of repayment by Tenant at the maximum annual interest
rate allowed by law for business loans (not primarily for personal,
family or household purposes) not exempt from the usury law at the
date of expenditure or, if there is no such maximum annual interest
rate, at the rate of eighteen percent (18%) per annum. Landlord
shall have, in addition to all other rights and remedies of
Landlord, the same rights and remedies in the event of the non-
payment of such sums plus interest by Tenant as in the case of
default by Tenant in the payment of rent.

15.6 If Tenant abandons or surrenders the Premises, or is
dispossessed by process of law or otherwise, any movable furniture,
equipment, trade fixtures or personal property belonging to Tenant
and left in the Premises shall be deemed to be abandoned, at the
option of Landlord, and Landlord shall have the right to sell or
otherwise dispose of such personal property in any commercially
reasonable manner.

## ARTICLE 16

### Damage or Destruction

16.1 If the Building or the Premises, or any part thereof, is
damaged by fire or other casualty before the Commencement Date or
during the term of this Lease, and this Lease is not terminated
pursuant to section 16.2 hereof, Landlord shall repair such damage
and restore the Building and the Premises to substantially the same
condition in which the Building and the Premises existed before the
occurrence of such fire or other casualty and this Lease shall,
subject to this section 16.1, remain in full force and effect. If
such fire or other casualty damages the Premises or common areas of
the Building necessary for Tenant's use and occupancy of the
Premises and if such damage is not the result of the negligence or
willful misconduct of Tenant or Tenant's agents, officers,
employees, contractors, licensees or invitees, then, during the
period the Premises are rendered unusable by such damage, Tenant
shall be entitled to a reduction in Base Rent in the proportion
that the area of the Premises rendered unusable by such damage
bears to the total area of the Premises. Landlord shall not be
obligated to repair any damage to, or to make any replacement of,
any movable furniture, equipment, trade fixtures or personal
property in the Premises. Tenant shall, at Tenant's sole cost and
expense, repair and replace all such movable furniture, equipment,
trade fixtures and personal property. Such repair and replacement
by Tenant shall be done in accordance with Article 9 hereof.
Tenant hereby waives California Civil Code sections 1932(2) and
1933(4).

16.2 If the Building or the Premises, or any part thereof, is
damaged by fire or other casualty before the Commencement Date or
during the term of this Lease and (a) such fire or other casualty
occurs during the last twelve (12) months of the term of this Lease
and the repair and restoration work to be performed by Landlord in
accordance with section 16.1 hereof cannot, as reasonably estimated
by Landlord, be completed within two (2) months after the
occurrence of such fire or other casualty, or (b) the insurance
proceeds received by Landlord in respect of such damage are not
adequate to pay the entire cost, as reasonably estimated by
Landlord, of the repair and restoration work to be performed by

10993444

Landlord in accordance with section 16.1 hereof, or (c) the repair and restoration work to be performed by Landlord in accordance with section 16.1 hereof cannot, as reasonably estimated by Landlord, be completed within six (6) months after the occurrence of such fire or other casualty, then, in any such event, Landlord shall have the right, by giving written notice to Tenant within sixty (60) days after the occurrence of such fire or other casualty, to terminate this Lease as of the date of such notice. If Landlord does not exercise the right to terminate this Lease in accordance with this section 16.2, Landlord shall repair such damage and restore the Building and the Premises in accordance with section 16.1 hereof and this Lease shall, subject to section 16.1 hereof, remain in full force and effect. A total destruction of the Building shall automatically terminate this Lease effective as of the date of such total destruction.

## ARTICLE 17

### Eminent Domain

17.1 Landlord shall have the right to terminate this Lease if any part (but less than all) of the Premises or any substantial part of the Building (whether or not it includes the Premises) is taken by exercise of the power of eminent domain before the Commencement Date or during the term of this Lease. Tenant shall have the right to terminate this Lease if a substantial portion of the Premises is taken by exercise of the power of eminent domain before the Commencement Date or during the term of this Lease and the remaining portion of the Premises is not reasonably suitable for Tenant's purposes. In each such case, Landlord or Tenant shall exercise such termination right by giving written notice to the other within thirty (30) days after the date of such taking. If either Landlord or Tenant exercises such right to terminate this Lease in accordance with this section 17.1, this Lease shall terminate as of the date of such taking. If neither Landlord nor Tenant exercises such right to terminate this Lease in accordance with this section 17.1, this Lease shall terminate as to the portion of the Premises so taken as of the date of such taking and shall remain in full force and effect as to the portion of the Premises not so taken, and the Base Rent and Tenant's Percentage Share shall be reduced as of the date of such taking in the proportion that the area of the Premises so taken bears to the total area of the Premises. If all of the Premises is taken by exercise of the power of eminent domain before the Commencement Date or during the term of this Lease, this Lease shall terminate as of the date of such taking.

17.2 If all or any part of the Premises is taken by exercise of the power of eminent domain, all awards, compensation, damages, income, rent and interest payable in connection with such taking shall, except as expressly set forth in this section 17.2, be paid to and become the property of Landlord, and Tenant hereby assigns to Landlord all of the foregoing. Without limiting the generality of the foregoing, Tenant shall have no claim against Landlord or the entity exercising the power of eminent domain for the value of the leasehold estate created by this Lease or any unexpired term of this Lease. Tenant shall have the right to claim and receive directly from the entity exercising the power of eminent domain only the share of any award determined to be owing to Tenant for the taking of improvements installed in the portion of the Premises so taken by Tenant at Tenant's sole cost and expense based on the unamortized cost actually paid by Tenant for such improvements, for the taking of Tenant's movable furniture, equipment, trade fixtures

10293664

21

and personal property, for loss of goodwill, for interference with or interruption of Tenant's business, or for removal and relocation expenses.

17.3 Notwithstanding sections 17.1 and 17.2 hereof to the contrary, if the use of all or any part of the Premises is taken by exercise of the power of eminent domain during the term of this Lease on a temporary basis for a period less than the term of this Lease remaining after such taking, this Lease shall continue in full force and effect, Tenant shall continue to pay all of the rent and to perform all of the covenants of Tenant in accordance with this Lease, to the extent reasonably practicable under the circumstances, and the condemnation proceeds in respect of such temporary taking shall be paid to Tenant.

17.4 As used in this Article 17, a "taking" means the acquisition of all or part of the Premises for a public use by exercise of the power of eminent domain or voluntary conveyance in lieu thereof and the taking shall be considered to occur as of the earlier of the date on which possession of the Premises (or part so taken) by the entity exercising the power of eminent domain is authorized as stated in an order for possession or the date on which title to the Premises (or part so taken) vests in the entity exercising the power of eminent domain.   Tenant hereby waives California Code of Civil Procedure sections 1265.110 through 1265.160.


## ARTICLE 18

## Subordination, Merger and Sale

18.1 This Lease shall be subject and subordinate at all times to the lien of all mortgages and deeds of trust securing any amount or amounts whatsoever which may now exist or hereafter be placed on or against the Building or on or against Landlord's interest or estate therein, all without the necessity of having further instruments executed by Tenant to effect such subordination. Notwithstanding the foregoing, in the event of a foreclosure of any such mortgage or deed of trust or of any other action or proceeding for the enforcement thereof, or of any sale thereunder, this Lease shall not be terminated or extinguished, nor shall the rights and possession of Tenant hereunder be disturbed, if no Event of Default then exists under this Lease, and Tenant shall attorn to the person who acquires Landlord's interest hereunder through any such mortgage or deed of trust.  Tenant agrees to execute, acknowledge and deliver upon demand such further instruments evidencing such subordination of this Lease to the lien of all such mortgages and deeds of trust as may reasonably be required by Landlord, but Tenant's covenant to subordinate this Lease to mortgages or deeds of trust hereafter executed is conditioned upon each such senior mortgage or deed of trust, or a separate subordination agreement, containing the commitments specified in the preceding sentence.

18.2 The voluntary or other surrender of this Lease by Tenant, or a mutual cancellation thereof, shall not work a merger and shall, at the option of Landlord, terminate all or any existing subleases or subtenancies or operate as an assignment to Landlord of any or all such sub-leases or subtenancies.

18.3 If the original Landlord hereunder, or any successor owner of the Building, sells or conveys the Building, all liabilities and obligations on the part of the original Landlord, or such successor owner, under this Lease accruing after such sale

or conveyance shall terminate and the original Landlord, or such successor owner, shall be automatically be released therefrom, and thereupon all such liabilities and obligations shall be binding upon the new owner. Tenant agrees to attorn to such new owner.

## ARTICLE 19

### Estoppel Certificate

19.1 At any time and from time to time, Tenant shall, within ten (10) days after written request by Landlord, execute, acknowledge and deliver to Landlord a certificate certifying: (a) that this Lease is unmodified and in full force and effect (or, if there have been modifications, that this Lease is in full force and effect as modified, and stating the date and nature of each modification; (b) the Commencement Date and the Expiration Date determined in accordance with Article 2 hereof and the date, if any, to which all rent and other sums payable hereunder have been paid; (c) that no notice has been received by Tenant of any default by Tenant hereunder which has not been cured, except as to defaults specified in such certificate; (d) that Landlord is not in default under this Lease, except as to defaults specified in such certificate; and (e) such other matters as may be reasonably requested by Landlord or any actual or prospective purchaser or mortgage lender. Any such certificate may be relied upon by Landlord and any actual or prospective purchaser or mortgage lender of the Building or any part thereof. At any time and from time to time, Tenant shall, within ten (10) days after written request by Landlord, deliver to Landlord copies of all current financial statements (including, without limitation, a balance sheet, an income statement, and an accumulated retained earnings statement), annual reports, and other financial and operating information and data of Tenant prepared by Tenant in the course of Tenant's business. Unless available to the public, Landlord shall disclose such financial statements, annual reports and other information or data only to actual or prospective purchasers or mortgage lenders of the Building or any part thereof, and otherwise keep them confidential unless other disclosure is required by Law.

## ARTICLE 20

### Holding Over

20.1 If, without objection by Landlord, Tenant holds possession of the Premises after expiration of the term of this Lease, Tenant shall become a tenant from month to month upon the terms herein specified but at a Base Rent equal to one hundred fifty percent (150%) of the Base Rent in effect at the expiration of the term of this Lease pursuant to Article 3 hereof, payable in advance on or before the first day of each month. Such month to month tenancy may be terminated by either Landlord or Tenant by giving thirty (30) days' written notice of termination to the other at any time.

## ARTICLE 21

### Security Deposit

21.1 Upon signing this Lease, Tenant shall pay to Landlord (a) an amount equal to the Base Rent for the first month of the

100993664

term of this Lease, which amount Landlord shall apply to the Base Rent for such first month, and (b) the amount of the deposit specified in the Basic Lease Information (the "Deposit"). The Deposit shall be held by Landlord as security for the performance by Tenant of all of the covenants of this Lease to be performed by Tenant, and Tenant shall not be entitled to interest thereon. Landlord shall have no obligation to hold the Deposit in a separate account and may commingle the Deposit with funds in any other account maintained by Landlord. If Tenant fails to perform any of the covenants of this Lease to be performed by Tenant, then Landlord shall have the right, but no obligation, to apply the Deposit, or so much thereof as may be necessary, to cure any such failure by Tenant. If Landlord applies the Deposit or any part thereof to cure any such failure by Tenant, then Tenant shall immediately pay to Landlord the sum necessary to restore the Deposit to the full amount required by this section 21.1. Any remaining portion of the Deposit shall be returned to Tenant upon termination of this Lease. Upon termination of the original Landlord's or any successor owner's interest in the Premises or the Building, the original Landlord or such successor owner shall be released from further liability with respect to the Deposit upon the original Landlord's or such successor owner's complying with California Civil Code section 1950.7

## ARTICLE 22

### Hazardous Materials

22.1 As used herein, the term "Hazardous Material" means any hazardous or toxic substance, material or waste which is or becomes regulated by any local governmental authority, the State of California or the United States Government. The term "Hazardous Material" includes any material or substance which is (i) defined as a "hazardous waste," under sections 25515, 25117 or 25122.7, or listed pursuant to section 25140, of the California Health and Safety Code, Division 20, Chapter 6.5 (Hazardous Waste Control Law), (ii) defined as a "hazardous substance" under section 25316 of the California Health and Safety Code, Division 2, Chapter 6.8 (Carpenter-Presly-Tanner Hazardous Substance Account Act), (iii) defined as a "hazardous material," "hazardous substance" or "hazardous waste" under section 25501 of the California Health and Safety Code, Division 20, Chapter 6.95 (Hazardous Substances), (iv) petroleum, (v) asbestos, (vi) designated as a "hazardous substance" pursuant to section 311 of the Federal Water Pollution Control Act (33 U.S.C. section 1317,) (vii) defined as a "hazardous waste" pursuant to section 1004 of the Federal Resource Conservation and Recovery Act, 42 U.S.C. section 6901, et seq. (42 U.S.C. section 6903), or (ix) defined as a "hazardous substance" pursuant to section 101 of the Comprehensive Environmental Response Compensation and Liability Act (42 U.S.C. section 9601, et seq.).

22.2 As used herein, the term "Environmental Requirements" means all laws, ordinances, rules, regulations, orders and other requirements of any government or public authority now in force or which may hereafter be in force relating to protection of human health or the environment, including all requirements pertaining to reporting, licensing, permitting, investigation and remediation of emissions, discharges, storage, disposal or release of Hazardous Materials and all requirements pertaining to the protection of the health and safety of employees or the public.

22.3 Tenant shall not permit or conduct the handling, use, generation, treatment, storage or disposal on, in or about the

10393864

Premises or the Building of any Hazardous Material without the prior written consent of Landlord. Any request by Tenant for such consent by Landlord shall be in writing and shall demonstrate to the reasonable satisfaction of Landlord that such Hazardous Material is necessary to the business of Tenant and will be handled, used, generated, treated, stored or disposed of in a manner that complies with all Environmental Requirements. Any such handling, use, generation, treatment, storage or disposal of any Hazardous Material permitted by Landlord hereunder shall be in compliance with all Environmental Requirements.

22.4 Tenant shall, within five (5) days after the receipt thereof, give written notice to Landlord of any notice or other communication regarding any (a) actual or alleged violation of Environmental Requirements by Tenant or with respect to the Premises or the Building, (b) actual or threatened migration of Hazardous Material from the Premises or the Building, or (c) the existence of Hazardous Material in or on the Premises or the Building or regarding any actual or threatened investigation, inquiry, lawsuit, claim, citation, directive, summons, proceeding, complaint, notice, order, writ or injunction relating to any of the foregoing.

22.5 Tenant shall indemnify and defend Landlord against and hold Landlord harmless from all claims, demands, liabilities, damages, fines, encumbrances, liens, losses, costs and expenses, including reasonable attorneys' fees and disbursements, and costs and expenses of investigation, arising from or related to the existence on or after the Commencement Date of Hazardous Material in or on the Premises (or the Building if resulting from the acts or omissions of Tenant's agents, servants, employees, invitees or licensees) or the actual or threatened migration on or after the Commencement Date of Hazardous Material from the Premises (or the Building if resulting from the acts or omissions of Tenant's employees, agents, servants, invitees or licensees) or the existence on or after the Commencement Date of a violation of Environmental Requirements by Tenant or with respect to the Premises. The obligations of Tenant under this section 22.5 shall not be affected by any investigation by or on behalf of Landlord or by any information which Landlord may have or obtain with respect thereto. Tenant shall, to the reasonable satisfaction of Landlord, perform all remedial actions necessary to remove any Hazardous Material in or on the Premises on or after the Commencement Date or to remedy actual or threatened migration from the Premises of any Hazardous Material or to remedy any actual or threatened violation of Environmental Requirements, provided such remedial action is required under Environmental Requirements. This section 22.5 shall survive termination of this Lease.

## ARTICLE 23

### Waiver

23.1 The waiver by Landlord or Tenant of any breach of any covenant in this Lease shall not be deemed to be a waiver of any subsequent breach of the same or any other covenant in this Lease, nor shall any custom or practice which may grow up between Landlord and Tenant in the administration of this Lease be construed to waive or to lessen the right of Landlord or Tenant to insist upon the performance by Landlord or Tenant in strict accordance with this Lease. The subsequent acceptance of rent hereunder by Landlord or the payment of rent by Tenant shall not waive any preceding breach by Tenant of any covenant in this Lease, nor cure

H2903664

25

any Event of Default, nor waive any forfeiture of this Lease or unlawful detainer action, other than the failure of Tenant to pay the particular rent so accepted, regardless of Landlord's or Tenant's knowledge of such preceding breach at the time of acceptance or payment of such rent.

## ARTICLE 24

### Notices

24.1 All requests, approvals, consents, notices and other communications given by Landlord or Tenant under this Lease shall be properly given only if made in writing and either deposited in the United States mail, postage prepaid, certified with return receipt requested, or delivered by hand (which may be through a messenger or recognized delivery or courier service) and addressed as follows:  To Landlord at the address of Landlord specified in the Basic Lease Information, or at such other place as Landlord may from time to time designate in a written notice to Tenant; to Tenant, before the Commencement Date, at the address of Tenant specified in the Basic Lease Information, and after the Commencement Date, at the Premises, or at such other place as Tenant may from time to time designate in a written notice to Landlord; and to the guarantor(s) specified in the Basic Lease Information at the address of such guarantor(s) specified in the Basic Lease Information, or at such other place as such guarantor(s) may from time to time designate in a written notice to Landlord.  Such requests, approvals, consents, notices and other communications shall be effective on the date of receipt (evidenced by the certified mail receipt) if mailed or on the date of delivery if hand delivered.

## ARTICLE 25

### Miscellaneous

25.1 The words "Landlord" and "Tenant" as used herein shall include the plural as well as the singular.  The words "include," "includes" and "including shall be deemed to be followed by the phrase "without limitation."  Tenant shall indemnify and defend Landlord against and hold Landlord harmless from all claims, demands, liabilities, damages, losses, costs and expenses, including reasonable attorneys' fees and disbursements, arising out of or resulting from any failure by Tenant to perform any of its obligations or any breach by Tenant of any of its representations or warranties in accordance with this Lease.  If there is more than one Tenant, the obligations hereunder imposed upon Tenant shall be joint and several.  Time is of the essence of this Lease and each and all of its provisions.  Submission of this instrument for examination or signature by Tenant does not constitute a reservation of or option for lease, and it is not effective as a lease or otherwise until execution and delivery by both Landlord and Tenant.  Subject to Article 12 hereof, this Lease shall benefit and bind Landlord and Tenant and the personal representatives, heirs, successors and assigns of Landlord and Tenant.  Tenant shall not use the name of the Building for any purpose whatsoever other than as the address of Tenant at the Premises.  If any provision of this Lease is determined to be illegal or unenforceable, such determination shall not affect any other provision of this Lease and all such other provisions shall remain in full force and effect.  If Tenant requests the consent or approval of Landlord to any assignment, sublease or other action by Tenant, Tenant shall

10993664

26

pay to Landlord on demand, as additional rent, all costs and expenses, including reasonable attorneys' fees and disbursements, incurred by Landlord in connection therewith. This lease shall be governed by and construed in accordance with the laws of the State of California.

25.2 If there is any legal action or proceeding between Landlord and Tenant to enforce this Lease or to protect or establish any right or remedy under this Lease, the unsuccessful party to such action or proceeding shall pay to the prevailing party all costs and expenses, including reasonable attorneys' fees and disbursements, incurred by such prevailing party in such action or proceeding and in any appeal in connection therewith. If such prevailing party recovers a judgment in any such action, proceeding or appeal, such costs, expenses and attorneys' fees and disbursements shall be included in and as a part of such judgment.

25.3 Tenant shall cause the guarantor(s) specified in the Basic Lease Information to execute the Continuing Lease Guaranty attached to this Lease. The Continuing Lease Guaranty, Exhibit A (Plan(s) Outlining the Premises), and Exhibit B (Rules and Regulations) are attached to and made a part of this Lease.

25.4 Tenant warrants and represents to Landlord that Tenant has negotiated this Lease directly with the real estate broker(s) specified in the Basic Lease Information and has not authorized or employed, or acted by implication to authorize or to employ, any other real estate broker or salesman to act for Tenant in connection with this lease.

25.5 If Tenant is a corporation, Tenant and each person executing this Lease on behalf of Tenant represents and warrants to Landlord that (a) Tenant is duly incorporated and validly existing under the laws of its state of incorporation, (b) Tenant is qualified to do business in California, (c) Tenant has full corporate right, power and authority to enter into this Lease and to perform all of Tenant's obligations hereunder, and (d) each person signing this Lease on behalf of the corporation is duly and validly authorized to do so. Concurrently with signing this Lease, Tenant shall deliver to Landlord a true and correct copy of resolutions duly adopted by the board of directors of Tenant, certified by the secretary of Tenant to be true and correct, unmodified and in full force, which authorize and approve this Lease and authorize each person signing this Lease on behalf of Tenant to do so.

25.6 Landlord shall have the right, at any time and from time to time before the Commencement Date and during the term of this Lease, by giving at least thirty (30) days' prior written notice to Tenant, to substitute other space in the Building (the "Substitute Premises") for the Premises and to relocate Tenant to the Substitute Premises. Landlord shall designate the effective date for the substitution of the Substitute Premises for the Premises and the relocation of Tenant to the Substitute Premises in such notice. The area of the Substitute Premises shall be approximately comparable to the area of the Premises. Landlord shall, at Landlord's expense before such effective date, construct and install in the Substitute Premises improvements substantially similar in quality and quantity to the improvements in the Premises. Landlord shall pay the reasonable costs of moving Tenant's movable furniture, equipment, trade fixtures and personal property from the Premises to the Substitute Premises. As of the effective date for the substitution of the Substitute Premises for the Premises and the relocation of Tenant to the Substitute

16593864

27

Premises, Tenant shall vacate the Premises and move to the Substitute Premises, and the Substitute Premises shall be substituted for the Premises under this Lease. Landlord and Tenant each shall, promptly after such effective date, execute and deliver to the other an amendment to this Lease which sets forth the substitution of the Substitute Premises for the Premises, with an appropriate new Exhibit A, and the effective date of such substitution, but the Substitute Premises shall be substituted for the Premises on such effective date whether or not such amendment is executed.

25.7 There are no oral agreements between Landlord and Tenant affecting this Lease, and this lease supersedes and cancels any and all previous negotiations, arrangements, brochures, offers, agreements and understandings, oral or written, if any, between Landlord and Tenant or displayed by Landlord to Tenant with respect to the subject matter of this Lease, the Premises or the Building. There are no representations between Landlord and Tenant or between any real estate broker and Tenant other than those expressly set forth in this Lease and all reliance with respect to any representations is solely upon representations expressly set forth in this Lease. This Lease may not be amended or modified in any respect whatsoever except by and instrument in writing signed by Landlord and Tenant.

25.8 Tenant acknowledges that insofar as Wells Fargo Bank, N.A. ("Wells Fargo") is Landlord under this Lease, acting as a fiduciary and not its corporate capacity. With respect to Wells Fargo, Tenant agrees to look solely to the assets held by Wells Fargo in such fiduciary capacity for satisfaction of any claim of Tenant.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the date first hereinabove written.

Wells Fargo Bank, N.A., as Trustee
For the Clara Poppic Trust

By _____
Steven S. Schulman
Its:

BY _____
James B. Boydstone
Its:

BY _____
Henry Poppic, Co-Trustee

By _____
Michael Yi

10993864

28

## CONTINUING LEASE GUARANTY

THIS GUARANTY, made as of the date specified in the Basic Lease Information, by and between the guarantor(s) specified in the Basic Lease Information ("Guarantor") and the landlord specified in the Basic Lease Information ("Landlord"),

### W I T N E S S E T H:

1. For valuable consideration, receipt of which is acknowledged, and to induce Landlord to enter into the Lease with Tenant, Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Landlord, and agrees fully to pay, perform and discharge, as and when payment, performance and discharge are due, all of the covenants, obligations and liabilities of Tenant under the Lease and all amendments modifications, renewals, extensions, supplements, substitutions and replacements of the Lease (the "Guaranteed Obligations"). Each individual Guarantor under this Guaranty shall be jointly and severally liable for the Guaranteed Obligations. The obligations of Guarantor under this Guaranty shall be absolute, unconditional and irrevocable and shall continue and remain in full force and effect until all of the Guaranteed Obligations have been fully paid, performed and discharged.

2. The obligations of Guarantor under this Guaranty shall not be affected, modified or impaired by the occurrence of any of the following events, whether or not with notice to, or the consent of, Guarantor: (a) the waiver, surrender, compromise, settlement, release or termination of any or all of the Guaranteed Obligations; (b) the failure to give notice to Guarantor of the occurrence of an event of default under the Guaranteed Obligations; (c) the extension of the time for the payment, performance or discharge of any of all of the Guaranteed Obligations; (d) the amendment or modification (whether material or otherwise) of the Lease or the Guaranteed Obligations in any respect; (e) any failure, omission, delay or lack on the part of Landlord to enforce, assert or exercise any right, power or remedy conferred on Landlord under the Lease; (f) the voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all of the assets, marshalling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition with creditors or adjustment of debts, or other similar proceedings affecting Tenant or Guarantor of any of the assets of either of them; (g) the release or discharge by operation of law of Tenant from the payment, performance or discharge of any or all of the Guaranteed Obligations; (h) the release or discharge by operation of law of Guarantor from any or all of the obligations of Guarantor under this Guaranty; or (i) the invalidity or unenforceability of any or all of the Guaranteed Obligations. Guarantor acknowledges that Landlord would not enter into the Lease without this Guaranty and that Landlord is relying on this Guaranty.

3. The obligations of Guarantor under this Guaranty are independent of the Guaranteed Obligations. Guarantor agrees that Landlord shall have the right to proceed against Guarantor directly and independently of Tenant. A separate action may be brought and prosecuted against Guarantor whether or not an action is brought against Tenant or Tenant is joined in any such action. Guarantor authorizes Landlord and Tenant, without notice to, demand of, or consent from Guarantor and without releasing or affecting

Guarantor's liability under this Guaranty, from time to time to amend, modify, renew, extends, supplement or replace the Lease or the Guaranteed Obligations or otherwise change the terms of the Lease or the Guaranteed Obligations, to take and hold security for the Guaranteed Obligations, and to enforce, waive, surrender, impair, comprise or release any such security or any or all of the Guaranteed Obligations or any person or entity liable for any or all of the Guaranteed Obligations. Guarantor shall be and remain bound under this Guaranty notwithstanding any such act or omission by Tenant or Landlord. Guarantor waives all rights under section 2845 of the California Civil Code and waives the right to require Landlord to proceed against Tenant, to proceed against or exhaust any security held by Landlord, or to pursue any other remedy in Landlord's power. Landlord shall have the right to exercise any right or remedy it may have against Tenant or any security held by Landlord. Guarantor waives all rights under section 2849 of the California Civil Code and waives the right, if any, to the benefit of, or to direct the application of, any security held by Landlord. Guarantor waives (a) any defense arising out of any alteration of the Guaranteed Obligations, (b) any defense arising out of the absence, impairment or loss of any right of reimbursement or subrogation or other right or remedy of Guarantor against Tenant or any security held by Landlord, and (c) any defense arising by reason of any disability or other defense of Tenant or by reason of the cessation or reduction from any cause whatsoever of the liability of Tenant other than full payment, performance and discharge of the Guaranteed Obligations. The cessation or reduction of the liability of Tenant for any reason other than full payment, performance and discharge of the Guaranteed Obligations shall not release or affect in any way the liability of Guarantor under this Guaranty.

4.    If Tenant becomes insolvent or is adjudicated bankrupt or files a petition for reorganization, arrangement, composition or similar relief under any present or future provision of the Federal Bankruptcy Code, or if such a petition is filed against Tenant, or Tenant makes a general assignment for the benefit of creditors, and in any such proceeding any or all of the Guaranteed Obligations are terminated or rejected or any or all of the Guaranteed Obligations are modified or abrogated, Guarantor agrees that Guarantor's liability hereunder shall not thereby be affected or modified and such liability shall continue in full force and effect as if no such action or proceeding had occurred. This Guaranty shall continue to be effective or be reinstated, as the case may be, if any payment of the Guaranteed Obligations must be returned by Landlord upon the insolvency, bankruptcy or reorganization of Tenant, Guarantor, or otherwise, as though such payment had not been made.

5.    Guarantor assumes the responsibility for being and keeping Guarantor informed of the financial condition of Tenant and of all other circumstances bearing upon the risk of failure to pay, perform or discharge any of the Guaranteed Obligations which diligent inquiry would reveal, and Guarantor agrees that Landlord has no duty to advise Guarantor of information known to Landlord regarding such condition or any such circumstance. Guarantor acknowledges that repeated and successive demands may be made and payments or performance made hereunder in response to such demands as and when, from time to time, Tenant defaults in the payment, performance or discharge of the Guaranteed Obligations. Notwithstanding any such payments and performance hereunder, this Guaranty shall remain in full force and effect and shall apply to any and all subsequent defaults by Tenant. It is not necessary for

10393664

30

Landlord to inquire into the capacity, authority or powers of Tenant or the partners, directors, officers, employees or agents acting or purporting to act on behalf of Tenant, and all of the Guaranteed Obligations made or created in reliance upon the purported exercise of such powers shall be guaranteed hereunder. Guarantor hereby subordinates all indebtedness of Tenant to Guarantor now or hereafter held by Guarantor to all indebtedness of Tenant to Landlord. If requested by Landlord, Guarantor shall collect, enforce and receive all such indebtedness of Tenant to Guarantor as trustee for Landlord and Guarantor shall pay such indebtedness to Landlord on account of the indebtedness of Tenant to Landlord, but without otherwise reducing or affecting in any manner the liability of Guarantor under this Guaranty.

6.    If Tenant and Guarantor fail to pay, perform and discharge, as and when payment, performance and discharge are due, all of the Guaranteed Obligations, Landlord shall have the right, but no obligation, and without releasing Tenant or Guarantor from any of the Guaranteed Obligations, to pay, perform and discharge any or all of the Guaranteed Obligations on behalf of Tenant and Guarantor.    Guarantor shall, on demand, pay to Landlord all sums expended by Landlord in the payment, performance and discharge of the Guaranteed Obligations, together with interest on all such sums from the date of expenditure to the date all such sums are paid by Tenant or Guarantor to Landlord at the maximum annual interest rate allowed by law for business loans (not primarily for personal, family or household purposes) not exempt from the usury law on such date of expenditure, or, if there is no such maximum annual interest rate, at the rate of eighteen percent (18%) per annum. Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices or protest, notices of dishonor and notices of acceptance of this Guaranty.    Guarantor agrees to pay all costs and expenses, including reasonable attorneys' fees, which are incurred by Landlord in the enforcement of this Guaranty. If any provision of this Guaranty is held to be invalid or unenforceable, the validity or enforceability of the other provisions of this Guaranty shall not be affected.    This Guaranty may not be amended or modified in any respect except by a written instrument signed by Guarantor and Landlord. As used in this Guaranty, the singular shall include the plural.    This Guaranty shall bind and inure to the benefit of Guarantor and Landlord    and    their    respective    transferees,    personal representatives, heirs, successors and assigns. This Guaranty shall be governed by and construed in accordance with the laws of the State of California.

IN WITNESS WHEREOF, Guarantor and Landlord have executed this Continuing Lease Guaranty as of the date first hereinabove written.

By: _____        By: _____
      Michael                        Title: STEVEN S. SCHULMAN
                                             ASSISTANT VICE PRESIDENT

                                      By: _____
                                      Title: James B. Boydstone
                                             Vice President

                                      BY: _____
                                            Henry Poppic, Co-Trustee

31

**EXHIBIT 'A'**

Not To Scale



CAL CLEANERS          RESTAURANT

Telegraph Avenue







## EXHIBIT "B"

## Rules and Regulations

1. **Common Areas.** The sidewalks, halls, passages, exits, entrances, elevators and stairways of the Building shall not be obstructed by Tenant or used for any purpose other than for ingress to and egress from the Premises. The halls, passages, exits, entrances, elevators and stairways are not for the general public and Landlord shall in all cases have the right to control and prevent access thereto of all persons (including, without limitation, messengers or delivery personnel not wearing uniforms) whose presence in the judgment of Landlord would be prejudicial to the safety, character, reputation or interests of the Building and its tenants. Neither Tenant nor any agent, employee, contractor, invitee or licensee of Tenant shall go upon the roof of the Building. Landlord shall have the right at any time, without the same constituting an actual or constructive eviction and without incurring any liability to Tenant therefor, to change the arrangement or location of entrances or passageways, doors or doorways, corridors, elevators, stairs, toilets and common areas of the Building.

2. **Signs.** No sign, placard, picture, name, advertisement or notice visible from the exterior of the Premises shall be inscribed, painted, affixed or otherwise displayed by Tenant on any part of the Building or the Premises without the prior written consent of Landlord. Landlord will adopt and furnish to tenants general guidelines relating to signs inside the Building. Tenant agrees to conform to such guidelines. All approved signs or lettering shall be printed, painted, affixed or inscribed at the expense of Tenant by a person approved by Landlord. Material visible from outside the Building will not be permitted.

3. **Prohibited Uses.** The Premises shall not be used for the storage of merchandise held for sale to the general public or for lodging. No cooking shall be done or permitted on the Premises except that private use by Tenant of microwave ovens and Underwriters' Laboratory-approved equipment for brewing coffee, tea, hot chocolate and similar beverages will be permitted, provided that such use is in accordance with all applicable federal, state and municipal laws, codes, ordinances, rules and regulations. Tenant shall not place any load on the floors of the Building exceeding fifty (50) pounds per square foot, live or dead load. Tenant shall not use electricity for lighting, machines or equipment in excess of four (4) watts per square foot.

4. **Janitorial Service.** Tenant shall not employ any person other than the janitor of Landlord for the purpose of cleaning the Premises unless otherwise agreed to by Landlord in writing. Except with the written consent of Landlord, no persons other than those approved by Landlord shall be permitted to enter the Building for the purpose of cleaning the Premises. Tenant shall not cause any unnecessary labor by reason of Tenant's carelessness or indifference in the preservation of good order and cleanliness. Landlord shall not be responsible to Tenant for any loss of property in the Premises, however occurring, or for any damage done to the effects of Tenant by the janitor or any other employee or any other person.

5. **Keys.** Landlord will furnish Tenant without charge with two (2) keys to each door lock provided in the Premises by Landlord. Landlord may make a reasonable charge for any additional keys. Tenant shall not have any such keys copied or any keys made. Tenant shall not alter any lock or install a new or additional lock or any bolt on any door of the Premises. Tenant, upon the termination of this Lease, shall deliver to Landlord all keys to doors in the Building.

IC092664

6. __Moving Procedures__. Landlord shall designate appropriate entrances for deliveries or other movement to or from the Premises of equipment, materials, supplies, furniture or other property, and Tenant shall not use any other entrances for such purposes. All moves shall be scheduled and carried out during non-business hours of the Building. All persons employed and means or methods used to move equipment, materials, supplies, furniture or other property in or out of the Building must be approved by Landlord prior to any such movement. Landlord shall have the right to prescribe the maximum weight, size and position of all equipment, materials, furniture or other property brought into the Building. Heavy objects shall, if considered necessary by Landlord, stand on a platform of such thickness as is necessary properly to distribute the weight. Landlord will not be responsible for loss of or damage to any such property from any cause, and all damage done to the Building by moving or maintaining such property shall be repaired at the expense of Tenant.

7. __No Nuisances__. Tenant shall not use or keep in the Premises or the Building any kerosene, gasoline or inflammable or combustible fluid or material other than limited quantities thereof reasonably necessary for the operation of maintenance of office equipment. Tenant shall not use any method of heating or air conditioning other than that supplied by Landlord. Tenant shall not use or keep or permit to be used or kept any foul or noxious gas or substance in the Premises, or permit or suffer the Premises to be occupied or used in a manner offensive or objectionable to Landlord or other occupants of the Building by reason of noise, odors or vibrations, or interfere in any way with other tenants or those having business in the Building, nor shall any animals be brought or kept in the Premises or the Building.

8. __Change of Address__. Landlord shall have the right, exercisable without notice and without liability to Tenant, to change the name or street address of the Building or the room or suite number of the Premises.

9. __Business Hours__. Landlord establishes the hours of 8 A.M. to 6 P.M. Monday through Friday, except union holidays and legal holidays, as reasonable and usual business hours for the purposes of section 7.1 of this Lease. If Tenant requests electricity or heat or air conditioning or any other services during any other hours or on any other days, and if Landlord is able to provide the same, Tenant shall pay Landlord such charge as Landlord shall establish from time to time for providing such services during such hours. Any such charges which Tenant is obligated to pay shall be deemed to be additional rent under this Lease.

10. __Access to Building__. Landlord reserves the right to exclude from the Building during the evening, night and early morning hours beginning at 6 P.M. and ending at 8 A.M. Monday through Friday, and at all hours on Saturdays, Sundays, union holidays and legal holidays, all persons who do not present identification acceptable to Landlord. Tenant shall provide Landlord with a list of all persons authorized by Tenant to enter the Premises and shall be liable to Landlord for all acts of such persons. Landlord shall in no case be liable for damages for any error with regard to the admission to or exclusion from the Building of any person. In the case of invasion, mob, riot, public excitement or other circumstances rendering such action advisable in Landlord's opinion, Landlord reserves the right to prevent access to the Building during the continuance of the same by such action as Landlord may deem appropriate, including closing doors.

11. **Building Directory.** The directory of the Building will be provided for the display of the name and location of Tenant and a reasonable number of the principal officers and employees of Tenant at the expense of Tenant. Landlord reserves the right to restrict the amount of directory space utilized by Tenant.

12. **Window Coverings.** No curtains, draperies, blinds, shutters, shades, screens or other coverings, hangings or decorations shall be attached to, hung or placed in, or used in connection with any window of the Building without the prior written consent of Landlord. In any event, with the prior written consent of Landlord, such items shall be installed on the office side of Landlord's standard window covering and shall in no way be visible from the exterior of the Building. Tenant shall keep window coverings closed when the effect of sunlight (or the lack thereof) would impose unnecessary loads on the Building's air conditioning systems.

13. **Food and Beverages.** Tenant shall not obtain for use in the Premises ice, drinking water, food, beverage, towel or other similar services, except at such reasonable hours and under such reasonable regulations as may be established by Landlord.

14. **Procedures When Leaving.** Tenant shall ensure that the doors of the Premises are closed and locked and that all water faucets, water apparatus and utilities are shut off before Tenant and its employees leave the Premises so as to prevent waste or damage. For any default or carelessness in this regard, Tenant shall be liable and pay for all damage and injuries sustained by Landlord or other tenants or occupants of the Building. On multiple-tenancy floors, Tenant shall keep the doors to the Building corridors closed at all times except for ingress and egress.

15. **Bathrooms.** The toilet rooms, toilets, urinals, wash bowls and other apparatus shall not be used for any purpose other than that for which they were constructed, no foreign substance of any kind whatsoever shall be thrown therein, and the expense of any breakage, stoppage or damage resulting from the violation of this rule shall be paid by Tenant if caused by Tenant or its agents, employees, contractors, invitees or licensees.

16. **Prohibited Activities.** Except with the prior written consent of Landlord, Tenant shall not sell at retail newspapers, magazines, periodicals, theatre or travel tickets or any other goods or merchandise to the general public in or on the Premises, nor shall Tenant carry on or permit or allow any employee or other person to carry on the business of stenography, typewriting, printing or photocopying or any similar business in or from the Premises for the service or accommodation of occupants of any other portion of the Building, nor shall the Premises be used for manufacturing of any kind, or any business or activity other than that specifically provided for in this Lease.

17. **No Antenna.** Tenant shall not install any radio or television antenna, loudspeaker, or other device on the roof or exterior walls of the Building. No television or radio or recorder shall be played in such a manner as to cause a nuisance to any other tenant.

18. **Vehicles.** There shall not be used in any space, or in the public halls of the Building, either by Tenant or others, any hand trucks except those equipped with rubber tires and side guards or such other material handling equipment as Landlord approves. No

other vehicles of any kind shall be brought by Tenant into the Building or kept in or about the Premises.

19. **Trash Removal.** Tenant shall store all its trash and garbage within the Premises. No material shall be placed in the trash boxes or receptacles if such material is of such nature that it may not be disposed of in the ordinary and customary manner of removing and disposing of office building trash and garbage in the city or county in which the Building is located without being in violation of any law or ordinance governing such disposal. All garbage and refuse disposal shall be made only through entryways and elevators provided for such purposes and at such times as Landlord shall designate. Tenant shall crush and flatten all boxes, cartons and containers. Tenant shall pay extra charges for any unusual trash disposal.

20. **No Soliciting.** Canvassing, soliciting, distribution of handbills or any other written material and peddling in the Building are prohibited, and Tenant shall cooperate to prevent the same.

21. **Services.** The requirements of Tenant will be attended to only upon application in writing at the office of the Building. Personnel of Landlord shall not perform any work or do anything outside of their regular duties unless under special instructions from Landlord.

22. **Waiver.** Landlord may waive any one or more of these Rules and Regulations for the benefit of any particular tenant or tenants, but no such waiver by Landlord shall be construed as a waiver of such Rules and Regulations in favor of any other tenant or tenants, nor prevent Landlord from thereafter enforcing any such Rules and Regulations against any or all of the tenants of the Building.

23. **Supplemental to Lease.** These Rules and Regulations are in addition to, and shall not be construed to in any way modify or amend, in whole or in part, the covenants of this Lease.

24. **Amendments and Additions.** Landlord reserves the right to make such other rules and regulations, and to amend or repeal these Rules and Regulations, as in Landlord's judgment may from time to time be desirable for the safety, care and cleanliness of the Building and for the preservation of good order therein.







10093464

**EXHIBIT 'C'**

ADDITIONAL TERMS AND CONDITIONS

**OPTION:**

Provided tenant is not then in default under this Lease, Tenant shall have the right to one Five (5) year option upon the same terms and conditions as in the then in effect Lease, except for rent. The Tenant shall exercise such Option six (6) months prior to the termination date of the then in effect Lease by written notice. The new rent for this Option period will equal Fair Market Rent for similar space within the market area. If Landlord and Tenant cannot agree on a Fair Market Rent, the process to determine Fair Market Rent will be that which is defined in the then in effect Lease, Section #3.2(d).







10393844

EXHIBIT "F"

## AMENDMENT AND EXTENSION TO LEASE

Reference is made to that certain lease dated February 1, 1994 by and between Wells Fargo, N.A., Trustee for the Clara Poppic Trust, and Michael Yi, as Lessee, which expires January 31, 1999.  Said lease covers all that certain real property commonly known as 2531 Telegraph Ave., Berkeley CA.

For valuable consideration, receipt of which is acknowledged, said lease is being hereby extended for an additional period of five (5) years, expiring January 31, 2004 upon the same terms and conditions otherwise in effect except as provided as follows:

- Lessee agrees to a new "Base Rent" of $2,540.63 per month
- The new "Market Adjustment Date" shall be January 2004

All other terms of the lease dated February 1, 1994 shall remain the same, including the CPI clause (section 3.2 (a)) and the CPI adjustment date of November.

LESSEE (S):                          LESSOR (S):        JOHN M. WARD
                                                        ASSISTANT VICE PRESIDENT

_____Mike Yi_____        by: _____  co -

                                     WELLS FARGO BANK N.A. AS TRUSTEE

                                by: _____

                                     _____

DATE:___4 / 6 / 99____        DATE:_____7/9/99_____

Note: See approval letter from Mr. Henry Poppic (Dated March, 15, 1999), regarding Co-Trustee

MAR 2 6 1999

420 Montgomery Street, 3rd Floor
P.O. Box 63939
San Francisco, CA 94163
415 983-0701 Fax

Private Client Services
Specialty Assets - Real Estate

# WELLS
# FARGO

March 15, 1999

Mr. Henry Poppic
P. O. Box 187
San Juan Bautista, CA  95045-0187

Re:    2531 Telegraph Ave., Berkeley CA
       Property #1930
       Poppic Trust #712051

Dear Mr. Poppic:

I received your telephone call today confirming that you are in agreement over the amount that should be established for the reserves for the referenced property. I understand that you have just returned from the hospital and wish not to be disturbed so I will not telephone you. Meanwhile, I will keep you informed through written correspondence.

Cal Cleaners, the tenant at 2531 Telegraph Ave., has requested a rent reduction. I called a local real estate agent who stated that the rent Cal Cleaners is paying is at fair market level. Therefore, I propose we agree to a five year lease renewal and keep the rent at the current level for the next year (rather than a rent reduction) with CPI increases each year after the first year.

Please acknowledge your agreement to this five year lease renewal under the terms described by signing below and returning one copy of the signed letter to me. Thank you for your assistance. I hope that you are feeling better in the near future.

Sincerely,

John M. Ward
Assistant Vice President
415/396-3019

Approved: _____
          Henry Poppic — Co-Trustee

EXHIBIT "G"

NOV-05-99 17:01  FROM:                    415-983-0701        TO:5100-150377      PAGE:002
NOV-05-1999  13:24      JTTENBERG RAPSON COLVIN                     4155074526    P.02

CAL CLEANERS
POPPIC

## ASSIGNMENT AND ASSUMPTION OF LEASE AND CONSENT OF LANDLORD

This Assignment of Lease and Consent of Landlord (the "Assignment") is entered into effective _NOV 15TH_, 1999 by and between Nan Y. Park ("Assignee"), Michael Yi, individual, and dba Cal Cleaners ("Assignor") and Wells Fargo Bank, N.A., trustee of the Poppic Trust ("Landlord"), and is made with respect to the following facts and circumstances:

A.    Assignor is the tenant under that certain lease dated February 1, 1994, as amended by that certain Amendment and Extension to Lease (collectively, the "Lease") by and between Assignor and Landlord concerning that certain real property commonly known as 2531 Telegraph Avenue, Berkeley, California as more particularly described in the Lease (the "Premises").

B.    Assignor now desires to assign the Lease to Assignee, and Assignee desires to accept the assignment thereof, and Landlord desires to give its consent to said assignment and affirm the status of the Lease to Assignee, all on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the promises, covenants and conditions set forth herein, the parties agree as follows:

1.    Assignment. Assignor hereby assigns, conveys and transfers to Assignee all of Assignor's right, title, benefit and interest in, to and under the Lease, and Assignee agrees to and does accept the said assignment of the Lease from Assignor. Commencing on _NOV 15TH_, 1999 (the "Transfer Date"), and for the remaining term of the Lease, Assignee hereby assumes and agrees to keep, perform and fulfill all the terms, covenants, conditions and obligations required to be kept, performed and fulfilled by the tenant under the Lease, including the making of all payments due to, or payable on behalf of, Landlord set forth in the Lease. Notwithstanding the foregoing or any contrary provision hereof, Assignor and Assignee agree to be and remain jointly and severally liable to Landlord for the full and timely payment and performance of all obligations owing Landlord under the Lease.

2.    Consent of Landlord. Landlord hereby consents to the assignment of the Lease set forth above to Assignee from Assignor, agrees to accept performance of all tenant obligations, promises and covenants under the Lease from Assignee, and agrees to perform all Landlord covenants, promises and obligations for the benefit of Assignee as tenant under the Lease.

3.    Indemnification. Assignee hereby agrees to defend, indemnify and hold Assignor and Landlord (and its beneficiaries, trustors, trustees, successors and/or assigns) harmless from and against any and all liabilities, responsibilities, claims, demands, costs and fees (including reasonable attorneys' and consultants' fees) made against or incurred by Assignor arising from or relating to (i) the nonperformance of any Lease obligation arising on or after the Transfer Date, (ii) the release of any hazardous or toxic materials (as such terms may from time to time be defined by applicable law) on, at

ALANWFTREVCOPPIC/A\AR/051.1

or from the Premises on or after the Transfer Date, and/or (iii) Assignee's occupancy or use of the Premises. Assignor hereby agrees to defend, indemnify and hold Assignee and Landlord (and its beneficiaries, trustors, trustees, successors and/or assigns) harmless from and against any and all liabilities, responsibilities, claims, demands, costs and fees (including reasonable attorneys' and consultants' fees) made against or incurred by Assignee arising from or relating to (i) the nonperformance of any Lease obligation arising before the Transfer Date, (ii) the release of any hazardous or toxic materials (as such terms may from time to time be defined by applicable law) on, at or from the Premises before the Transfer Date, and/or (iii) Assignor's occupancy or use of the Premises. Furthermore, both Assignor and Assignee agree to defend (with legal counsel selected by Landlord), indemnify and hold harmless Landlord, its beneficiaries, trustors, trustees, successors and/or assigns, from and against any and all liabilities, responsibilities, claims, demands, costs and fees (including reasonable attorneys' and consultants' fees) made against or incurred by Landlord arising from or relating to the assignment and assumption of the Lease as described herein.

        4.    Certain Lease Provisions.  Assignor and Assignee acknowledge and agree that (a) the monthly Base Rent payable under the Lease is $2,540.63 per month as of October 1, 1999, (b) said monthly base Rent is subject to increase each year during the remaining term of the Lease (commencing on November 1, 1999) pursuant to Section 3.2(a) of the Lease, (c) the term of the Lease expires on January 31, 2004 (subject to Tenant's right to extend the Lease pursuant to Exhibit C of the Lease, which extension period is hereby amended from five (5) years to six (6) years (including without limitation adjusting the Base Rent thereunder to Fair Market Rent pursuant to Section 3.2 (b), (d) of the Lease, effective January 1, 2004; provided, however, that in no event shall Fair Market Rent be less than the Base Rent payable in the calendar month immediately preceding the imposition of Fair Market Rent), (e) no default by Landlord (or matter with the giving of notice or passage of time or both would constitute a default by Landlord) exists under the Lease, and (f) all representations, warranties, promises and covenants owing to Landlord under the Lease are hereby ratified, reaffirmed and remade.

        5.    Attorneys' Fees.   In any action or dispute between the parties arising out of or in any way connected with this Assignment and Assumption of Lease and Consent of Landlord, the prevailing party in such action or dispute (whether by way of judgment, arbitration award, mediation, settlement, dismissal of claims, or otherwise,

                                2

NOV-05-99 17:02 FROM:                415 903 0701          TO:5120450377        PAGE:004
NOV-05-1999 13:25      ITENBERG RAPSON COLVIN                        4155074526     P.04

and whether or not suit is commenced), shall be entitled to collect from the other party the prevailing party's costs and expenses incurred in connection with such dispute, including, without limitation, all litigation costs and attorneys' fees.

WHEREFORE, the parties have executed and delivered this Assignment as of the day and year first above written.

"ASSIGNEE"                                          "ASSIGNOR"

_Nan Y. Park_                                       Michael Yi, Individually and dba Cal
Nan Y. Park                                         Cleaners

"LANDLORD"

WELLS FARGO BANK, N.A., Trustee of
the Poppic Trust

By:

Its: _____ JOHN M. WARD
          ASSISTANT VICE PRESIDENT

By:

Its: _____ HEATHER FAIRFULL
          VICE PRESIDENT

Henry Poppic

3

# EXHIBIT "H"

# AMENDMENT AND EXTENSION TO LEASE

Reference is made to that certain lease dated February 1, 1994 between Wells Fargo Bank and Henry Poppic, each as Co-Trustees of the Poppic Trust, as Lessor, and Michael Yi dba Cal Cleaners, as Lessee, and that certain assignment agreement dated November 15, 1999 between Nan Y. Park (Assignee), Michael Yi (Assignor) and Wells Fargo Bank and Henry Poppic each as Co-Trustees of the Poppic Trust (Lessor). Currently, the lease expires January 31, 2004, however, by signing below, Nan Y. Park as Lessee (Assignee) will exercise the option to extend the lease term of the said lease for an additional Five (5) years. Said lease covers that certain real property commonly known as 2531 Telegraph Ave., Berkeley, CA.

Further, Lessee acknowledges and agrees that Lessor is not in default of any of its obligations (if any) under the Lease. Lessee hereby releases Lessor from any and all claims, actions, causes of action, liabilities and debts, known or unknown, absolute or contingent, now or hereafter discovered or arising, which in any way relate to the Lease, the Premises, the Building or the Center or any actual or alleged act or failure to act by Lessor in connection with any of the foregoing, at any time through and including the date of execution and delivery of this Addendum. In making the aforesaid general release, Lessee acknowledges, understands and knowingly waives the provisions of California Civil Code § 1542 which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

For valuable consideration, receipt of which is acknowledged, said lease is being hereby extended for an additional period of five years, expiring January 31, 2009 upon the same terms and conditions otherwise in effect except that as provided as follows:

**New Rent Schedule** –The amount of Base Monthly Rent is subject to increase (and not decrease) as follows: 1) base rent shall be $2,993.55 per month from ~~January 1,~~ Feb 1, (np) 2004 through ~~July 31, 2004~~ Oct 31, np at which time it will be subject to a CPI increase at that time and on each anniversary thereafter (i.e.: every ~~July 31st~~ Oct 30th), pursuant to the referenced lease.

**Option to renew** - No further option to extend the lease shall be included.

All other terms of the lease and assignment agreement referenced above shall remain the same.

LESSEE(S):

LESSOR(S): WELLS FARGO BANK, N.A. AS TRUSTEE
JOHN M. WAAS
VICE PRESIDENT    L. SHELLY EISAMAN
VICE PRESIDENT

DATE: 10-21-2003    DATE: 10/24/03

EXHIBIT "I"

## ASSIGNMENT AND ASSUMPTION OF LEASE AND CONSENT OF LANDLORD

This Assignment of Lease and Consent of Landlord (the "Assignment") is entered into effective ___*April 9*___, 2004 by and between Nan Y. Park ("Assignor"), and Guan Huang, Ying Zhang, and Sui Song (jointly and severally, "Assignee") and Wells Fargo Bank, N.A. and Henry Poppic, each as co-trustee of the Poppic Trust ("Landlord"), and is made with respect to the following facts and circumstances:

A.    Assignor is the tenant under that certain lease dated February 1, 1994, as amended by those two (2) certain Amendments and Extensions to Lease dated October 24, 2003 and April 9, 1999, respectively (collectively, the "Lease") by and between Assignor and Landlord concerning that certain real property commonly known as 2531 Telegraph Avenue, Berkeley, California as more particularly described in the Lease (the "Premises").

B.    Assignor now desires to assign the Lease to Assignee, and Assignee desires to accept the assignment thereof, and Landlord desires to give its consent to said assignment and affirm the status of the Lease to Assignee, all on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the promises, covenants and conditions set forth herein, the parties agree as follows:

1.    **Assignment.** Assignor hereby assigns, conveys and transfers to Assignee all of Assignor's right, title, benefit and interest in, to and under the Lease, and Assignee agrees to and does accept the said assignment of the Lease from Assignor. Commencing on ___*April 9*___, 2004 (the "Transfer Date"), and for the remaining term of the Lease, Assignee hereby assumes and agrees to keep, perform and fulfill all the terms, covenants, conditions and obligations required to be kept, performed and fulfilled by the tenant under the Lease, including the making of all payments due to, or payable on behalf of, Landlord set forth in the Lease. Notwithstanding the foregoing or any contrary provision hereof, Assignor and Assignee agree to be and remain jointly and severally liable to Landlord for the full and timely payment and performance of all obligations owing Landlord under the Lease.

2.    **Consent of Landlord.** Landlord hereby consents to the assignment of the Lease set forth above to Assignee from Assignor, agrees to accept performance of all tenant obligations, promises and covenants under the Lease from Assignee, and agrees to perform all Landlord covenants, promises and obligations for the benefit of Assignee as tenant under the Lease.

3.    **Indemnification.** Assignee hereby agrees to defend, indemnify and hold Assignor and Landlord (and its beneficiaries, trustors, trustees, successors and/or assigns) harmless from and against any and all liabilities, responsibilities, claims, demands, costs and fees (including reasonable attorneys' and consultants' fees) made against or incurred by Assignor arising from or relating to (i) the nonperformance of any Lease obligation arising on or after the Transfer Date, (ii) the release of any hazardous or toxic materials (as such terms may from time to time be defined by applicable law) on, at or from the Premises on or after the Transfer Date, and/or (iii) Assignee's occupancy or use of the Premises. Assignor hereby agrees to defend, indemnify and hold Assignee and Landlord (and its beneficiaries, trustors, trustees, successors

1

and/or assigns) harmless from and against any and all liabilities, responsibilities, claims, demands, costs and fees (including reasonable attorneys' and consultants' fees) made against or incurred by Assignee arising from or relating to (i) the nonperformance of any Lease obligation arising before the Transfer Date, (ii) the release of any hazardous or toxic materials (as such terms may from time to time be defined by applicable law) on, at or from the Premises before the Transfer Date, and/or (iii) Assignor's occupancy or use of the Premises. Furthermore, both Assignor and Assignee agree to defend (with legal counsel selected by Landlord), indemnify and hold harmless Landlord, its beneficiaries, trustors, trustees, successors and/or assigns, from and against any and all liabilities, responsibilities, claims, demands, costs and fees (including reasonable attorneys' and consultants' fees) made against or incurred by Landlord arising from or relating to the assignment and assumption of the Lease as described herein.

4.    **Certain Lease Provisions.**    Assignor and Assignee acknowledge and agree that (a) the monthly Base Rent payable under the Lease is $2,993.55 per month as of April 1, 2004, (b) said monthly Base Rent is subject to increase each year during the remaining term of the Lease (commencing on November 1, 2004), pursuant to Section 3.2(a) of the Lease, (c) the term of the Lease expires ("Expiration Date") on January 31, 2009 (and Tenant has no other or further right to extend the Lease, whether pursuant to Exhibit C of the Lease or otherwise, except as provided in Section 6 below, (d) the current Security Deposit under the Lease in the sum of $2,300.00 (currently on deposit with Landlord for the account of Assignor) is hereby transferred and conveyed by Assignor to Assignee effective on the Transfer Date, and said Security Deposit shall be retained by Landlord and held by Landlord as security for the account of Assignee from and after the Transfer Date, and Assignor shall have no further right, title, interest or claim therein or thereto (and in addition, Assignee shall deposit the additional sum of $693.55 with Landlord on or before the Transfer Date as an additional security deposit under the Lease), (e) Assignee shall have deposited with Landlord on or before the Transfer Date the sum of $800.00 as the Landlord's standard processing fee payable to Landlord under Lease section 12.5 in connection with this assignment of Lease, and the sum of $700.00 to pay all of Landlord's legal fees and costs in connection with this assignment of Lease, (f) no default by Landlord (or matter with the giving of notice or passage of time or both would constitute a default by Landlord) exists under the Lease, and (g) all representations, warranties, promises and covenants owing to Landlord under the Lease are hereby ratified, reaffirmed and remade.

5.    **Attorneys' Fees.**    In any action or dispute between the parties arising out of or in any way connected with this Assignment and Assumption of Lease and Consent of Landlord, the prevailing party in such action or dispute (whether by way of judgment, arbitration award, mediation, settlement, dismissal of claims, or otherwise, and whether or not suit is commenced), shall be entitled to collect from the other party the prevailing party's costs and expenses incurred in connection with such dispute, including, without limitation, all litigation costs and attorneys' fees.

6.    **Assignee's Extension Option.**    Provided that Assignee is not then in default under the Lease, Assignee shall have the right to extend the term of the Lease by one (1) five (5) year period ("Extended Term"), by delivering written notice of exercise of extension option to Landlord not later than six (6) months nor more than twelve (12) months prior to the Expiration Date. Assignee's possession and use of the Premises during the Extended Term shall be pursuant to all of the terms and conditions of the Lease and this Addendum, except that the

2

initial monthly Base Rent during the Extended Term shall be equal to the "Fair Market Rent" (as hereafter defined), which initial monthly Base Rent shall be increased annually throughout the Extended Term by the Rent Adjustment pursuant to Section 7 below, and except that the Premises shall be accepted by Lessee AS IS, WHERE IS and WITH ALL FAULTS (with absolutely no representations or warranties of Landlord express or implied). "Fair Market Rent" shall mean the fair market monthly base rent for a lease of the Premises in its physical condition as of the date of commencement of the Extended Term (assuming that Assignee has complied with each and all of its maintenance, repair and replacement obligations under the Lease), but without regard to any additional tenant improvement(s), broker commissions, lease concessions, incentives or allowances relating thereto, and with regard to any and all of the lawful purposes for which the Demised Premises may be used; provided, however, that in no event may the Fair Market Rent be less than 103% of the monthly Base Rent payable in the month immediately preceding the Extended Term. If the Extended Term commences before the Fair Market Rent is finally determined as provided in this Section, then the Extended Term shall nonetheless commence and Assignee shall fully and timely perform all obligations under the Lease and this Addendum and pay to Landlord Base Rent during the Extended Term at 103% of the monthly Base Rent payable under the Lease in the month immediately preceding the Extended Term (until the Fair Market Rent is finally determined as provided hereunder, in which case such determination shall be retroactive to the commencement of the Extended Term and Assignee shall immediately thereupon pay Landlord any unpaid monthly Base Rent during the Extended Term accruing at a rate equal to the Fair Market Rent. This extension option is personal to the Assignee only and may not be assigned by Assignee to any person or entity, and it may not be exercised by Assignor or any future assignee(s) or subtenant(s) of Assignee. "Fair Market Rent" shall be determined as follows: on or before four (4) months before the Expiration Date (or as soon thereafter as reasonably practicable), Landlord shall advise Assignee in writing of Landlord's estimate of Fair Market Rent ("Landlord's Proposed Rent"). Within ten (10) business days after Assignee's receipt of Landlord's Proposed Rent, Assignee shall notify Landlord in writing whether or not Assignee accepts Landlord's Proposed Rent. If Assignee so accepts Landlord's Proposed Rent, then Landlord's Proposed Rent shall become the initial monthly Base Rent for the Extended Term. If Assignee does not so accept Landlord's Proposed Rent, Assignee shall (within said ten (10) business day period) notify Landlord of Assignee's estimate of the Fair Market Rent for the Premises ("Assignee's Proposed Rent"). Within ten (10) business days after receipt of Assignee's Proposed Rent, Landlord shall notify Assignee in writing whether or not Landlord accepts Assignee's Proposed Rent (and if Landlord does so accept, then Assignee's Proposed Rent shall become the initial monthly Base Rent for the Premises for the Extended Term). If Landlord does not so accept Assignee's Proposed Rent, then the parties shall proceed to arbitrate Base Rent as follows:

The parties shall appoint a single appraiser, who shall be an MAI appraiser with not less than ten years' experience in appraising commercial property similar to the Premises in the San Francisco area, and who shall conduct a binding arbitration as hereafter provided. If the parties cannot agree upon an arbitrator within ten days after Landlord's rejection of Assignee's Proposed Rent, then either party may apply to the San Francisco Regional Office of the American Arbitration Association to appoint an arbitrator who meets the above experience qualifications, and the individual arbitrator so appointed by the AAA shall be the arbitrator for this purpose. Each party shall initially pay fifty percent (50%) of the arbitrator's fees and costs (subject to reimbursement as provided in

the last sentence of this section). Each party shall present to the arbitrator such information as the party deems relevant and the arbitrator shall be empowered to and shall only select either the Landlord's Proposed Rent or the Assignee's Proposed Rent (but no other amount) as being closest to the Fair Market Rent of the Premises (as defined above), and closest amount so selected by the arbitrator shall conclusively be the initial monthly Base Rent for said Extended Term (subject to annual increase by the Rent Adjustment, as provided in Section 4 above). The party whose estimate of Fair Market Rent is not selected by the arbitrator as closest to the Fair Market Rent shall reimburse the other party for all fees and costs paid to the arbitrator. In addition to Fair Market Rent (as determined above), Assignee shall continue to pay and/or reimburse Landlord throughout the Extended Term for any and all costs or expenses of Landlord of a type or nature which are payable or reimbursable by Assignee under the Lease prior to the Extended Term.

7.    **CPI Rent Adjustment during Extended Term.** In the event that Assignee exercises its extension option pursuant to Section 6 above, on the date which is one (1) year after first day of the Extended Term, and on each one-year anniversary date thereafter prior to the expiration of the Extended Term, if any, each such date being herein referred to as an "Adjustment Date"), Base Rent shall be increased ("Rent Adjustment") by the greater of (i) the CPI Increase (as otherwise provided in Lease section 3.2) or (ii) three percent (3%) above the immediately preceding year's Base Rent.

WHEREFORE, the parties have executed and delivered this Assignment as of the day and year first above written.

4

**"ASSIGNOR"**

Nan Y. Park

**"LANDLORD"**

WELLS FARGO BANK, N.A., as Co-trustee of the Poppic Trust

By: _____

Its: _____
JOHN M. WARD
VICE PRESIDENT

By: _____

Its: _____
L. SHELLY EISAMAN
VICE PRESIDENT

Henry Poppic, as Co-trustee of the Poppic Trust

**"ASSIGNEE"**

Guan Huang

Ying Zhang

Sui Song

5

ALANWFTRBPOPPICLEASEASS31
3/22/04 (I)

## AMENDMENT AND EXTENSION TO LEASE

Reference is made to that certain lease dated February 1, 1994 between Wells Fargo Bank and Henry Poppic, each as Co-Trustees of the Poppic Trust, as Lessor, and Michael Yi dba Cal Cleaners, as Lessee, and that certain assignment agreement dated November 15, 1999 between Nan Y. Park (Assignee), Michael Yi (Assignor) and Wells Fargo Bank and Henry Poppic each as Co-Trustees of the Poppic Trust (Lessor). Currently, the lease expires January 31, 2004, however, by signing below, Nan Y. Park as Lessee (Assignee) will exercise the option to extend the lease term of the said lease for an additional Five (5) years. Said lease covers that certain real property commonly known as 2531 Telegraph Ave., Berkeley, CA.

Further, Lessee acknowledges and agrees that Lessor is not in default of any of its obligations (if any) under the Lease. Lessee hereby releases Lessor from any and all claims, actions, causes of action, liabilities and debts, known or unknown, absolute or contingent, now or hereafter discovered or arising, which in any way relate to the Lease, the Premises, the Building or the Center or any actual or alleged act or failure to act by Lessor in connection with any of the foregoing, at any time through and including the date of execution and delivery of this Addendum. In making the aforesaid general release, Lessee acknowledges, understands and knowingly waives the provisions of California Civil Code § 1542 which provides:

> A general release does not extend to claims which the
> creditor does not know or suspect to exist in his favor at the
> time of executing the release, which if known by him must
> have materially affected his settlement with the debtor.

For valuable consideration, receipt of which is acknowledged, said lease is being hereby extended for an additional period of five years, expiring January 31, 2009 upon the same terms and conditions otherwise in effect except that as provided as follows:

New Rent Schedule –The amount of Base Monthly Rent is subject to increase (and not decrease) as follows: 1) base rent shall be $2,993.55 per month from ~~January 1~~, Feb 1, (RP) 2004 through ~~July 31~~, 2004 at which time it will be subject to a CPI increase at that time and on each anniversary thereafter (i.e.: every ~~July 31st~~), pursuant to the referenced lease.

Option to renew - No further option to extend the lease shall be included.

All other terms of the lease and assignment agreement referenced above shall remain the same.

LESSEE(S):　　　　　　　　　　　LESSOR(S):　WELLS FARGO BANK, N.A. AS TRUSTEE
　　　　　　　　　　　　　　　　　　　　　　JOHN M. WARD　　　　L. SHELLY EISAMAN
　　　　　　　　　　　　　　　　　　　　　　VICE PRESIDENT　　　　VICE PRESIDENT

DATE: 10-21-2003　　DATE: 10/24/03

NOV-05-99 17:01  FROM:                415-903-0701              TO:510-150377          PAGE:002
NOV-05-1999  13:24      JTTENBERG RAPSON COLVIN                        4155074526          P.02

*CAL CLEANERS*
*POPPIC*

## ASSIGNMENT AND ASSUMPTION OF LEASE AND CONSENT OF LANDLORD

This Assignment of Lease and Consent of Landlord (the "Assignment") is entered into effective _NOV 15TH_, 1999 by and between Nan Y. Park ("Assignee"), Michael Yi, individually, and dba Cal Cleaners ("Assignor") and Wells Fargo Bank, N.A., trustee of the Popple Trust ("Landlord"), and is made with respect to the following facts and circumstances:

A.    Assignor is the tenant under that certain lease dated February 1, 1994, as amended by that certain Amendment and Extension to Lease (collectively, the "Lease") by and between Assignor and Landlord concerning that certain real property commonly known as 2531 Telegraph Avenue, Berkeley, California as more particularly described in the Lease (the "Premises").

B.    Assignor now desires to assign the Lease to Assignee, and Assignee desires to accept the assignment thereof, and Landlord desires to give its consent to said assignment and affirm the status of the Lease to Assignee, all on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the promises, covenants and conditions set forth herein, the parties agree as follows:

1.    **Assignment.** Assignor hereby assigns, conveys and transfers to Assignee all of Assignor's right, title, benefit and interest in, to and under the Lease, and Assignee agrees to and does accept the said assignment of the Lease from Assignor. Commencing on _NOV 15TH_, 1999 (the "Transfer Date"), and for the remaining term of the Lease, Assignee hereby assumes and agrees to keep, perform and fulfill all the terms, covenants, conditions and obligations required to be kept, performed and fulfilled by the tenant under the Lease, including the making of all payments due to, or payable on behalf of, Landlord set forth in the Lease. Notwithstanding the foregoing or any contrary provision hereof, Assignor and Assignee agree to be and remain jointly and severally liable to Landlord for the full and timely payment and performance of all obligations owing Landlord under the Lease.

2.    **Consent of Landlord.** Landlord hereby consents to the assignment of the Lease set forth above to Assignee from Assignor, agrees to accept performance of all tenant obligations, promises and covenants under the Lease from Assignee, and agrees to perform all Landlord covenants, promises and obligations for the benefit of Assignee as tenant under the Lease.

3.    **Indemnification.** Assignee hereby agrees to defend, indemnify and hold Assignor and Landlord (and its beneficiaries, trustors, trustees, successors and/or assigns) harmless from and against any and all liabilities, responsibilities, claims, demands, costs and fees (including reasonable attorneys' and consultants' fees) made against or incurred by Assignor arising from or relating to (i) the nonperformance of any Lease obligation arising on or after the Transfer Date, (ii) the release of any hazardous or toxic materials (as such terms may from time to time be defined by applicable law) on, at

ALANRAPTREXPOPPIG2AFUSE.2

NOV-05-99 17:01  FROM:                415-983-0701            TO:5100450377              PAGE:003
NOV-05-1999  13:25     ( JTTENBERG RAPSON COLVIN                  (      4155074526      P.03

or from the Premises on or after the Transfer Date, and/or (iii) Assignee's occupancy or use of the Premises.  Assignor hereby agrees to defend, indemnify and hold Assignee and Landlord (and its beneficiaries, trustors, trustees, successors and/or assigns) harmless from and against any and all liabilities, responsibilities, claims, demands, costs and fees (including reasonable attorneys' and consultants' fees) made against or incurred by Assignee arising from or relating to (i) the nonperformance of any Lease obligation arising before the Transfer Date, (ii) the release of any hazardous or toxic materials (as such terms may from time to time be defined by applicable law) on, at or from the Premises before the Transfer Date, and/or (iii) Assignor's occupancy or use of the Premises.  Furthermore, both Assignor and Assignee agree to defend (with legal counsel selected by Landlord), indemnify and hold harmless Landlord, its beneficiaries, trustors, trustees, successors and/or assigns, from and against any and all liabilities, responsibilities, claims, demands, costs and fees (including reasonable attorneys' and consultants' fees) made against or incurred by Landlord arising from or relating to the assignment and assumption of the Lease as described herein.

4.     Certain Lease Provisions.  Assignor and Assignee acknowledge and agree that (a) the monthly Base Rent payable under the Lease is $2,540.65 per month as of October 1, 1999, (b) said monthly base Rent is subject to increase each year during the remaining term of the Lease (commencing on November 1, 1999), pursuant to Section 3.2(a) of the Lease, (c) the term of the Lease expires on January 31, 2004 (subject to Tenant's right to extend the Lease pursuant to Exhibit C of the Lease, which extension period is hereby amended from five (5) years to six (6) years (including without limitation adjusting the Base Rent thereunder to Fair Market Rent pursuant to Section 3.2 (b), (d) of the Lease, effective January 1, 2004; provided, however, that in no event shall Fair Market Rent be less than the Base Rent payable in the calendar month immediately preceding the imposition of Fair Market Rent), (e) no default by Landlord (or matter with the giving of notice or passage of time or both would constitute a default by Landlord) exists under the Lease, and (f) all representations, warranties, promises and covenants owing to Landlord under the Lease are hereby ratified, reaffirmed and remade.

5.     Attorneys' Fees.  In any action or dispute between the parties arising out of or in any way connected with this Assignment and Assumption of Lease and Consent of Landlord, the prevailing party in such action or dispute (whether by way of judgment, arbitration award, mediation, settlement, dismissal of claims, or otherwise,

ALANWFTRUVOFFICLLEASE5.2

and whether or not suit is commenced), shall be entitled to collect from the other party the prevailing party's costs and expenses incurred in connection with such dispute, including, without limitation, all litigation costs and attorneys' fees.

     WHEREFORE, the parties have executed and delivered this Assignment as of the day and year first above written.

"ASSIGNEE"

Nan Y. Park

                                                     "ASSIGNOR"

Michael Yi, individually and dba Cal Cleaners

"LANDLORD"

WELLS FARGO BANK, N.A., Trustee of the Poppic Trust

By: _____

Its: _____
            JOHN M. WARD
         ASSISTANT VICE PRESIDENT

By: _____
        HEATHER FAIRFULL
        VICE PRESIDENT
Its: _____

Henry Poppic

3

ALARM/FTRP/POPPIC/LEASEASS.2
11/05/99 (1)
      TOTAL P.04

APR  9 1999

## AMENDMENT AND EXTENSION TO LEASE

Reference is made to that certain lease dated February 1, 1994 by and between Wells Fargo, N.A., Trustee for the Clara Poppic Trust, and Michael Yi, as Lessee, which expires January 31, 1999. Said lease covers all that certain real property commonly known as 2531 Telegraph Ave., Berkeley CA.

For valuable consideration, receipt of which is acknowledged, said lease is being hereby extended for an additional period of five (5) years, expiring January 31, 2004 upon the same terms and conditions otherwise in effect except as provided as follows:

- Lessee agrees to a new "Base Rent" of $2,540.63 per month
- The new "Market Adjustment Date" shall be January 2004

All other terms of the lease dated February 1, 1994 shall remain the same, including the CPI clause (section 3.2 (a)) and the CPI adjustment date of November.

LESSEE (S):                                    LESSOR (S):       JOHN M. WARD
                                                                 ASSISTANT VICE PRESIDENT

MIKE Yi                                        by: _____  CO-

_____                               WELLS FARGO BANK N.A. AS TRUSTEE

                                              by: _____

                                              _____

DATE: 4/6/99          DATE: 4/9/99

Note: See approval letter from Mr. Henry Poppic (dated March, 15, 1999) regarding Co-trustee

MAR 2 6 1999

420 Montgomery Street, 3rd Floor
P.O. Box 63939
San Francisco, CA 94163
415 983-0701 Fax

Private Client Services
Specialty Assets - Real Estate

# WELLS
# FARGO

March 15, 1999

Mr. Henry Poppic
P. O. Box 187
San Juan Bautista, CA  95045-0187

Re:    2531 Telegraph Ave., Berkeley CA
       Property #1930
       Poppic Trust #712051

Dear Mr. Poppic:

I received your telephone call today confirming that you are in agreement over the
amount that should be established for the reserves for the referenced property.  I
understand that you have just returned from the hospital and wish not to be disturbed so I
will not telephone you.  Meanwhile, I will keep you informed through written
correspondence.

Cal Cleaners, the tenant at 2531 Telegraph Ave., has requested a rent reduction.  I called
a local real estate agent who stated that the rent Cal Cleaners is paying is at fair market
level.  Therefore, I propose we agree to a five year lease renewal and keep the rent at the
current level for the next year (rather than a rent reduction) with CPI increases each year
after the first year.

Please acknowledge your agreement to this five year lease renewal under the terms
described by signing below and returning one copy of the signed letter to me.  Thank you
for your assistance. I hope that you are feeling better in the near future.

Sincerely,

John M. Ward
Assistant Vice President
415/396-3019

Approved:  _____
           Henry Poppic – Co-Trustee

EXHIBIT "J"

## Amendment to Assignment and Assumption of
## Lease and Consent of Landlord

This Amendment to Assignment of Lease and Consent of Landlord (the "Assignment") dated April 8, 2004 by and between Guang Huang, Ying Zhang, and Sui Song (jointly and severally, "Assignee"), and Wells Fargo Bank, N.A. and Henry Poppic, each as co-trustee of the Poppic Trust ("Landlord"), is amended as follows:

Guang Huang is hereby removed as "Assignee" from the lease agreement. Ying Zhang and Sui Song, in addition to continuing their responsibility as Assignee, also agree to deposit an additional $5,987.10 (two months rent) with Landlord. This Security Deposit shall be retained and held by Landlord as security for the account of Assignee from and after the Amendment Date, and Guang Huang shall have no further right, title, interest or claim therein or thereto.

"ASSIGNEE"

_____
Guang Huang

_____
Ying Zhang

_____
Sui Song

"LANDLORD"

WELLS FARGO BANK, N.A., as Co-trustee of the Poppic Trust

JOHN M. WARD
VICE PRESIDENT

By : _____

Its : _____

By : _____

Its : _____
HEATHER FAIRFULL
VICE PRESIDENT

_____
Henry Poppic, as Co-trustee of the Poppic Trust

## ASSIGNMENT AND ASSUMPTION OF LEASE AND CONSENT OF LANDLORD

This Assignment of Lease and Consent of Landlord (the "Assignment") is entered into effective _____April 9_____, 2004 by and between Nan Y. Park ("Assignor"), and Guan Huang, Ying Zhang, and Sui Song (jointly and severally, "Assignee") and Wells Fargo Bank, N.A. and Henry Poppic, each as co-trustee of the Poppic Trust ("Landlord"), and is made with respect to the following facts and circumstances:

**A.**     Assignor is the tenant under that certain lease dated February 1, 1994, as amended by those two (2) certain Amendments and Extensions to Lease dated October 24, 2003 and April 9, 1999, respectively (collectively, the "Lease") by and between Assignor and Landlord concerning that certain real property commonly known as 2531 Telegraph Avenue, Berkeley, California as more particularly described in the Lease (the "Premises").

**B.**     Assignor now desires to assign the Lease to Assignee, and Assignee desires to accept the assignment thereof, and Landlord desires to give its consent to said assignment and affirm the status of the Lease to Assignee, all on the terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the promises, covenants and conditions set forth herein, the parties agree as follows:

**1.     Assignment.** Assignor hereby assigns, conveys and transfers to Assignee all of Assignor's right, title, benefit and interest in, to and under the Lease, and Assignee agrees to and does accept the said assignment of the Lease from Assignor.  Commencing on _____April 9_____, 2004 (the "Transfer Date"), and for the remaining term of the Lease, Assignee hereby assumes and agrees to keep, perform and fulfill all the terms, covenants, conditions and obligations required to be kept, performed and fulfilled by the tenant under the Lease, including the making of all payments due to, or payable on behalf of, Landlord set forth in the Lease.  Notwithstanding the foregoing or any contrary provision hereof, Assignor and Assignee agree to be and remain jointly and severally liable to Landlord for the full and timely payment and performance of all obligations owing Landlord under the Lease.

**2.     Consent of Landlord.** Landlord hereby consents to the assignment of the Lease set forth above to Assignee from Assignor, agrees to accept performance of all tenant obligations, promises and covenants under the Lease from Assignee, and agrees to perform all Landlord covenants, promises and obligations for the benefit of Assignee as tenant under the Lease.

**3.     Indemnification.** Assignee hereby agrees to defend, indemnify and hold Assignor and Landlord (and its beneficiaries, trustors, trustees, successors and/or assigns) harmless from and against any and all liabilities, responsibilities, claims, demands, costs and fees (including reasonable attorneys' and consultants' fees) made against or incurred by Assignor arising from or relating to (i) the nonperformance of any Lease obligation arising on or after the Transfer Date, (ii) the release of any hazardous or toxic materials (as such terms may from time to time be defined by applicable law) on, at or from the Premises on or after the Transfer Date, and/or (iii) Assignee's occupancy or use of the Premises.  Assignor hereby agrees to defend, indemnify and hold Assignee and Landlord (and its beneficiaries, trustors, trustees, successors

1

and/or assigns) harmless from and against any and all liabilities, responsibilities, claims, demands, costs and fees (including reasonable attorneys' and consultants' fees) made against or incurred by Assignee arising from or relating to (i) the nonperformance of any Lease obligation arising before the Transfer Date, (ii) the release of any hazardous or toxic materials (as such terms may from time to time be defined by applicable law) on, at or from the Premises before the Transfer Date, and/or (iii) Assignor's occupancy or use of the Premises. Furthermore, both Assignor and Assignee agree to defend (with legal counsel selected by Landlord), indemnify and hold harmless Landlord, its beneficiaries, trustors, trustees, successors and/or assigns, from and against any and all liabilities, responsibilities, claims, demands, costs and fees (including reasonable attorneys' and consultants' fees) made against or incurred by Landlord arising from or relating to the assignment and assumption of the Lease as described herein.

     **4.    Certain Lease Provisions.**  Assignor and Assignee acknowledge and agree that (a) the monthly Base Rent payable under the Lease is $2,993.55 per month as of April 1, 2004, (b) said monthly Base Rent is subject to increase each year during the remaining term of the Lease (commencing on November 1, 2004), pursuant to Section 3.2(a) of the Lease, (c) the term of the Lease expires ("Expiration Date") on January 31, 2009 (and Tenant has no other or further right to extend the Lease, whether pursuant to Exhibit C of the Lease or otherwise, except as provided in Section 6 below, (d) the current Security Deposit under the Lease in the sum of $2,300.00 (currently on deposit with Landlord for the account of Assignor) is hereby transferred and conveyed by Assignor to Assignee effective on the Transfer Date, and said Security Deposit shall be retained by Landlord and held by Landlord as security for the account of Assignee from and after the Transfer Date, and Assignor shall have no further right, title, interest or claim therein or thereto (and in addition, Assignee shall deposit the additional sum of $693.55 with Landlord on or before the Transfer Date as an additional security deposit under the Lease), (e) Assignee shall have deposited with Landlord on or before the Transfer Date the sum of $800.00 as the Landlord's standard processing fee payable to Landlord under Lease section 12.5 in connection with this assignment of Lease, and the sum of $700.00 to pay all of Landlord's legal fees and costs in connection with this assignment of Lease, (f) no default by Landlord (or matter with the giving of notice or passage of time or both would constitute a default by Landlord) exists under the Lease, and (g) all representations, warranties, promises and covenants owing to Landlord under the Lease are hereby ratified, reaffirmed and remade.

     **5.    Attorneys' Fees.**   In any action or dispute between the parties arising out of or in any way connected with this Assignment and Assumption of Lease and Consent of Landlord, the prevailing party in such action or dispute (whether by way of judgment, arbitration award, mediation, settlement, dismissal of claims, or otherwise, and whether or not suit is commenced), shall be entitled to collect from the other party the prevailing party's costs and expenses incurred in connection with such dispute, including, without limitation, all litigation costs and attorneys' fees.

     **6.    Assignee's Extension Option.**   Provided that Assignee is not then in default under the Lease, Assignee shall have the right to extend the term of the Lease by one (1) five (5) year period ("Extended Term"), by delivering written notice of exercise of extension option to Landlord not later than six (6) months nor more than twelve (12) months prior to the Expiration Date. Assignee's possession and use of the Premises during the Extended Term shall be pursuant to all of the terms and conditions of the Lease and this Addendum, except that the

<center>2</center>

initial monthly Base Rent during the Extended Term shall be equal to the "Fair Market Rent" (as hereafter defined), which initial monthly Base Rent shall be increased annually throughout the Extended Term by the Rent Adjustment pursuant to Section 7 below, and except that the Premises shall be accepted by Lessee AS IS, WHERE IS and WITH ALL FAULTS (with absolutely no representations or warranties of Landlord express or implied). "Fair Market Rent" shall mean the fair market monthly base rent for a lease of the Premises in its physical condition as of the date of commencement of the Extended Term (assuming that Assignee has complied with each and all of its maintenance, repair and replacement obligations under the Lease), but without regard to any additional tenant improvement(s), broker commissions, lease concessions, incentives or allowances relating thereto, and with regard to any and all of the lawful purposes for which the Demised Premises may be used; provided, however, that in no event may the Fair Market Rent be less than 103% of the monthly Base Rent payable in the month immediately preceding the Extended Term. If the Extended Term commences before the Fair Market Rent is finally determined as provided in this Section, then the Extended Term shall nonetheless commence and Assignee shall fully and timely perform all obligations under the Lease and this Addendum and pay to Landlord Base Rent during the Extended Term at 103% of the monthly Base Rent payable under the Lease in the month immediately preceding the Extended Term (until the Fair Market Rent is finally determined as provided hereunder, in which case such determination shall be retroactive to the commencement of the Extended Term and Assignee shall immediately thereupon pay Landlord any unpaid monthly Base Rent during the Extended Term accruing at a rate equal to the Fair Market Rent. This extension option is personal to the Assignee only and may not be assigned by Assignee to any person or entity, and it may not be exercised by Assignor or any future assignee(s) or subtenant(s) of Assignee. "Fair Market Rent" shall be determined as follows: on or before four (4) months before the Expiration Date (or as soon thereafter as reasonably practicable), Landlord shall advise Assignee in writing of Landlord's estimate of Fair Market Rent ("Landlord's Proposed Rent"). Within ten (10) business days after Assignee's receipt of Landlord's Proposed Rent, Assignee shall notify Landlord in writing whether or not Assignee accepts Landlord's Proposed Rent. If Assignee so accepts Landlord's Proposed Rent, then Landlord's Proposed Rent shall become the initial monthly Base Rent for the Extended Term. If Assignee does not so accept Landlord's Proposed Rent, Assignee shall (within said ten (10) business day period) notify Landlord of Assignee's estimate of the Fair Market Rent for the Premises ("Assignee's Proposed Rent"). Within ten (10) business days after receipt of Assignee's Proposed Rent, Landlord shall notify Assignee in writing whether or not Landlord accepts Assignee's Proposed Rent (and if Landlord does so accept, then Assignee's Proposed Rent shall become the initial monthly Base Rent for the Premises for the Extended Term). If Landlord does not so accept Assignee's Proposed Rent, then the parties shall proceed to arbitrate Base Rent as follows:

The parties shall appoint a single appraiser, who shall be an MAI appraiser with not less than ten years' experience in appraising commercial property similar to the Premises in the San Francisco area, and who shall conduct a binding arbitration as hereafter provided. If the parties cannot agree upon an arbitrator within ten days after Landlord's rejection of Assignee's Proposed Rent, then either party may apply to the San Francisco Regional Office of the American Arbitration Association to appoint an arbitrator who meets the above experience qualifications, and the individual arbitrator so appointed by the AAA shall be the arbitrator for this purpose. Each party shall initially pay fifty percent (50%) of the arbitrator's fees and costs (subject to reimbursement as provided in

<div align="center">3</div>

the last sentence of this section). Each party shall present to the arbitrator such information as the party deems relevant and the arbitrator shall be empowered to and shall only select either the Landlord's Proposed Rent or the Assignee's Proposed Rent (but no other amount) as being closest to the Fair Market Rent of the Premises (as defined above), and closest amount so selected by the arbitrator shall conclusively be the initial monthly Base Rent for said Extended Term (subject to annual increase by the Rent Adjustment, as provided in Section 4 above). The party whose estimate of Fair Market Rent is not selected by the arbitrator as closest to the Fair Market Rent shall reimburse the other party for all fees and costs paid to the arbitrator. In addition to Fair Market Rent (as determined above), Assignee shall continue to pay and/or reimburse Landlord throughout the Extended Term for any and all costs or expenses of Landlord of a type or nature which are payable or reimbursable by Assignee under the Lease prior to the Extended Term.

   7.    **CPI Rent Adjustment during Extended Term.** In the event that Assignee exercises its extension option pursuant to Section 6 above, on the date which is one (1) year after first day of the Extended Term, and on each one-year anniversary date thereafter prior to the expiration of the Extended Term, if any, each such date being herein referred to as an "**Adjustment Date**"), Base Rent shall be increased ("**Rent Adjustment**") by the greater of (i) the CPI Increase (as otherwise provided in Lease section 3.2) or (ii) three percent (3%) above the immediately preceding year's Base Rent.

   **WHEREFORE**, the parties have executed and delivered this Assignment as of the day and year first above written.

4

**"ASSIGNOR"**

_[signature: Nan Y Park]_

Nan Y. Park

**"LANDLORD"**

WELLS FARGO BANK, N.A., as Co-
trustee of the Poppic Trust

By: _[signature]_

             JOHN M. WARD
             VICE PRESIDENT

Its: _____

By: _[signature]_

           L. SHELLY EISAMAN
           VICE PRESIDENT

Its: _____

_[signature: Henry Poppic]_

Henry Poppic, as Co-trustee of the Poppic
Trust

**"ASSIGNEE"**

_[signature]_

Guan Huang

_[signature: zhang ying]_

Ying Zhang

_[signature]_

Sui Song

5

EXHIBIT "K"

## LEASE TERMINATION, FORBEARANCE AND SETTLEMENT AGREEMENT

THIS LEASE TERMINATION, FORBEARANCE AND SETTLEMENT AGREEMENT ("Agreement") is made as of February 5, 2008, by and between WELLS FARGO BANK, N.A., as Trustee of the Poppic Trust ("Landlord"), and Sui Song ("Tenant").

### RECITALS

A.    Landlord is the landlord under that certain lease entitled "Commercial Lease -- Net" and dated February 1, 1994, as thereafter amended, including without limitation by that certain Assignment and Assumption of Lease and Consent of Landlord dated effective April 8, 2004, and Amendments thereto (collectively, "Lease"), for the real property commonly known as 2531 Telegraph Avenue, Berkeley, California ("Premises");

B.    Tenant is the current tenant under the Lease and is currently occupying the Premises pursuant to the Lease, but Landlord contends that Tenant is in default under the Lease in that Tenant has failed to pay rent thereunder (due to environmental expenses allegedly incurred by Landlord concerning the Premises and not reimbursed by Tenant after demand by Landlord) ("Default"), as such alleged Default is more particularly described on the Three Day Notice to Pay Rent or Quit previously served on Tenant by Landlord on December 21, 2007 ("3 Day Notice");

C.    Tenant disputes that she owes the amounts claimed as owing under the 3 Day Notice and all other allegations of the 3 Day Notice, but Tenant has requested that Landlord forbear from exercising rights and remedies under the Lease (if any) by reason of the alleged Default, and rather have the parties enter this Agreement to terminate the Lease and return possession of the Premises to Landlord, all on the terms and conditions hereinafter set forth;

D.    Landlord is willing to forbear from exercising rights and remedies under the Lease by reason of the alleged Default (if any), and to enter this Agreement to terminate the Lease and return possession of the Premises to Landlord, but only on the terms and conditions hereafter set forth in this Agreement.

NOW, THEREFORE, Landlord and Tenant hereby agree as follows:

1.    Acknowledgement of Alleged Default; Forbearance.  Landlord contends that Tenant has defaulted under the Lease by reason of the alleged Default, that Landlord properly prepared the 3 Day Notice and properly served it on Tenant (and that Tenant actually received the 3 Day Notice) on December 21, 2007, that Landlord has previously terminated the Lease and Tenant's right to further possession of the Property (due to Tenant's alleged failure to pay the rent therein demanded within the three day period described therein), and that Tenant owes Landlord the rent as described in the 3 Day Notice.  Tenant denies Landlord's contentions regarding the alleged Default, the 3 Day Notice, and related to the alleged environmental issues

at the Premises. However, so long as Tenant fully and timely performs its obligations under section 2 below, Landlord agrees to forbear from exercising rights and remedies under the Lease (if any) and to agree to Lease termination on the terms and conditions herein set forth.

2.    Tenant's Obligations. Tenant agrees as follows:

a.    Tenant shall fully and timely perform its obligations and agreements under this Agreement;

b.    Tenant shall vacate the Premises and deliver possession of same to Landlord, free and clear of any and all rights of possession (including all Premises keys to Landlord) on or before February 8, 2008, in broom clean, operable and reasonable physical condition with all of Tenant's personal property and furnishings, fixtures and equipment therefrom, including without limitation removal, transportation and disposal of any and all hazardous substances and materials (and all equipment, conduit, racks and containers) used in connection with Tenant's business removed from the Premises (collectively, "FFE") and any structural or utility damage to the Premises (if any) be repaired to Landlord's reasonable satisfaction, all at Tenant's sole cost and liability (if any); provided, however, that nothing contained herein shall obligate Tenant to investigate, remediate or remove any hazardous substances or materials from the soil or groundwater beneath the Premises.

c.    Tenant represents and warrants to Landlord that Ying Zhang, a former named tenant under the Lease, previously conveyed all of her interest in the Lease to Tenant, and that neither Ms. Zhang nor any other person has any right, title, or interest in or to the Lease or to the Premises by reason of the Lease.

3.    If Tenant fully and timely performs its obligations under Section 2 above, Landlord shall do the following:

a.    Landlord shall perform a walk-through of the Premises with Tenant (and one or more designated representative(s) of Landlord) on or about 3:30 p.m. on February 8, 2008 to confirm that Tenant has delivered possession of the Premises to Landlord in the condition required under Section 2(b) above, and if Landlord is not reasonably satisfied with such condition, Landlord shall advise Tenant what is not satisfactory and will provide Tenant two (2) additional calendar days to cure any deficiencies so noted by Landlord (Landlord and its environmental consultant having previously met with Tenant at the Premises at 10:00 a.m. on February 4, 2008 to advise Tenant regarding any particular Landlord requirements regarding such vacating and removal of FFE);

b.    Landlord shall pay to Tenant immediately after a satisfactory walk-through of the Premises under section 3(a) above the sum of $5,000.00 of the total Security Deposit of $9,130.65 held by Landlord under the Lease. Landlord shall retain the balance of said Security Deposit and apply same to alleged amounts owing by Tenant under the Lease as described in the Three Day Notice. Tenant consents to such application of the Security Deposit by Landlord, and Landlord and Tenant agree that no other or further notice of disposition of said Security Deposit is required, whether under Civil Code section 1950.7 or otherwise;

c.    Landlord and Tenant agree that the Lease is terminated effective January 31, 2008, and that Tenant shall owe no other or further rent or fair rental value of the Premises from and after January 31, 2008; provided, however, that Landlord and Tenant acknowledge and agree that this Agreement and termination of the Lease hereunder shall in no way release or impair or otherwise effect Landlord's or Tenant's liability under the Lease and/or applicable law, if any, for hazardous substances or materials at, on, under, about or migrating from the Premises as of January 31, 2008 (and/or Tenants or Landlord costs and expenses incurred in connection with same, whether now or hereafter incurred), and, except as expressly set forth in this Agreement, any provision of the Lease which sets forth that it survives the termination of the Lease (specifically including provision 22.5 of the Lease) will remain in full force and effect and is unaffected by the Lease termination or this Agreement.

4.    <u>Tenant Limited Release of Claims</u>.    As material consideration to Landlord entering this Agreement, Tenant agrees to release Landlord from any all claims, actions, causes of action, liabilities, obligations and damages, known or unknown and related to or in connection with Landlord's actions in terminating the Lease and/or entering this Agreement; provided, however, that nothing contained in this Agreement is intended or shall be deemed or construed to release Landlord from any liability Landlord may have (if any) under the Lease or applicable law to Tenant (or any defenses that Tenant may have against Landlord) concerning environmental liability under the Lease or for hazardous substances or materials at, on, under, about or migrating from the Premises, if any.

5.    <u>Attorneys' Fees</u>.    If any legal action or any other proceeding, including without limitation arbitration or an action for declaratory relief, is brought for the enforcement of this Agreement or because of an alleged dispute, breach, default or misrepresentation in connection with this Agreement, the prevailing party shall be entitled to recover from the other party its reasonable attorneys fees and costs of suit, in addition to any other relief to which the party may be entitled.

6.    <u>Integration</u>.    This Agreement contains the entire agreement between the parties, and expressly supersedes all previous or contemporaneous agreements, understandings, representations or statements between the parties respecting the termination of the Lease and the other matters set

WFIRE\POPPIC\CalCleaners\UDAFORBEAR2a
02/06/08

3

forth herein.

      7.    <u>Amendment</u>.  This Agreement may not be amended or altered except by a written instrument executed by both the Landlord and Tenant.

      8.    <u>Time of the Essence</u>.  Time is of the essence for this Agreement.

      9.    <u>Partial Invalidity</u>.  Any provision of this Agreement that is unenforceable or invalid or the inclusion of which would adversely affect the validity, legality or enforceability of the Agreement shall be of no effect, but all the remaining provisions of this Agreement shall remain in full force and effect.

      10.    <u>Governing Law</u>.  The validity, meaning and effect of this Agreement shall be determined in accordance with California laws.

      11.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument.

      12.    <u>No Admission of Liability</u>.  Except as may be provided by law, nothing in this Agreement shall be construed to create any rights in, or grant any cause of action to, any person not a party to this Agreement.  By entering into this Agreement, the Landlord and Tenant agree that it is a compromise of disputed claims and shall not constitute nor be asserted to constitute an admission of liability by any person.  Except as expressly provided herein, the Landlord and Tenant expressly reserve and do not waive any rights and defenses as against each other or non-parties to this agreement.  Nothing in this Agreement shall affect or provide a defense to the respective undertakings required under this Agreement.

      13.    <u>Legal Counsel</u>.  Landlord and Tenant acknowledge and agreed that they have both had the opportunity to and have obtained independent legal counsel prior to executing this Agreement.

Dated: As of February 7, 2008

Tenant:

_____
Sui Song

Landlord:  WELLS FARGO BANK, N.A., Trustee of the Poppic Trust

By_____

Its_____

By_____

Its_____

WPTRP\POPPIC\VNJCtrustee\UDAPOEEBFAB2s
02/04/08

4

# EXHIBIT B

to Declaration of Jenna Motola, Esq.
In Support of Motion for Leave to Amend

GREBEN & ASSOCIATES

ATTORNEYS AT LAW

JAN ADAM GREBEN
jan@grebenlaw.com

JENNA L. MOTOLA
jenna@grebenlaw.com

ARLINGTON COURT
1332 ANACAPA STREET, SUITE 110
SANTA BARBARA, CALIFORNIA 93101
TELEPHONE  805-963-9090
FACSIMILE  805-963-9098

SACRAMENTO
WELLS FARGO CENTER
400 CAPITOL MALL, SUITE 1100
SACRAMENTO, CALIFORNIA 95814
TELEPHONE  916.447.4450
FACSIMILE  916.447.2414

May 8, 2008

**VIA REGISTERED MAIL**
Return receipt requested

**Kenneth G. Renz**
**Jackson R. Dennison**
783 Crossbrook Drive
Moraga, CA 94556-1238

2326 Rose St
Berkely, CA 94708

**Won Jae Yi aka Michael Yi**
14 Shannon Circle
Alameda, CA 94502-7729

2565 Telegraph Ave
Berkely, CA 94704-2917

**Guan Huang**
1515 Lakeside Dr. Apt. 806
Oakland, CA 94612-4558

**Sui Song**
1650 13th Avenue
Oakland, CA 94606

**Kazuko Umstead**
**Wiley Umstead**
1377 Hull Lane
Martinez, CA 94553-4758

**Nan Young Park**
1350 Sloat Boulevard
San Francisco, CA 94132

1462 Willowbend Way
Beaumont, CA 92223-7196

**Ying Zhang**
2064 35th Avenue
Oakland, CA 94601

**Re:  Notice of Violation of RCRA, 2531 Telegraph Avenue, Berkeley, California**

Dear Violators,

Prior to commencing suit for an imminent and substantial endangerment to human health

or the environment under the Federal Resource Conservation and Recovery Act ("RCRA") 42 U.S.C. § 6972(a)(1)(B), 42 U.S.C. § 6972(b)(2)(A) requires that a private party provide notice to the alleged violators of RCRA, the Administrator of the Environmental Protection Agency and the State in which the RCRA violation is alleged to have occurred, ninety (90) days prior to filing suit.

On behalf of Wells Fargo Bank, N.A., Trustee of the Clara Poppic Trust ("Trust"), we are providing statutory notification to Kenneth G. Renz, Jackson R. Dennison; Wiley Umstead; Kazuko Umstead; Won Jae Yi aka Michael Yi; Nan Y. Park; Guan Huang; Ying Zhang; and Sui Song (collectively referred to hereafter as "Violators"), the chief administrator for the solid waste management agency for the State of California, the Administrator of the Environmental Protection Agency, and the Regional Administrator of the Environmental Protection Agency, of Violators' continuing violations of RCRA in conjunction with the Violators' present and/or past ownership and operation of a dry cleaning facility at the property located at 2531 Telegraph Avenue, Berkeley, California ("Site").

## RCRA

RCRA, enacted in 1976, is a Federal law of the United States contained in 42 U.S.C. §§ 6901 et seq. RCRA's goals include protecting the public from harm caused by waste disposal and related contamination.

The violations of RCRA stem from Violators' ownership and operation of the "Cal Cleaners" dry cleaning facility at the Site that has caused contamination of soil and groundwater. This contamination presents an imminent and substantial endangerment to human health and the environment.

## Site Background

The Clara Poppic Trust is the owner of the Site. Since at least 1974, the Site has been leased to Violators and used as a dry cleaning facility. PCE was used on the Site for purposes of dry cleaning operations. Violators discharged and permitted the discharge of PCE to the soil and groundwater by their operation and control of the dry cleaning and disposal systems at the Site.

Investigations at the Site have revealed the presence of volatile organic compounds, including PCE in soil and groundwater. This contamination presents an imminent and substantial endangerment to human health and the environment. Release of PCE from dry cleaning operations at the Site has been identified as a possible mechanism for contamination at the Site. The City of Berkeley, Toxic Management Division has been informed of the contamination found in the soil and groundwater on the Property and is currently supervising the investigation and cleanup of the Site. The Trust has proceeded with an investigation and

analysis of the Site and off-site areas to determine the extent and magnitude of the contamination. The Trust has incurred substantial costs in conducting this investigation, including testing, consultant and oversight costs, as well as attorney's fees.

As owners and operators of the dry cleaning facility at the Site, Violators are past and present generators, past and present transporters, and past and present owners and operators of a treatment, storage and/or disposal facility. Violators have knowingly contributed and are contributing to the past and present handling, storage, treatment, transportation and disposal of solid and hazardous waste which presents an imminent and substantial endangerment to human health and the environment. The endangerment caused by Violators has been ongoing since at least 1974 and is continuing in nature.

The discharge and threatened discharge of contaminants has unreasonably affected water quality in that the discharge or threatened discharge is deleterious to the beneficial uses of state waters, and has impaired water quality to a degree which creates a threat to public health. The conditions threaten to continue unless the discharge or threatened discharge is permanently cleaned up and abated.

In addition to the violations set forth above, this Notice is intended to cover all violations of RCRA evidenced by information which becomes available to the Trust after the date of this Notice, and seeks all penalties and other enforcement provisions related to such violations.

## Conclusion

All communications regarding this matter should be addressed to:

Jan A. Greben, Esq.
Greben & Associates
1332 Anacapa Street, Suite 110
Santa Barbara, CA 93101
Tel. (805) 963-9090
Fax. (806) 963-9098
jan@grebenlaw.com

We believe that this Notice sufficiently states grounds for filing suit. At the close of the 90-day notice period or shortly thereafter, the Trust intends to file a citizen's suit under RCRA against Violators for the violations described herein.

During the 90-day notice period, the Trust is willing to discuss effective remedies for the violations described in this Notice. However, if the Violators wish to pursue such discussions in

*RCRA Notice*
*May 8, 2008*
*Page 4*

the absence of litigation, it is suggested that those discussion be initiated with the next twenty days so that they may be completed before the end of the 90-day notice period. The Trust does not intend to delay the filing of a lawsuit if discussions are continuing when that period ends.

Very Truly Yours,

Jan A. Greben
GREBEN & ASSOCIATES

cc:

Stephen L. Johnson, Administrator
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Mail Code 3213A
Washington, D.C. 20460

Wayne Nastri, Regional Administrator
U.S. Environmental Protection Agency, Region 9
75 Hawthorne Street
San Francisco, CA 94105

Dorothy Rice, Executive Director
State Water Resources Control Board
1001 "I" Street
Sacramento, CA 95814

Mark Leary, Executive Director
California Integrated Waste Management Board
1001 "I" Street
Sacramento, CA 95814

Maureen F. Gorsen, Director
California Department of Toxic Substances Control
1001 "I" Street
Sacramento, CA 95814-2828

# EXHIBIT C
to Declaration of Jenna Motola, Esq.
In Support of Motion for Leave to Amend

**SENDER: COMPLETE THIS SECTION**

- Complete Items 1, 2, and 3. Also complete Item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Kenneth G. Renz
Jackson R. Dennison
783 Crossbrook Drive
Moraga, CA 94556-1238

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent
                    ☐ Addressee

B. Received by ( Printed Name)     C. Date of Delivery
Kenneth G. Renz                    5/5/06

D. Is delivery address different from Item 1?   ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☐ Certified Mail      ☐ Express Mail
   ☑ Registered          ☐ Return Receipt for Merchandise
   ☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)            ☐ Yes

2. Article Number
   (Transfer from service label)     RB 804 487 673 US

PS Form 3811, February 2004       Domestic Return Receipt       102595-02-M-1540

# EXHIBIT D

to Declaration of Jenna Motola, Esq.
In Support of Motion for Leave to Amend

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Kazuko Umstead
Wiley Umstead
1377 Full Lane
Martinez, CA 94553-4758

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X *Kazuko Umstead*  ☐ Agent  ☒ Addressee

B. Received by ( Printed Name)     C. Date of Delivery  5-12-c 8

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☒ No

3. Service Type
   ☐ Certified Mail     ☐ Express Mail
   ☒ Registered     ☐ Return Receipt for Merchandise
   ☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)     ☐ Yes

2. Article Number
   (Transfer from service label)     RB 804 487 656 US

PS Form 3811, February 2004          Domestic Return Receipt          102595-02-M-1540

# EXHIBIT E

to Declaration of Jenna Motola, Esq.
In Support of Motion for Leave to Amend

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X _Young_   ☑ Agent<br>   ☐ Addressee<br>B. Received by ( *Printed Name*)   C. Date of Delivery 5/10/68 |
| 1. Article Addressed to:<br><br>Won Jae Yi, aka Michael Yi<br>2565 Telegraph Ave.<br>Berkeley, CA 94704-2917 | D. Is delivery address different from item 1?  ☐ Yes<br>   If YES, enter delivery address below:  ☐ No |
|  | 3. Service Type<br>☐ Certified Mail   ☐ Express Mail<br>☑ Registered   ☐ Return Receipt for Merchandise<br>☐ Insured Mail   ☐ C.O.D.<br>4. Restricted Delivery? (*Extra Fee*)   ☐ Yes |
| 2. Article Number<br>(*Transfer from service label*)   RB 804 487 639 US | |

PS Form 3811, February 2004          Domestic Return Receipt          102595-02-M-1540

# EXHIBIT F

to Declaration of Jenna Motola, Esq.
In Support of Motion for Leave to Amend

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Sui Song
1650 13th Avenue
Oakland, CA 94606

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____    ☐ Agent
                        ☐ Addressee

B. Received by ( Printed Name )    C. Date of Delivery

                                   5-10-06

D. Is delivery address different from item 1?    ☐ Yes
   If YES, enter delivery address below:          ☐ No

3. Service Type
   ☐ Certified Mail      ☐ Express Mail
   ☒ Registered          ☐ Return Receipt for Merchandise
   ☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)    RB 804 487 660 US

PS Form 3811, February 2004      Domestic Return Receipt      102595-02-M-1540

# EXHIBIT G

to Declaration of Jenna Motola, Esq.
In Support of Motion for Leave to Amend



### Track/Confirm - Intranet Item Inquiry - Domestic

**Item: RB80 4487 611U S**        **Service Calculation Acceptance Date/Time: 05/08/2008 14:01**

**Destination**    **ZIP Code:** 92223        **City:** BEAUMONT        **State:** CA
**Origin**         **ZIP Code:** 93190-9998   **City:** SANTA BARBARA   **State:** CA

**Class:** First Class

**Anticipated Delivery Date:** 05/10/2008

**Weight:** 0 **lb(s)** 1 **oz(s)**            **Postage:** $0.41

**Record Restored on 08/20/2008**

**Delv Rqmt:** Normal Delivery              **PO Box?:** N

| Special Services | Associated Labels | Amount |
|---|---|---|
| RETURN RECEIPT | | $2.15 |
| REGISTERED MAIL | RB80 4487 611U S | $9.50 |

| Event | Date/Time | Location | Scanner ID |
|---|---|---|---|
| DELIVERED | 05/23/2008 09:43 | BEAUMONT, CA 92223 | POS5580223 |
| | Request Delivery Record | | |
| | View Delivery Signature and Address | | |
| NOTICE LEFT | 05/13/2008 15:49 | BEAUMONT, CA 92223 | 030SHFG980 |
| ARRIVAL AT UNIT | 05/13/2008 07:54 | BEAUMONT, CA 92223 | 030SHFH000 |
| ENROUTE/PROCESSED | 05/08/2008 19:45 | GOLETA, CA 93199 | 030SHJB212 |
| ACCEPT OR PICKUP | 05/08/2008 14:01 | SANTA BARBARA, CA 93190 | |

**Enter Request Type and Item Number:**

**Quick Search** ◉     **Extensive Search** ○

Explanation of Quick and Extensive Searches

Submit

*Version 1.0*

Inquire on multiple items.

Go to the Product Tracking System Home Page.


**UNITED STATES POSTAL SERVICE**

**Track/Confirm - Intranet Item Inquiry**
**Item Number: RB80 4487 611U S**

### This item was delivered on 05/23/2008 at 09:43

| Signature: | *(handwritten signature)* |
|---|---|
| Address: | *(handwritten address)* |

**Enter Request Type and Item Number:**

Quick Search ⦿        Extensive Search ◯

Explanation of Quick and Extensive Searches

Submit

*Version 1.0*

Inquire on multiple items.

Go to the Product Tracking System Home Page.

# EXHIBIT H

to Declaration of Jenna Motola, Esq.
In Support of Motion for Leave to Amend

GREBEN & ASSOCIATES

ATTORNEYS AT LAW

JAN ADAM GREBEN
jan@grebenlaw.com

JENNA L. MOTOLA
jenna@grebenlaw.com

ARLINGTON COURT
1332 ANACAPA STREET, SUITE 110
SANTA BARBARA, CALIFORNIA 93101
TELEPHONE 805-963-9090
FACSIMILE 805-963-9098

SACRAMENTO
WELLS FARGO CENTER
400 CAPITOL MALL, SUITE 1100
SACRAMENTO, CALIFORNIA 95814
TELEPHONE 916.447.4450
FACSIMILE 916.447.2414

May 21, 2008

**VIA REGISTERED MAIL**
Return Receipt Requested

Guan C. Huang
2683 22nd St.
San Francisco, CA 94110-3408

Re:    **2531 Telegraph Avenue, Berkeley, California**

Dear Guan C. Huang,

Enclosed please find the Notice of Violation of RCRA letter regarding the above address, originally sent to an incorrect address.

Thank you.

Sincerely,

Jenna L. Motola
GREBEN & ASSOCIATES

JLM/cb
Enclosure

GREBEN & ASSOCIATES

ATTORNEYS AT LAW

JAN ADAM GREBEN
jan@grebenlaw.com

JENNA L. MOTOLA
jenna@grebenlaw.com

ARLINGTON COURT
1332 ANACAPA STREET, SUITE 110
SANTA BARBARA, CALIFORNIA 93101
TELEPHONE  805-963-9090
FACSIMILE   805-963-9098

SACRAMENTO
WELLS FARGO CENTER
400 CAPITOL MALL, SUITE 1100
SACRAMENTO, CALIFORNIA 95814
TELEPHONE  916.447.4450
FACSIMILE   916.447.2414

May 8, 2008

<u>VIA REGISTERED MAIL</u>
Return receipt requested

**Kenneth G. Renz**
**Jackson R. Dennison**
783 Crossbrook Drive
Moraga, CA 94556-1238

2326 Rose St
Berkely, CA 94708

**Won Jae Yi aka Michael Yi**
14 Shannon Circle
Alameda, CA 94502-7729

2565 Telegraph Ave
Berkely, CA 94704-2917

**Guan Huang**
1515 Lakeside Dr. Apt. 806
Oakland, CA 94612-4558

**Sui Song**
1650 13th Avenue
Oakland, CA 94606

**Kazuko Umstead**
**Wiley Umstead**
1377 Hull Lane
Martinez, CA 94553-4758

**Nan Young Park**
1350 Sloat Boulevard
San Francisco, CA 94132

1462 Willowbend Way
Beaumont, CA 92223-7196

**Ying Zhang**
2064 35th Avenue
Oakland, CA 94601

<u>Re:  Notice of Violation of RCRA, 2531 Telegraph Avenue, Berkeley, California</u>

Dear Violators,

Prior to commencing suit for an imminent and substantial endangerment to human health

or the environment under the Federal Resource Conservation and Recovery Act ("RCRA") 42 U.S.C. § 6972(a)(1)(B), 42 U.S.C. § 6972(b)(2)(A) requires that a private party provide notice to the alleged violators of RCRA, the Administrator of the Environmental Protection Agency and the State in which the RCRA violation is alleged to have occurred, ninety (90) days prior to filing suit.

On behalf of Wells Fargo Bank, N.A., Trustee of the Clara Poppic Trust ("Trust"), we are providing statutory notification to Kenneth G. Renz, Jackson R. Dennison; Wiley Umstead; Kazuko Umstead; Won Jae Yi aka Michael Yi; Nan Y. Park; Guan Huang; Ying Zhang; and Sui Song (collectively referred to hereafter as "Violators"), the chief administrator for the solid waste management agency for the State of California, the Administrator of the Environmental Protection Agency, and the Regional Administrator of the Environmental Protection Agency, of Violators' continuing violations of RCRA in conjunction with the Violators' present and/or past ownership and operation of a dry cleaning facility at the property located at 2531 Telegraph Avenue, Berkeley, California ("Site").

## RCRA.

RCRA, enacted in 1976, is a Federal law of the United States contained in 42 U.S.C. §§ 6901 et seq. RCRA's goals include protecting the public from harm caused by waste disposal and related contamination.

The violations of RCRA stem from Violators' ownership and operation of the "Cal Cleaners" dry cleaning facility at the Site that has caused contamination of soil and groundwater. This contamination presents an imminent and substantial endangerment to human health and the environment.

## Site Background

The Clara Poppic Trust is the owner of the Site. Since at least 1974, the Site has been leased to Violators and used as a dry cleaning facility. PCE was used on the Site for purposes of dry cleaning operations. Violators discharged and permitted the discharge of PCE to the soil and groundwater by their operation and control of the dry cleaning and disposal systems at the Site.

Investigations at the Site have revealed the presence of volatile organic compounds, including PCE in soil and groundwater. This contamination presents an imminent and substantial endangerment to human health and the environment. Release of PCE from dry cleaning operations at the Site has been identified as a possible mechanism for contamination at the Site. The City of Berkeley, Toxic Management Division has been informed of the contamination found in the soil and groundwater on the Property and is currently supervising the investigation and cleanup of the Site. The Trust has proceeded with an investigation and

analysis of the Site and off-site areas to determine the extent and magnitude of the contamination. The Trust has incurred substantial costs in conducting this investigation, including testing, consultant and oversight costs, as well as attorney's fees.

As owners and operators of the dry cleaning facility at the Site, Violators are past and present generators, past and present transporters, and past and present owners and operators of a treatment, storage and/or disposal facility. Violators have knowingly contributed and are contributing to the past and present handling, storage, treatment, transportation and disposal of solid and hazardous waste which presents an imminent and substantial endangerment to human health and the environment. The endangerment caused by Violators has been ongoing since at least 1974 and is continuing in nature.

The discharge and threatened discharge of contaminants has unreasonably affected water quality in that the discharge or threatened discharge is deleterious to the beneficial uses of state waters, and has impaired water quality to a degree which creates a threat to public health. The conditions threaten to continue unless the discharge or threatened discharge is permanently cleaned up and abated.

In addition to the violations set forth above, this Notice is intended to cover all violations of RCRA evidenced by information which becomes available to the Trust after the date of this Notice, and seeks all penalties and other enforcement provisions related to such violations.

## Conclusion

All communications regarding this matter should be addressed to:

Jan A. Greben, Esq.
Greben & Associates
1332 Anacapa Street, Suite 110
Santa Barbara, CA 93101
Tel. (805) 963-9090
Fax. (806) 963-9098
jan@grebenlaw.com

We believe that this Notice sufficiently states grounds for filing suit. At the close of the 90-day notice period or shortly thereafter, the Trust intends to file a citizen's suit under RCRA against Violators for the violations described herein.

During the 90-day notice period, the Trust is willing to discuss effective remedies for the violations described in this Notice. However, if the Violators wish to pursue such discussions in

*RCRA Notice*
*May 8, 2008*
*Page 4*

the absence of litigation, it is suggested that those discussion be initiated with the next twenty days so that they may be completed before the end of the 90-day notice period. The Trust does not intend to delay the filing of a lawsuit if discussions are continuing when that period ends.

Very Truly Yours,

Jan A. Greben
GREBEN & ASSOCIATES

cc:

Stephen L. Johnson, Administrator
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Mail Code 3213A
Washington, D.C. 20460

Wayne Nastri, Regional Administrator
U.S. Environmental Protection Agency, Region 9
75 Hawthorne Street
San Francisco, CA 94105

Dorothy Rice, Executive Director
State Water Resources Control Board
1001 "I" Street
Sacramento, CA 95814

Mark Leary, Executive Director
California Integrated Waste Management Board
1001 "I" Street
Sacramento, CA 95814

Maureen F. Gorsen, Director
California Department of Toxic Substances Control
1001 "I" Street
Sacramento, CA 95814-2828

# EXHIBIT I

to Declaration of Jenna Motola, Esq.
In Support of Motion for Leave to Amend

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X _____ ☐ Agent ☐ Addressee<br>B. Received by ( *Printed Name*)    C. Date of Delivery |
| 1. Article Addressed to:<br><br>Guan C. Huang<br>2683 22nd Street<br>San Francsco, CA<br>94110-3408 | D. Is delivery address different from item 1? ☐ Yes<br>   If YES, enter delivery address below: ☐ No |
| | 3. Service Type<br>☐ Certified Mail   ☐ Express Mail<br>☒ Registered   ☐ Return Receipt for Merchandise<br>☐ Insured Mail   ☐ C.O.D.<br>4. Restricted Delivery? (*Extra Fee*)    ☐ Yes |
| 2. Article Number<br>*(Transfer from service label)* | RB-804·487·700·US |

PS Form 3811, February 2004     Domestic Return Receipt     102595-02-M-1540

# EXHIBIT J

to Declaration of Jenna Motola, Esq.
In Support of Motion for Leave to Amend

# GREBEN & ASSOCIATES

### ATTORNEYS AT LAW

JAN ADAM GREBEN
jan@grebenlaw.com

JENNA L. MOTOLA
jenna@grebenlaw.com

ARLINGTON COURT
1332 ANACAPA STREET, SUITE 110
SANTA BARBARA, CALIFORNIA 93101
TELEPHONE  805-963-9090
FACSIMILE  805-963-9098

SACRAMENTO
WELLS FARGO CENTER
400 CAPITOL MALL, SUITE 1100
SACRAMENTO, CALIFORNIA 95814
TELEPHONE  916.447.4450
FACSIMILE  916.447.2414

June 20, 2008

**VIA REGISTERED MAIL**
Return Receipt Requested

Ying Zhang
213 Brush Street
Alameda, CA, 94501

Re:    **2531 Telegraph Avenue, Berkeley, California**

Dear Ying Zhang,

Enclosed please find the May 8, 2008 Notice of Violation of RCRA letter regarding the above address. We have subsequently been informed that the above listed location is your current address and provide a copy of the enclosed notice accordingly.

Thank you.

Sincerely,

Jenna L. Motola
GREBEN & ASSOCIATES

JLM/cb
Enclosure

GREBEN & ASSOCIATES

ATTORNEYS AT LAW

JAN ADAM GREBEN
jan@grebenlaw.com

JENNA L. MOTOLA
jenna@grebenlaw.com

ARLINGTON COURT
1332 ANACAPA STREET, SUITE 110
SANTA BARBARA, CALIFORNIA 93101
TELEPHONE  805-963-9090
FACSIMILE  805-963-9098

SACRAMENTO
WELLS FARGO CENTER
400 CAPITOL MALL, SUITE 1100
SACRAMENTO, CALIFORNIA 95814
TELEPHONE  916.447.4450
FACSIMILE  916.447.2414

May 8, 2008

<u>VIA REGISTERED MAIL</u>
Return receipt requested

Kenneth G. Renz
Jackson R. Dennison
783 Crossbrook Drive
Moraga, CA 94556-1238

Kazuko Umstead
Wiley Umstead
1377 Hull Lane
Martinez, CA 94553-4758

2326 Rose St
Berkely, CA 94708

Won Jae Yi aka Michael Yi
14 Shannon Circle
Alameda, CA 94502-7729

Nan Young Park
1350 Sloat Boulevard
San Francisco, CA 94132

2565 Telegraph Ave
Berkely, CA 94704-2917

1462 Willowbend Way
Beaumont, CA 92223-7196

Guan Huang
1515 Lakeside Dr. Apt. 806
Oakland, CA 94612-4558

Ying Zhang
2064 35th Avenue
Oakland, CA 94601

Sui Song
1650 13th Avenue
Oakland, CA 94606

<u>Re:  Notice of Violation of RCRA, 2531 Telegraph Avenue, Berkeley, California</u>

Dear Violators,

Prior to commencing suit for an imminent and substantial endangerment to human health

or the environment under the Federal Resource Conservation and Recovery Act ("RCRA") 42 U.S.C. § 6972(a)(1)(B), 42 U.S.C. § 6972(b)(2)(A) requires that a private party provide notice to the alleged violators of RCRA, the Administrator of the Environmental Protection Agency and the State in which the RCRA violation is alleged to have occurred, ninety (90) days prior to filing suit.

On behalf of Wells Fargo Bank, N.A., Trustee of the Clara Poppic Trust ("Trust"), we are providing statutory notification to Kenneth G. Renz, Jackson R. Dennison; Wiley Umstead; Kazuko Umstead; Won Jae Yi aka Michael Yi; Nan Y. Park; Guan Huang; Ying Zhang; and Sui Song (collectively referred to hereafter as "Violators"), the chief administrator for the solid waste management agency for the State of California, the Administrator of the Environmental Protection Agency, and the Regional Administrator of the Environmental Protection Agency, of Violators' continuing violations of RCRA in conjunction with the Violators' present and/or past ownership and operation of a dry cleaning facility at the property located at 2531 Telegraph Avenue, Berkeley, California ("Site").

## RCRA

RCRA, enacted in 1976, is a Federal law of the United States contained in 42 U.S.C. §§ 6901 et seq. RCRA's goals include protecting the public from harm caused by waste disposal and related contamination.
The violations of RCRA stem from Violators' ownership and operation of the "Cal Cleaners" dry cleaning facility at the Site that has caused contamination of soil and groundwater. This contamination presents an imminent and substantial endangerment to human health and the environment.

## Site Background

The Clara Poppic Trust is the owner of the Site. Since at least 1974, the Site has been leased to Violators and used as a dry cleaning facility. PCE was used on the Site for purposes of dry cleaning operations. Violators discharged and permitted the discharge of PCE to the soil and groundwater by their operation and control of the dry cleaning and disposal systems at the Site.

Investigations at the Site have revealed the presence of volatile organic compounds, including PCE in soil and groundwater. This contamination presents an imminent and substantial endangerment to human health and the environment. Release of PCE from dry cleaning operations at the Site has been identified as a possible mechanism for contamination at the Site. The City of Berkeley, Toxic Management Division has been informed of the contamination found in the soil and groundwater on the Property and is currently supervising the investigation and cleanup of the Site. The Trust has proceeded with an investigation and

analysis of the Site and off-site areas to determine the extent and magnitude of the contamination. The Trust has incurred substantial costs in conducting this investigation, including testing, consultant and oversight costs, as well as attorney's fees.

As owners and operators of the dry cleaning facility at the Site, Violators are past and present generators, past and present transporters, and past and present owners and operators of a treatment, storage and/or disposal facility. Violators have knowingly contributed and are contributing to the past and present handling, storage, treatment, transportation and disposal of solid and hazardous waste which presents an imminent and substantial endangerment to human health and the environment. The endangerment caused by Violators has been ongoing since at least 1974 and is continuing in nature.

The discharge and threatened discharge of contaminants has unreasonably affected water quality in that the discharge or threatened discharge is deleterious to the beneficial uses of state waters, and has impaired water quality to a degree which creates a threat to public health. The conditions threaten to continue unless the discharge or threatened discharge is permanently cleaned up and abated.

In addition to the violations set forth above, this Notice is intended to cover all violations of RCRA evidenced by information which becomes available to the Trust after the date of this Notice, and seeks all penalties and other enforcement provisions related to such violations.

## Conclusion

All communications regarding this matter should be addressed to:

Jan A. Greben, Esq.
Greben & Associates
1332 Anacapa Street, Suite 110
Santa Barbara, CA 93101
Tel. (805) 963-9090
Fax. (806) 963-9098
jan@grebenlaw.com

We believe that this Notice sufficiently states grounds for filing suit. At the close of the 90-day notice period or shortly thereafter, the Trust intends to file a citizen's suit under RCRA against Violators for the violations described herein.

During the 90-day notice period, the Trust is willing to discuss effective remedies for the violations described in this Notice. However, if the Violators wish to pursue such discussions in

*RCRA Notice*
*May 8, 2008*
*Page 4*

the absence of litigation, it is suggested that those discussion be initiated with the next twenty days so that they may be completed before the end of the 90-day notice period.  The Trust does not intend to delay the filing of a lawsuit if discussions are continuing when that period ends.

Very Truly Yours,

Jan A. Greben
GREBEN & ASSOCIATES

cc:

Stephen L. Johnson, Administrator
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Mail Code 3213A
Washington, D.C. 20460

Wayne Nastri, Regional Administrator
U.S. Environmental Protection Agency, Region 9
75 Hawthorne Street
San Francisco, CA 94105

Dorothy Rice, Executive Director
State Water Resources Control Board
1001 "I" Street
Sacramento, CA 95814

Mark Leary, Executive Director
California Integrated Waste Management Board
1001 "I" Street
Sacramento, CA 95814

Maureen F. Gorsen, Director
California Department of Toxic Substances Control
1001 "I" Street
Sacramento, CA 95814-2828

# EXHIBIT K

to Declaration of Jenna Motola, Esq.
In Support of Motion for Leave to Amend

<div align="center">

GREBEN & ASSOCIATES

ATTORNEYS AT LAW

</div>

JAN ADAM GREBEN
jan@grebenlaw.com

JENNA L. MOTOLA
jenna@grebenlaw.com

ARLINGTON COURT
1332 ANACAPA STREET, SUITE 110
SANTA BARBARA, CALIFORNIA 93101
TELEPHONE  805-963-9090
FACSIMILE   805-963-9098

SACRAMENTO
WELLS FARGO CENTER
400 CAPITOL MALL, SUITE 1100
SACRAMENTO, CALIFORNIA 95814
TELEPHONE  916.447.4450
FACSIMILE   916.447.2414

August 8, 2008

**VIA FACSIMILE & MAIL**

Peter H. Liederman, Esq.
Law Office of Peter H. Liederman
2444 Russell Street
Berkeley, CA 94705

Jonathan E. Meislin, Esq.
Bassi, Martini, Edlin & Blum
351 California Street, Suite 200
San Francisco, CA 4104

Karl Morthole, Esq.
Law Office of Karl Morthole
57 Post Street, Suite 801
San Francisco, CA 94104

Won Jae Yi
2565 Telegraph Avenue
Berkeley, CA 94704

Re:    **Wells Fargo Bank, Trustee of the Clara Poppic Trust v. Renz, et al**
       **Case No. CV 08 02561**

Dear Counsel and/or Defendants,

Pursuant to Judge Armstrong's Standing Order, we advise we intend to file a motion to amend the First Amended Complaint as follows:

1.    to add a RCRA claim, due to the expiration of the requisite 90 day pre filing notice; and

2.    to add claims for breach of contract and contractual indemnity against Defendants Renz, Estate of Dennison, Umstead, and Estate of Umstead.

The addition of the RCRA claim is supported by *Zands v. Nelson*, 779 F. Supp. 1254, 1259 (S.D. Cal. 1991)("for purposes of a notice and delay provision relating to a new claim which appears for the first time in the pleadings in the amended complaint, the Court will look to the filing of the amended complaint to determine when the 'action' is commenced"). *See also Envirowatch, Inc. v. Fukino*, 2007 U.S. Dist. LEXIS 47088, *11-12 (D. Haw. June 27, 2007).

The support for the addition of the breach of contract and contractual indemnity claims is demonstrated in *Universal Paragon Corp. v. Ingersoll-Rand Co.,* 2007 U.S. Dist. LEXIS 14530, 27 (N.D. Cal. Feb. 13, 2007) ("Under the discovery rule, a cause of action accrues when the plaintiff actually discovers its injury and the negligent cause, or could have discovered the injury and cause through a reasonably diligent investigation"); *Smith v. Parks Manor,* 197 Cal. App. 3d 872, 880 (1987)("A cause of

*Letter to Counsel/Defendants*
*August 8, 2008*
*Page  2*

action for indemnity accrues, however, when the indemnitee suffers a loss through payment of a judgment or settlement debt.")  Given that Plaintiff did not discover any contamination at the subject property until September 2006, these claims are unaffected by any statute of limitations and their addition at this time no can be of no prejudice to any party.

Please advise by August 15 if you will stipulate to the foregoing.  If not, pursuant to the Court's rules, please meet and confer and advise the support for your position by August 15.

Thank you.  Please call if you should have any questions.

Sincerely,

Jenna L. Motola
GREBEN & ASSOCIATES

JLM/cb